# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - - - - - - - - -

JOHN L. MCGILL,

Plaintiff,

vs C.A. No.: 05-0481/S

MINNESOTA MUTUAL LIFE INSURANCE CO.,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - ORIGINAL

DEPOSITION OF JOHN L. MCGILL, called as a witness by counsel for the Defendant, pursuant to the provisions of Rhode Island Rules of Civil Procedure, before Victoria S. Reade, Professional Court Reporter and Notary Public, in and for the State of Rhode Island, taken at D'Amico Burchfield, LLP, 536 Atwells Avenue, Providence, Rhode Island, on Wednesday, May 31, 2006, commencing at 11:30 a.m.

have heard and understood the question; do you understand that, sir?
A. Yes.
Q. Mr. McGill, can you please state your name for the record.
A. John L. McGill.
Q. Are you currently employed?
A. No. Well, let me rephrase. I have some matters that I am winding down from my old job.
Q. Okay. What was your old job?
A. I was a partner with McGill Law.
Q. And what is McGill Law?
A. It's McGill Law, LLP. It's a law firm.
Q. Were you a principal of that law firm?
A. I was a partner.
Q. Were you a founding partner of the law firm?
A. I am one of the three founding partners.
Q. Who are the other two partners?
A. Ryan M. McGill, my son, and Cynthia B. McGill, ex-spouse.
Q. When was McGill Law, LLP founded?
A. October 12th of 2002.

I have BS in engineering from the United States Military Academy at West Point. I have a JD from Western New England College School of Law in Springfield, Massachusetts, and I have an LLM from Temple University in Philadelphia, Pennsylvania.
Q. When did you receive your LLM, sir?
A. 1999.
Q. How long did it take you to complete the LLM?
A. Thirteen months.
Q. Were you living in Philadelphia in 1999 when you completed the LLM?
A. No. My residence was in New York, Oswego, New York, but I had lived in Delaware in the '70s and early '80s and had a friend who I stayed with when I would travel to Philadelphia to go to school and spent most of my time at his place in Elkton, Maryland.
Q. The LLM was completed in 1999 and it took you 13 months, did you start in 1998?
A. Yes, April of 1998 to May of 1999.

was that, one, I was too old, and two, my resume had too many jobs with president on them.

I don't think anybody 30-years-old wanted a 50-year-old employee that was a lawyer.

Q. Working backwards, prior to founding McGill, LLP, were you employed and that would include self-employment?

A. The job immediately before that was as personnel director for the City of Oswego, New York.

Q. And during what period of time did you serve in that position?

A. October of 2000 to July of 2002.

Q. And what were you duties as personnel director for the City of Oswego?

A. I administered the civil service program. I administered the grievance procedure for six unions, and I worked on the team of labor negotiators and the bargaining process for six unions.

Q. I am sorry, the bargaining process for?

A. For six unions, collective bargaining

A. Yes.
Q. And who appointed you to the position?
A. The mayor.
Q. The same one you just described?
A. Yes.
Q. And what is his name?
A. John Gosek.
Q. And how did you get to know Mr. Gosek?
A. Through a mutual friend who was the ex-fire chief in the City of Oswego.
Q. Prior to being appointed to the position in the City of New York, were you employed?
A. I had a part-time general law practice in Oswego, New York.
Q. And --
A. And I had one management consulting client.
Q. Was the management consulting client separate and apart from your law practice or do I understand you that was your only client in your practice?
A. It was separate.
Q. What kind of practice did you have in

Oswego?
A. It was general.
Q. And when did you start that practice?
A. Late 1999.
Q. Were you operating as a sole practitioner?
A. Yes.
Q. Did you have any other attorneys working with you?
A. No.
Q. Did you do any litigation?
A. No trials but motions hearings and things like that, represented people for drunk driving, but none of them went to trial.
Q. Criminal type work?
A. Mostly family, domestic relations where I spent a good deal of my time in family court doing custody, child support, divorce.
Q. Did you do any type of administrative work involving the City of Oswego while you had your practice going?
A. No. I served on a committee, but it didn't involve any work.
Q. What kind of committee was that?

