# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

---

JOHN L. McGILL,

Plaintiff,

v. Case No. 05-481 S

MINNESOTA MUTUAL LIFE
INSURANCE COMPANY, Alias,
Defendant.

ORIGINAL

---

DEPOSITION OF

J. MICHAEL JOHNSON

1:00 p.m. - 4:00 p.m.

April 12, 2006

Richmond, Virginia

Job No. 173707

REPORTED BY: Joseph C. Spontarelli, CCR

but it was quite a number of years ago.

Q Was it before or after you had a professional relationship with Minnesota Life?

A It was after.

Q Sometime after 1989?

A That's correct.

Q When you met with Mr. Doyle was anyone else present at that meeting?

A I'm not sure at that particular meeting. The first meeting it was probably just Mr. Doyle. Typically when I met with him his wife, Mickey, was there and accompanied him.

Q What was the subject of the first meeting that you had with Mr. Doyle?

A Just a very general discussion about what my business entailed. I simply just asked him a number of questions about his business, about his planning, about everything from insurance to wills and fringe benefits, what the business was doing, what

he had done in terms of planning. It was really just a basic data gathering meeting.

In a brief time we told him a little bit about what we did and he told us what he had already been doing. We just basically tried to discover if there was any common ground and need to go further.

Q Was there any common ground in going forward?

A Sure.

Q What did you agree to move forward on with Mr. Doyle at that first meeting?

A We didn't really come to any conclusions. We weren't really selling anything at that meeting. We just talked and we agreed to continue the discussions.

Q Did the discussions in fact continue?

A Yes.

Q Can you describe for me generally how those discussions continued and when they continued?

A I can't give you exact dates, but I

can tell you that over the next several
months we met a number of times talking about
Joe's personal planning, he and Mickey, and
also about Eastern Shore Printing and about
some of the things he wanted to do and felt
like were important to him and the company.
Q I recognize this was a long time ago.
Is there anything you can recall specifically
that was important to Mr. Doyle with respect
to his business planning at that point?
A Disability insurance was a big deal
so we looked at both group and individual
policies for him and some of the key people
that were there.
Q What was Mr. Doyle looking for in
terms of disability insurance?
A He just wanted a disability policy
that would cover his executives. Like most
business owners he didn't know any of the
specifics of the contracts. We showed him
both individual policies and group policies
and basically we provided a menu of here are

a number of choices, tell me what you want, tell me what appeals to you and certainly that was driven by both the benefits and the cost.

Q At the point in time that Mr. Doyle indicated to you that he was interested in purchasing disability insurance for his executives at Eastern Shore Printing, had you had an opportunity to meet Mr. McGill yet?

A I'm not sure what time in that process Mr. McGill became employed. I think I had already done some work for Eastern Shore Printing prior to Mr. McGill arriving.

Q How did you meet Mr. McGill?

A I'm sure either Joe or Mickey Doyle introduced us. I don't remember the exact date or how we met.

Q When you met Mr. McGill did you have any discussion with him concerning obtaining an individual policy for him for disability coverage?

A Are you asking me if I had that

discussion the first time we met?

Q Yes.

A No.

Q At any time after your first meeting did you ever have a discussion with Mr. McGill regarding obtaining an individual disability insurance policy for himself?

A Yes.

Q What was the substance of those discussions?

A It's hard to summarize it in just a few sentences. We talked about the benefits. When Mr. McGill came to Eastern Shore Printing there were certain benefits that he would be eligible for that the company had established for the key employees. At some point we got into that discussion and we applied for both group insurance and an individual policy for disability for Jack.

Q When you say we applied for both a group and an individual disability policy for Jack, who is we?

A It was primarily me and it might have been Sylvia who was assisting me.

Q Was the individual coverage that you discussed with Mr. McGill separate and apart from the program of disability insurance that you had discussed with Mr. Doyle?

A No. Essentially all the policies were with Minnesota Mutual and the reason for that is it's not really group insurance, it uses individual contracts. When you do it on a franchise-type basis where you have more than two or three employees you get a discount. I can't recall what the discount was. It seems like it was ten to 20 percent off the regular premium.

Q Without reference to any documents do you have any recollection of what you proposed in terms of a disability insurance program for the executives of Eastern Shore Printing?

A All executives basically had the same coverage, or we tried to get everybody the

same coverage. It was basically a non-cancelable disability policy that provided benefits to age 65.

Q Do you recall the names of the other executives besides Mr. McGill who were going to be participating in this program of insurance?

A Eric Bumgarner was one, Glen Hunahan I think was one. I'm trying to think. If you had a list of names I could probably pick out those names. I haven't talked or communicated with them. Most of those folks left The Interflex Group and it's been a long time -- at least ten years -- since I've had any communication with any of them. There was a guy named Danny something. I can't remember Danny's last name. I think he had disability insurance.