A. A committee to better the City of Oswego, or something of that nature.
Q. And your management consult client, what kind of management consulting work were you doing?
A. It was essentially reviewing their financials, helping them develop new products and markets.
Q. And where was the client located?
A. Holland, Missouri.
Q. And did the consulting services that you provided require any travel?
A. I think I went to two meetings down there over a 15-year period and I flew both times.
Q. And what was the period of time from when to when, that 15-year span?
A. I consulted with them from 1984 or -5 until 2002.
Q. And how were you paid for this work?
A. 1099.
Q. Were you paid a flat fee or by the hour?
A. It was a flat monthly fee.
Q. What's the name of the company?

A. Sun Ribbon, Incorporated.

Q. And what kind of company is Sun Ribbon?

A. They were a manufacturer of printer ribbons.

Q. And do I understand you correctly that the only time that you traveled with respect to Sun Ribbon during that 15-year period was two meetings in Holland, Missouri?

A. Two, four maximum. The type of work I did for them was conducted over the phone or via fax. It really didn't require my presence.

Q. And why did you terminate your relationship with Sun Ribbon in 2002?

A. They couldn't afford me.

Q. Are they still in business?

A. At the time 2002 they were basically -- they went from a full-fledged manufacturer of all the components for the printer ribbons to just an assembler, and they were having all their parts and ink and ribbon manufactured in Mexico so they went from a 30 employee company down to like five, and I don't know if they're still in

business. I haven't talked to them since I left.

Q. As far as you know, they're still located in Holland, Missouri?

A. Right.

Q. Prior to taking the position as personnel director in Oswego -- strike that.

Prior to starting your practice in late 1999, were you employed in any capacity?

A. Yes. Prior to enrolling at Temple in April of 1998 I was living in Upstate New York and I spent most of my time either looking for a job or doing the consulting business with Sun Ribbon and two or three other small consulting clients.

Q. And who were the other two or three clients?

A. There was one in Elkton, Maryland that made tube patio furniture and I helped them with plant layout and material flow.

There was one up in Needham, Massachusetts or Dedham, Massachusetts that manufactured mats for clean room

environments and I helped them with plant layout and plant flow.

There was a couple of companies I applied for positions at that ultimately hired me to do spot consulting in specific areas and one was in Pennsylvania and one was, I think in, near Newberg, New York but it was very minor, I mean nothing.

It was essentially trying to get into their good graces so they might hire me, but none of that panned out.

Q. What were the names of these businesses?

A. I think the name of the chair company was Sunset Tubular Chair, it doesn't exist any more.

The business in Dedham was Ibec Corporation and the business in Pennsylvania was on the receivership at the time and I don't recall their name.

Q. When did Sunset Pipe go out of business?

A. 1999.

Q. And was that when your relationship with them terminated?

A. Terminated with them from a business

standpoint, but I was living with one of principals.

Q. That was your friend who you lived with during --

A. Right. It was actually his wife's business. I don't think he had an ownership interest in it.

Q. Do you remember their names?

A. Carlo and Maureen D'Savitino.

Q. And Ibec still in business?

A. I don't know.

Q. And you can't remember the name of the other company that was in receivership?

A. No. It know longer exists, I do know that.

Q. Prior to this period in 1999 when you were looking for a job and doing the consulting work as you've just described, were you employed in any other capacity?

A. No.

Q. For what period of time were you looking for a job and doing consulting?

A. From around April of 1996 to December 1998.

Q. I just want to make sure I am clear. From April of 1996 to December of 1998, was that when you were looking for a job and doing consulting work?

A. Correct.

Q. And in January of 1999, is that when you started your law practice?

A. Yes. I may have started a little bit before that, but I didn't finish the LLM program at Temple until May of 1996, and then I spent the period from May of 1996 through the summer applying for legal positions.

The only one I obtained was the one in the Bronx that I turned down so I could have started my law practice as early as the fall of, the fall of 1998. Is that right? No, that's not right.

I decided after not being able to find a job in my old industrial that I'd try to take the New York bar exam, so I knew that having a 20-year hiatus from law school graduation until then that I probably ought to get a jump start on it.

I obtained some bar brief books and started studying for the bar, the February 1998 bar, about six months before the exam was to be taken.

I spent a good part of the latter part of 1997 and then the first two months of 1998 studying for the New York bar exam that I sat for in February of 1998, but I continued the consulted business with Sun Ribbon throughout that entire period from 1985 to 2002. There was really no point in time when I didn't consult with them.