Q I'm going to show you a document that we've marked for identification as Johnson Exhibit No. 3.

A Danny Phillips.

Q Do you recognize this document at all?

A Yes, ma'am.

Q What do you recognize this document to be?

A This is a bank draft authorization for Minnesota Mutual disability insurance.

Q There's a center section of that document where it says client's name. Do you see where I'm showing you, sir?

A Yes.

Q Do you recognize the names there as people who were to participate in the executive disability insurance plan we've been discussing this afternoon?

A Yes.

Q The first name there appears to be Joseph R. Ambs.

A Right.

Q Who is Mr. Ambs?

A He was one of the management people at Eastern Shore Printing at the time.

Q Do you know where Mr. Ambs is today?
A I have no idea.
Q Next name is Eric N. Bumgarner.
A Uh-huh.
Q That was one of the names you did recall. Do you recall what Mr. Bumgarner's position was?
A I think he was the plant manager in North Carolina.
Q Do you know where he is today?
A The last I heard he was still working for what is now called The Interflex Group in the capacity of a plant manager down there.
Q In North Carolina?
A In North Carolina.
Q Timothy W. Carter.
A I have no idea.
Q Joseph S. Doyle.
A That's Joe Doyle. Joe is probably in a place called Sunapee, New Hampshire. He's retired. I don't have any contact with him either.

Q John McGill is the plaintiff.
A Right.
Q Daniel L. Phillips.
A Danny moved here from Maryland. He lived here for a while. He changed jobs two or three times. I don't know where he is now.
Q What about William R. Wilson?
A I don't have any contact with him either.
Q Do you recall what Mr. Wilson's position was?
A No, I really don't. If I remember correctly he was someone that had actually worked with Jack McGill in a previous plant -- I think, I'm not sure. I don't know what he did.
Q Now, your discussions with Mr. Doyle concerning the disability insurance coverage to be provided by Minnesota Mutual, was there any discussion as to who would pay for that coverage?

A I'm sure there was.

Q Do you recall what that discussion was?

A Not really. I can tell you from this form here whether it was -- I can't tell you ultimately whether it was charged as income to the employees but I can tell you that Interflex paid the premium.

Q Earlier you testified that initially the discussion with Mr. Doyle was that all the executives would get the same coverage which would be non-cancelable to age 65. Was that in fact the coverage that you obtained through Minnesota Mutual for all of the executives that were going to participate in the program?

A No.

Q What did you end up getting?

A I can't recall. There might have been a couple people other than Jack that we couldn't get exactly what we had tried to obtain. On Jack McGill's policy the contract

was issued with a five-year benefit period rather than age 65 benefit period.

Q Do you know why you were not able to get a policy issued for Mr. McGill with benefits to age 65?

A That was just an underwriting decision by Minnesota Mutual.

Q What did you have to do in order to get coverage bound for this program?

A What I had to do or what the proposed insureds had to do?

Q What did you have to do? What steps did you have to take to get the process started?

A The first thing I had to do was secure the census data from the human resources department which at that time was Mickey Doyle and she gave me the salaries, names, age, income and then the hire date for all the employees. That was the first thing.

Then I took that data and was able to put together a proposal and brought that back

for each employee and we looked at both the price of the individual coverage and the cost of group insurance. Ultimately both of those were implemented.

Q Both of those were what?

A Implemented, both group and individual policies.

Q The group insurance, was that for all employees of Eastern Shore Printing?

A Yes, it was.

Q And the individual policies, was that restricted to the executive employees as you testified to previously?

A Yes.

Q After you presented the proposals -- let's confine it to the individual policies because the group coverage isn't at issue here -- you had the census information, you created the proposals -- what was the next step?

A The next step was to fill out applications on each person and then each

A I think so. I'm not sure. I don't think anyone was absolutely declined.

Q Was coverage bound for Mr. McGill?

A Yes.

Q I understand from your earlier testimony that Mr. McGill's coverage was bound with a five-year benefit limitation.

A That's correct.

Q How did you learn that, sir?

A I can't recall whether I was told that or I saw it in an e-mail type of correspondence.

I've been doing this for 33 years and every time I have a client's contract that's issued differently than I propose it I always call the underwriter and talk to them about it. I asked them what happened, what's going on. I try as much as I can to get the type coverage that we wanted to secure initiated, but sometimes you can do that and sometimes you can't.

Q Do you know whether you had any

delivery instructions and most of the time there are amendments. Things have changed so much in the last ten, 15 years back. In today's world anything that's modified both the client and the agent would have to sign off saying that they agreed to it. I don't really recall what the requirements were at that time.