Q. So you took the New York Bar Exam in February of 1998?

A. Correct.

Q. Did you study on your own or did you take classes?

A. A combination of the two.

Q. How many classes did you take to study for the bar?

A. I took the standard bar brief course and I also took the course for the MPRE.

Q. The MPRE, what is that?

A. Multistate Professional Responsibility Exam.
Q. When were you admitted to the bar of New York?
A. I believe it was July of 1998.
Q. Previous to being admitted to the bar of the State of New York in July of 1998, were you admitted to any other state bar?
A. Yes.
Q. And to what bars were you admitted?
A. Delaware.
Q. And when were you admitted to the --
A. And Rhode Island.
Q. When were you admitted to the Delaware Bar?
A. 1982.
Q. And when were you admitted in Rhode Island?
A. 1991.
Q. Did you serve your preceptorship in Delaware?
A. Yes.
Q. Where did you serve your preceptorship?
A. It was at a real estate firm that I can't

while I was going to Temple so I wasn't totally just a full-time student. There was a little bit of work done, very little income, but most of the work that I did was non-income producing, looking for jobs.

Q. During that period of time were you receiving disability benefits?

A. Yes.

Q. From who were your receiving disability benefits?

A. TransGeneral and Minnesota Mutual.

Q. Prior to April of 1996 which was the period that you described as when you started your job search and doing consulting work and going to school, were you employed in any capacity prior to April of 1996?

A. Yes.

Q. By whom were you employed?

A. The Interflex Group.

Q. When did you start with the Interflex Group?

A. January 1992.

Q. In what capacity?
A. I believe I started as a vice president of Eastern Shore Printing.
Q. What is Eastern Shore Printing in relation to the Interflex Group?
A. It's the name of their Virginia plant prior to all three of their plants merging into the Interflex Group.
Q. And when you were hired in January of 1992, what was the business of Eastern Shore Printing?
A. They were poultry packaging film manufacturers.
Q. And what were your duties as vice president?
A. I had two main jobs first of which was to clean up all the operations of the three plants.
Q. When you say clean up the operations, can you tell me what you mean by that?
A. Well, they were beat up, rundown, old, dirty, inefficient manufacturing plants, so my job was to fix them both from a efficiency and a production standpoint and

also from the standpoint of being proud enough of them to invite our customers to visit our plants.

Prior to my coming there nobody ever visited the plants because they weren't showable.

Q. Where was the plant located?

A. The Virginia Printing or Eastern Shore was in Ashland, Virginia and then there were two other plants.

Q. I'm just trying to get the geography straight, Eastern Shore Printing, is Ashland on the eastern shore of Virginia?

A. The answer is no. Ashland is 15 miles due north of Richmond on I95.

Q. So Eastern Shore Printing didn't have anything of do with where it was located, it was just the name of the company?

A. Correct.

Q. And how did you come to be get the job as vice president of Eastern Shore Printing?

A. Through a headhunter.

Q. And you described for me the clean up of the operation and the efficiency duties

did the subject of key man disability coverage get raised in discussions with Mr. or Mrs. Doyle?

A. Yes.

Q. And when did that occur, sir?

A. I'd have to say it was in the March, April time frame of 1992.

Q. Who brought it up?

A. They did.

Q. And do you know what prompted them to bring it up?

A. I believe it was prompted by the fact that the group term benefit was so small in relation to our salaries, especially Joe's, Joe Doyle's salary, and that if we were going to have true coverage more like in a salary replacement of coverage that we would have to augment the group policy.

Q. You said it was Mr. Doyle who brought it up?

A. Well, I spoke with both the Doyles about it, but I am pretty sure Joe brought it up. Micky's role in human resources was limited back then.

A. Joe Doyle.
Q. And at that point in time what was his position or actually his title with the company?
A. Chairman and CEO.
Q. And what was your position when Mrs. Doyle was given the title of HR manager?
A. Vice president.
Q. So you're still a vice president at that point in time?
A. Correct.
Q. Did any of the Doyle's children work in the business?
A. Their son, Steven Doyle, was a member of the board of directors.
Q. Did he have any employee role in the company?
A. None that I knew of.
Q. And when you were discussing with Mr. Doyle and Mrs. Doyle augmenting the group policy for key man disability insurance, did you have any discussion of who would be covered under such insurance?
A. My original belief was that it was just

going to be Joe Doyle and myself, and I later found out that there were several other higher ranking executives in the company that were also offered the ability to purchase key man insurance, key man long-term disability.