Q Did you deliver this policy to Mr. McGill?

A Yes.

Q Do you have a specific recollection of the circumstances under which you delivered the policy to him?

A No.

Q Did you have any conversation with Mr. McGill concerning the modification of the policy?

A I'm sure I did. I talked with both he and Mickey Doyle about it.

Q What did you discuss with Mrs. Doyle?

A I don't remember the specifics of the

conversation. I just basically told her that the policy had been issued differently than what was applied for and gave her the facts of the case.

Q When you say the facts of the case what facts are you referring to, sir?

A I'm talking about the premium, the coverage period; the specifics that relate to that particular policy.

Q Would that include the modification?

A Yes.

Q What was the modification?

A I know the benefit period was reduced from being a policy that covered him from age 65 -- from his current age that the policy was issued to age 65 it had being reduced to a five-year benefit, meaning in the event of disability he would have been paid benefits for that five-year period.

I can't recall whether the premium increased or not as a result of that. Sometimes that happens, sometimes it doesn't.

I don't remember.

Q When you spoke with Mrs. Doyle was Mr. McGill present?

A I'm not sure. I don't remember.

Q Did you speak to Mr. McGill about the modification to the policy?

A Yes.

Q What did you tell Mr. McGill as best you can recall?

A The same thing I would tell anyone; that the contract had been modified. Typically when I talk to the underwriter I try to get specific things. For example, if they limited a contract because of someone's health was it due to high blood pressure, was it because someone had cancer before or simply because they were overweight. If they're overweight then I would explain to them that if they lose some weight and they keep it off for a while then we can always reapply. For example, if someone has cancer there's not a lot we can do about that

look at the document we marked for identification as Johnson Exhibit No. 10.

A Uh-huh.

Q Can you take a minute to go through it? I know it's not the best copy in the world, but it's the best one we could get.

A Okay.

Q Do you recognize that document, sir?

A Uh-huh.

Q What do you recognize that document to be?

A It's a disability policy on Mr. McGill.

Q When was that policy issued, sir?

A July 2, 1992.

Q Does that refresh your recollection as to when you would have delivered the policy to Mr. McGill?

A Because the insurance company requires you to deliver it typically, depending on the contract, within ten to 30 days it was certainly, I would think, between

July and the end of August at the latest when I delivered the contract.

Q Of 1992?

A Uh-huh.

Q Would it be fair to say that any conversation that you had with Mr. McGill concerning the benefit limitation period on the policy as issued would have occurred during that time period as well?

A Yes.

Q After you delivered the policy to Mr. McGill did you continue to have any type of personal or professional relationship with him?

A Yes.

Q What was the nature of that relationship, sir?

A Which one, the personal or business?

Q Let's start with business.

A The Interflex Group was one of my clients so as a result I think at that point we handled the group disability, the group

lot of things socially together.

Q During what period of time, sir?

A I would say 1992 to 1995 would be my guess. I'm not sure.

Q Is there some reason why the social relationship ended in 1995?

A No, only that Mr. McGill moved to New York.

Q Do you know why Mr. McGill moved to New York?

A I guess he wanted to. I don't know. You'd have to ask him.

Q I would like you to take a look at a document that we've marked for identification as Johnson Exhibit No. 2.

A Go ahead.

Q Do you recognize that document, sir?

A Yes, I do.

Q What do you recognize that document to be?

A This is a letter that came from Minnesota Life to Mr. McGill at his business

address relating to application number 1933689H. It simply states that there was an adverse decision made related to his disability application. It says that the decision was based on his build, abnormal blood tests and information from Dr. Staples.

Q Have you seen that letter before today?

A I don't recall. Typically I do not see this letter. This letter for privacy reasons wouldn't come to me, it would go directly to Mr. McGill. Anything that they usually send to me they would have carbon copy on the bottom.

Q You referenced in your testimony it was sent to Mr. McGill's business address. Is that the 125 Dow Gil Road, Ashland, Virginia address?

A Yes, ma'am.

Q Was that Eastern Shore Printing's address?

A Yes.

A At that time I think he had filed suit against both Minnesota Life and me and -- I don't recall exactly the specifics. If you're asking me do I know exactly why he did that, I don't recall. I don't recall what the document said. I haven't seen it in almost ten years.

MS. LANG: Let's go ahead and mark this.

(Johnson Exhibit No. 11 Marked for Identification.)

BY MS. LANG:

Q Mr. Johnson, having reviewed the document we've marked for identification as Johnson Exhibit No. 11, does that refresh your recollection as to why Mr. McGill brought suit against you back in 1997?

A Yes.

Q What is your understanding of why Mr. McGill brought suit against you?