Q. And who were those other executives?

A. When I was at Michael Johnson's deposition I saw a form that listed them, so if I were going to try to recall, it would have to be from that list, and I believe it was Nick Gilomie(phonetic), Bill Wilson, maybe Glen Hunnahan, Dan Phillips, Eric Bumgarner.

Q. When did you learn that other executives at Interflex -- or I guess at that point it's Eastern Shore Printing; is that correct?

A. Correct.

Q. -- would be participating in key man insurance?

A. I don't recall that.

Q. Was it prior to or after the institution of this litigation?

A. It was prior to that. You mean the instant litigation?

Q. Yes, the instant litigation.

A. Prior.

Q. Was it while you were employed at Eastern Shore and then Interflex?

A. That's very sketchy to me, but I believe it was, at some point in time I knew that.

Q. After you had this initial discussion with Mr. and/or Mrs. Doyle concerning augmenting the group policy with key man disability insurance, do you know what steps were taken to implement key man disability insurance?

A. Micky and Joe invited an insurance agent by the name of Mike Johnson to come to the plant primarily to meet me because I guess he had prior dealings with them, and for us to go to lunch and get to know each other, and if I wanted to get the key man, I would do it through Mike and I'd have to go through the application process.

Q. And did you go ahead and have a lunch meeting with Mr. Johnson?

A. I think Mike came by in April and we sat down in my office at Eastern Shore Printing and he had an application from Minnesota Mutual and he asked me questions and he filled it out.

Q. Now, in between the time that you had the first meeting with Mr. Johnson in March of 1992 and the second meeting that you just described which occurred in April of 1992, did you discuss the potential for the purchase of key man disability insurance coverage with anyone else?

A. I don't believe I did.

Q. You didn't discuss it with either Mr. or Mrs. Doyle?

A. I don't believe I did.

Q. Did you discuss it with any of the other executives at Eastern Shore?

A. No.

Q. Did you discuss it with Mr. Wilson?

A. No.

Q. Not with Mr. Hunnahan either?

A. I don't think they were there then.

Q. When did Mr. Wilson come to Eastern Shore?

I got through Mr. Johnson and Minnesota being the insurer was either -- it was sometime in '93, I believe.
Q. Now, can you describe for me what occurred during the April 1992 meeting when Mr. Johnson took your application.
A. The only thing I remember was that the meeting was quite lengthy because it was a about a six or eight page application.
Q. What occurred during the meeting in terms of completing the application?
A. He asked me personal data, prior positions held, I think with salary information and then a whole litany of health and medical questions, medical history questions.
Q. Did you write on the application at all?
A. I don't recall writing on it except to sign it when he was done filling it out.
Q. Before you signed it, did you review it for accuracy?
A. I am pretty sure he gave me a copy of it. He Xeroxed a copy of it before he left.
Q. But before you signed it did you review the application for accuracy?

A. In other words, did I write down what I said and his responses, I think I spot checked it. I didn't read it word for word.

Q. Do you have any reason to believe sitting here today that there was anything on the application that was completed in April of 1992 for key man disability insurance that was inaccurate?

A. Not to my knowledge.

Q. In the March of 1992 meeting --

A. Excuse me, do you have a copy the application?

Q. I'll get to that.

A. I could read it right now and tell you if it's inconsistent on a retroactive basis, retrospective, not prospective.

Q. During the March 1992 meeting did Mr. Johnson give you any documents?

A. I don't recall.

Q. Now, you have already related to me what are and Mr. Johnson discussed during the March of 1992 meeting, and I understand that it was more of a social meeting than

than others.

At some point I believe the marketing literature had in it a printout of a term sheet.

Q. When you say a term sheet, what do you mean?

A. Disability insurance term sheet.

Q. Was that the name of the document or a description of what you recall the document to be?

A. I don't know what it was entitled, but Mike referred to it as a term sheet and it had the salient features of their proposed coverage, so the whole thing was presented to me as a proposal of insurance coverage.

Q. And that occurred when?

A. I think it had to be after I had my physical exam because they sent a nurse to my office to give me one of those office type physicals and I am assuming that may have been in the May time frame and that Mike would have brought the term sheet and the proposal sometime in early to mid June. That's my recollection, I may be

Q. Did you give Mr. Johnson any money with the application?
A. I believe Micky Doyle did, gave him an Interflex check.
Q. And why did Mrs. Doyle give Mr. Johnson an Interflex check?
MS. BASSO: Objection.
A. I assume she gave him a check because in order for them to embark on their underwriting process they needed to get the first month's premium to cover the costs.
Q. Did you have check signing authority at Interflex back in April of 1992?
A. I don't think I ever had check signing authority.
Q. Did Mrs. Doyle have check signing authority?
A. Yes.
Q. So you would not have signed the check that Mrs. Doyle gave to Mr. Johnson?
A. No.
Q. Did you know if Mr. Johnson asked her for a check?

than putting it in the drawer, did you do anything with it?

A. I don't believe I did.

Q. Then at some point did you ever take action as you described it on the proposal?

A. As far as I can recall, I think when he left that day that he was just going do continue the process of getting the policy put together.

Q. Did you have a meeting with Mr. Johnson in your office regarding the proposal or did he just drop it off?

A. I think we had a meeting.

Q. What was discussed?

A. He says here is some literature on Minnesota Mutual and here's the nuts, the guts of the insurance proposal.

Q. And what did you understand the proposal to be?

A. It was my name and age, benefits to age 65, a 90-day elimination period and a premium of $100 something bucks.

Q. Per year?

A. No, per month.
Q. Did you read through the entire proposal?
A. That was essentially the proposal, the term sheet, all the rest of it was marketing hype.
Q. So did you read everything that Mr. Johnson give you that you've described in the proposal?
A. Yes, I read the entire brochure, it was about three or four pages and it gave examples of if you make salary after you become disabled all these insurance companies start to reduce your benefit at this point, but Minnesota Mutual doesn't reduce your benefit until you get here so Minnesota Mutual is better.
Everything was a comparison and they talked about the strength of the company and why it was such a good thing to choose them because they were going to be around for a long time, et cetera.
Q. Were you considering any other insurers for key man disability insurance --
A. No.

Q. Did you have any further conversation with Mr. Johnson regarding what was in the proposal prior to the disability insurance policy being issued?
A. I remember a phone conversation with Mr. Johnson where he said words to the effect, everything is okay and the only thing is they had to raise the premium a little bit and that's about it.
Q. Were you continuing to see Mr. Johnson socially during this period of time?
A. I think we were. At some point in time my wife worked for his wife, so we were a pretty friendly couple.
Q. And I am sorry, but was that Cynthia McGill?
A. No.
Q. And who was your wife at this period of time?
A. Diane McGill.
Q. Are you currently married to Diane McGill?
A. Yes.
Q. And what did Diane McGill do for Mr. Johnson's wife?

Q. At any time that you discussed life insurance coverage for yourself and your wife and your family with Mr. Johnson in late '92 or early '93, did the subject of the disability policy ever come up?

A. No.

Q. Had you received a copy of the disability policy?

A. At that time?

Q. Yes.

A. No.

Q. Did you question Mr. Johnson as to why you had not received the policy?

A. No.

Q. Why not?

A. I had a lot of other things on my mind about running the company and transforming it and a lot of pressure to do all the things I knew the company needed for me to do in order to get credit for being the do-gooder that I was. It wasn't something I was waiting with baited breath.

Q. Who paid the premium, the monthly premium on the policy in 1992?

A. I am pretty certain that the Interflex Group did.

Q. Do you have a lack of certainty that the Interflex Group paid the premium in 1992?

A. The only thing that is hazy is when they started to 1099 me for the premiums.

At some point in time I was either paying the premiums directly or on a reimbursement basis or being 1099'd and I am really not sure.

I think in the beginning because we were not all that well organized and we had somewhat of a country bumpkin for a CPA that our 1099 weren't issued separately, they were issued with a hodgepodge of items so it was hard to discern just what was being 1099'd.

I know I got 1099'd in 1995 because I asked Glenn Kirkpatrick to give me a 1099, make sure I had it, and it was for the specific amount of the premium for both Minnesota Mutual and TransGeneral.

Q. Who was the country bumpkin CPA who you've just described?

Interflex stock?
A. It was part of my severance agreement.
Q. Now, you said earlier in your testimony that you spoke with Mr. Trumbell along about the time that you brought suit against Minnesota Life, J. Michael Johnson and Interflex.
I'll talk to you about the lawsuit against Minnesota Life and Mr. Johnson later, but when did you bring suit against Interflex?
A. It was other '97 or '98.
Q. And where did you bring suit against Interflex?
A. Originally in was in state court in Virginia and then I think it went to, I think it may have been removed to federal court, I am not sure.
No. No. I am sorry, it was in state court because everything got thrown out on a demurrer, got thrown out because essentially they said you cannot sue us because you're receiving benefits so your cause of action is not right.

document to be?
A. It's the start of a lawsuit against Minnesota Mutual and Mike Johnson.
Q. And am I correct that you were a party to that lawsuit?
A. I was the plaintiff.
Q. And where did you initiate that lawsuit?
A. In the Circuit Court of the City of Richmond.
Q. And did you review that document before it was filed?
A. Yes.
Q. And did you sign that document at any point in time?
A. Yes, I signed an affidavit saying that I was the plaintiff and the alleged facts were true to the best of my knowledge.
Q. And when you signed the affidavit, had you reviewed the complaint, that document that we have marked as Johnson Exhibit No. 11?
A. Yes, I reviewed the complaint.
Q. And did you believe that it was accurate at the time that you signed affidavit?
A. Yes. Is it inconsistent?

would send a check to Interflex to Wanda Taylor's attention to cover the monthly premium.

Q. Did Interflex pay for any portion of that premium during the COBRA period that you've just described?

A. No.

MS. BASSO: You're talking about the COBRA premium?

MR. LANG: Yes.

A. There may have been a brief period when they told me they were going to continue all my benefit payments because I think that may have been only until March 31st of 1996 and I don't know if health was part of that. I tend to doubt it because they were pretty cheap.

MS. LANG: You can go ahead and mark this as McGill No. 1, please.

(EXHIBIT NO. 1 WAS MARKED FOR IDENTIFICATION.)

Q. Mr. McGill, I'd like you to take a look at a document marked for identification as McGill Exhibit No. 1 and my first question

to you, sir, is do you recognize that document?
A. Yes, I do.
Q. What do you recognize that document to be?
A. This is an agreement I made with Interflex when I left there.
Q. And what was the purpose of that agreement?
A. The purpose was to settle any and all disputes between me and the Interflex Group upon my departure.
Q. Who drafted that agreement?
A. The Doyles.
Q. Did you have any negotiation either on your own or through counsel regarding the text of that agreement?
A. No, it was submitted take it or leave it.
Q. Did you take the opportunity to review it with counsel?
A. Yes, I did.
Q. And did you sign that agreement?
A. Yes, I did.
Q. Would you like to take a minute to review the document to see if it refreshes your

recollection regarding what the agreement was with Interflex concerning payment for benefits after your departure?

A. Sure, what paragraph?

Q. I thought you might want to review the entire agreement rather than me just point out a paragraph to you.

A. Yes, I understand it.

Q. Now, having reviewed the document that's been marked for identification as McGill Exhibit No. 1, does that refresh your recollection as to who is responsible for payment for benefits including disability coverage during the three-month period after your departure from Interflex?

MS. BASSO: Object to the form. There is no specific reference in that document for payment of disability benefits, but you can answer the question.

A. Essentially my understanding of that paragraph was that they would continue to pay my health premiums commensurate with the period of salary continuation and thereafter I would pick up the payments

A. Yes.

Q. And how did you effect those reimbursements to Interflex?

A. I sent them a check.

Q. When did you first start sending checks to Interflex for reimbursement of disability premiums?

A. Not until 1996.

Q. And when in 1996?

A. I think it was in the March or April time frame, in that three-month period range because I got a bill that I got from Mike Johnson who had gotten it from Micky Doyle and at the bottom of the bill it says, Jack, please reimburse Interflex for these premiums.

Then I found out that these premiums fell under the waiver of premium provision in the policy and Minnesota Mutual must have reimbursed Interflex because I got a benefits payment from Minnesota Mutual that included those three months of premium.

Q. So you received a return of premium for

found that these months were covered under the waiver of premium provision in the policy, and I was reimbursed directly by Minnesota Mutual for the payment of these premiums in my monthly benefit payments.

Q. Prior to receiving this, what you described as a bill from Mrs. Doyle, had you reimbursed Interflex for premiums paid to Minnesota Mutual for disability coverage for yourself?

A. Not that I recall.

Q. So was this the only instance during which you physically reimbursed Interflex for the premiums that were paid for disability coverage?

A. Correct.

Q. Did you ever discuss with Mr. Doyle whether or not he received a 1099 from Interflex for payment of disability premiums?

A. No.

Q. How about any of the other executives at Interflex, did you ever discuss that with them?

beyond five years?
A. No.
Q. Why not?
A. Because I didn't know it was any different than what I had applied for which was coverage to age 65.
Q. How did you obtain the policy in late 1995?
A. I was rummaging through the HR department files where Micky Doyle worked because Micky Doyle was the secretary of the board of directors we had a meeting in September of 1995 where two major things occurred.
One, Steve Doyle, the son, announced that he was going to purchase the company, run it from Europe, and that I would be the new chairman and CEO and that Joe and Micky were going to retire, wonderful.
We also discussed the restricted stock agreement and got the board, Steve me, Eleanor and Joe, to agree that the restricted stock agreement was defective and we needed to have a sell back feature

for 15 years.

Unless you have that same agreement with that guy in Arkansas to price fix, you're going to see our profits plummet and I don't want to be the reason for that, and I also don't want to be the reason for you purchasing this company at an inflated price based upon price fixing, so I told him.

He should have kissed me and been my friend, but he went and told his parents and then they figured for the next three months, they figured out a way to fire me. Okay, that's how cruel the world is, aren't you glad you're lawyers.

So I knew that Micky always got her board minutes out within 48 hours of the meeting, she was very prompt in doing that.

I went looking for the minutes that were resolving that I could sell back my stock at fair market value because I was going to exercise my options and get out of dodge.

I went looking for them in her office and I inadvertently came across a folder. I looked at the front page and it had my name on it, I thumbed through it, a term sheet popped out and it was the one that I had originally gotten from Mike Johnson, benefit to age 65, so I put it back in, put that thing in my pocket and kept looking for the minutes for the board meeting, that's how I came across it.

That was October of 1995. Why didn't I know at that time that I should go looking for new coverage, because I didn't know. I didn't know that the policy had been issued any differently than it was applied for.

Q. So did you take the policy with you or make a copy of it?

A. I took it with me.

Q. So it was in your possession in October of 1995?

A. That is correct.

Q. And did you have occasion to review that policy after it was in your possession in

money because of the deep pockets that municipalities have, they just print money if they want it, so I didn't sue the city because I couldn't spend a hundred grand on a lawsuit.

Q. Where did you file for bankruptcy?

A. New York.

Q. Which district?

A. Eastern, sorry, Syracuse, whatever that is.

Q. And what year did you file for bankruptcy?

A. I think my original filing was the year that TransGeneral terminated my benefits, which I think would have been 2000 or 2001.

Q. And when was your bankruptcy completed?

A. It originally started out as a 13 and then I converted it when I lost my job with the City of Oswego; I converted to a 7 and it was final in 2003.

Q. Now, your benefits payable through the insurance policy that's at issue in this litigation was -- the benefits ceased being paid in February of 2001; is that

correct?

A. Yes.

Q. When you filed for bankruptcy in 2000 or 2001, did you list your claim against Minnesota Life as an asset?

A. No.

Q. Do you know why?

A. Because I didn't know her.

Q. Were you represented by counsel in the bankruptcy?

A. Yes.

Q. Who was your counsel in the bankruptcy?

A. Robert Fix.

Q. Where is his office located?

A. Oswego, New York.

Q. Do you recall who your trustee was with the bankruptcy?

A. Mark rings a bell, it was Mark somebody.

Q. I'd like you to take a look at your 2003 federal income tax return.

A. Okay.

Q. You list income Line No. 17 and Line No. 17 references Schedule E, but there is no Schedule E with that return; do have a