UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOHN L. McGILL, Plaintiff, -vs- MINNESOTA MUTUAL LIFE INSURANCE COMPANY, Defendant. | ) | CIVIL ACTION NO.: 05-CV-0481/S |

**DECLARATION OF PLAINTIFF JOHN L. McGILL**

JOHN L. MCGILL, pursuant to 28 U.S.C. § 1746, does hereby declare:

1. I am the Plaintiff in this action and hereby make this Declaration in opposition to the motion for summary judgment by Defendant Minnesota Mutual Life Insurance Company ("MML") based on my personal knowledge and upon my review of documents generated by me or maintained by me regarding the individual long-term disability insurance policy issued by MML effective July 2, 1992 providing coverage to me as an insured ('the Policy") and my claim for benefits under the Policy.

2. I entered into an Employment Agreement with Eastern Shore Printing Company, Inc., a Virginia Corporation whose name was later changed to The Interflex Company, Inc. ("Interflex"), on November 20, 1991,[1] to become employed as Vice-President effective January 6, 1992. One of the terms of my employment was that I was to be provided with "Paid Disability Insurance" (page 1), meaning that Interflex would pay for my long-term disability insurance coverage. I subsequently replaced Joseph S. Doyle as President, who along with his wife, Eleanor "Mickey" Doyle, owned Interflex.

---

[1] A copy of which is provided herewith as **Exhibit "1"**.

3. In the spring of 1992, an insurance agent, E. Michael Johnson ("Johnson") contacted me to discuss the purchase of "individual" long-term disability coverage that was not part of a plan sponsored by Interflex and provided to all Interflex employees . This individual disability coverage was intended to supplement an existing "group" long-term disability policy that was sponsored and paid for by Interflex and available to all Interflex employees, including myself. The group policy, which was issued by Trans-General, provided disability coverage until age 65.[2] When Johnson contacted me, I understood that he was meeting with only Joseph Doyle and I to sell the individual disability coverage to supplement the group policy benefits offered to all Interflex employees. Johnson was also the agent who obtained the group policy for all Interflex employees through Trans-General.

4. It was Johnson's duty to select the insurer and provide the individual long-term disability insurance policy for me. In early May of 1992 Johnson contacted me to schedule the presentation of a policy from an insurance carrier selected by Johnson, MML, to provide the individual long-term disability insurance for me.

5. I subsequently learned during this litigation that at approximately the same time Johnson was meeting with Joseph Doyle and I regarding the purchase of an individual, supplemental long-term disability policy or shortly thereafter, he also made proposals to a select few other executives at Interflex who also purchased individual policies from MML.

6. Interflex paid the premiums for my individual long-term disability policy that was issued by MML pursuant to the terms of my Employment Agreement with Interflex and for Joseph

---

2 Copies of the Trans-General Group Insurance Benefits Booklets provided to me at the beginning of my coverage under Interflex sponsored group policy issued by Trans-General that list "Eastern Shore Printing Corp." and "Interflex Group, Inc." as "Policyholder" are provided herewith as **Exhibits "2"** and **"3"**.

Doyle's policy. I received a Form 1099 reflecting the amount of the premiums paid by Interflex to MML for my Policy.

7. The select other Interflex executives who obtained an individual disability policy from MML had the premiums paid for them by Interflex, but the premiums were recovered by Interflex as a payroll deduction so that every employee except Joseph Doyle and myself paid his or her policy premiums for MML's individual disability policies.

8. On or about May 12, 1992, Johnson and I met in person and he presented me with a Term Sheet for the Policy as MML's authorized agent.[3] The Term Sheet for the Policy provided coverage in the amount of $3,400.00 per month from the date of the covered long-term disability, after the requisite waiting period, until my 65th birthday plus inflation adjusted increases each succeeding year during the coverage period after the commencement of a covered disability. The Term Sheet also provided for a waiver of premium payments in the event I suffered a covered disability.

9. At the May 12, 1992 meeting, I confirmed my acceptance of the terms of the Policy by signing the disability policy application of MML that was prepared by Johnson at the meeting (the "Application"). To the best of my knowledge, Interflex remitted a check to MML and Johnson in payment of the amount Johnson quoted as the first month's premium due under the Policy.

10. In June 1992 I presented myself for a physical examination for the Policy conducted by a nurse employed by MML at Interflex's offices as instructed by Johnson.

11. Effective July 2, 1992 MML issued the Policy, which provides for the payment of disability benefits to me in the event of a covered disability. However, the coverage provided for in the Policy, as written, did not conform to the terms of the Term Sheet MML and Johnson provided to me on May 12, 1992 and that I accepted at that time. Instead, the Policy as written provides materially

---

3 A copy of the Term Sheet is attached to MML's Statement of Undisputed Facts as **Exhibit "C"**.

and substantially less coverage than what had been offered to me by MML and Johnson and accepted by me on May 12, 1992, in that it limited the disability benefit payment period to a maximum duration of five (5) years or until my 65th birthday, if earlier. The Policy as written also increased the monthly premium charge for the lesser coverage it provided by approximately 50%.

12. Neither MML nor Johnson delivered the Policy to me, nor did they inform or notify me in any manner of the materially reduced long-term disability coverage to be provided by the Policy, as written and issued on July 2, 1992. Likewise, I was never asked by MML or Johnson to sign an amended application, and I would have refused to do so had I been asked, since it provided substantially less coverage than what I had contracted for.

13. In mid-July 1992 Johnson, as MML's agent, called me on the telephone and advised me that he had made several attempts to deliver the MML Policy, but I was either out of town or unavailable. He also told me that the Policy had been issued by MML "without a hitch," and further informed me in passing that MML would be charging a slightly higher premium than Johnson originally quoted when the Term Sheet was presented to me and I accepted it. In this telephone conversation, Johnson explained that the slightly higher premium was being charged because my physical examination indicated I was slightly overweight for my height and my blood pressure was slightly elevated on the day of the exam. Nevertheless, Johnson assured me that the Policy as written provided the same coverage I had contracted for as set forth in the Term Sheet and in my signed Application.

14. I reasonably relied on Johnson's telephone confirmation that MML had issued the Policy in conformity with the coverage terms I had bargained and contracted for and had accepted as provided in the Term Sheet and Application of May 12, 1992.

15. I consented to the higher premium amount, which was to be paid by Interflex, since the increase was not material to the coverage and I had no idea and no way of knowing from the

information given me that for a higher monthly premium MML was attempting to provide substantially less coverage in the Policy as written than what I had previously been offered and had accepted.

16. The only documentation I received from MML or Johnson after the policy was issued effective July 2, 1992 were "Annual Policy Reviews" sent to my home beginning July 2, 1993, the first anniversary of the effective date of the Policy, and on every successive anniversary date of the Policy thereafter until July 2, 1996.[4] Each of the aforesaid Annual Policy Reviews states, among other things that (1) "Your coverage cannot be cancelled as long as you continue paying premiums"; (2) that the Policy provides a monthly disability benefit amount of $3,400.00, in conformity with the monthly benefit amount I contracted for and accepted as provided in the Term Sheet and Application. None of the Annual Policy Reviews states that the maximum duration of the long-term disability benefit payments provided under the Policy, as written, is limited to five years, or contains any information by which I was put on notice that the Policy, as written, provides materially less coverage than the coverage terms I contracted for and accepted as provided in Term Sheet and Application.

17. In January 1994, resulting from the solicitation of Johnson and MML, I applied for and acquired from MML a $350,000 life insurance policy on my own life, which policy was only issued after I had first undergone a similar or identical physical exam to that administered prior to the issuance of the individual long-term disability Policy at issue herein. To the best of my knowledge, the MML life insurance policy was issued without limitation based on my physical examination and on standard, rather than "rated" premium rates.

---

4 True and correct copies of the "Annual Policy Reviews" for each of these years are provided herewith as **Exhibit "4"**, and were part of Exhibit 11 marked at the Deposition of Johnson.

18. In April 1994 I was diagnosed with severe obstructive sleep apnea. By the Fall of 1995 my sleep apnea had progressed to the extent that it rendered me disabled and incapacitated from continuing to work at my occupation.

19. In a September 1995 Board of Directors (Joseph and Mickey Doyle, their son Steve, and I) meeting of Interflex two significant events occurred. First, it was announced that Steve Doyle was going to purchase the company and I would be the new Chairman and CEO. Second, it was agreed that the restricted stock agreement I had would be replaced with an agreement allowing me to purchase my stock options at estate price (little or nothing) and sell them back to the company at market value. Thereafter, I advised Steve Doyle that I believed that their was a price fixing agreement in place between Interflex (Joseph Doyle) and its main competitor that allowed Interflex to achieve substantial profits that would not be continued unless he entered into a similar arrangement so that Steve would not blame me for falling profits after he acquired the company and paid a potentially inflated price for it.

20. Steve Doyle evidently told Joseph and Mickey Doyle what I had told him and they immediately became hostile with me and starting looking for a way to fire me. In October 1995 I was looking through the Human Resource (HR) Department files at Interflex where Mickey Doyle worked for the minutes of the September Board meeting because I knew she usually prepared and distributed them immediately after meetings, but I never received a copy of them. I knew she kept them in her office and I wanted confirmation of the agreement on my stock options since it clearly appeared I was about to be fired. I inadvertently came across a folder with my name on it and thumbed through it and saw the Term Sheet I had obtained from Johnson for my MML Policy. I took the folder and kept looking for the Board minutes without success.

21. I duly filed for disability benefits with both Trans-General, who had issued the group disability policy covering all Interflex employees, and MML, who issued the individual long-term

disability Policy, through Johnson. Thereafter, MML accepted my disability claim and following the 90 day waiting period I began receiving the $3,400.00 monthly benefit payment from MML and a waiver of premium for the MML Policy pursuant to its terms. In addition, Trans-General accepted my disability claim and began making disability payments to me under the group policy it issued to all Interflex employees.

22. When I filed for the group disability policy benefits with Trans-General, Interflex's HR Department provided me with a copy of an Interflex Plan Booklet that Defines the "Company" as "Trans-General Life Insurance Company."[5] I never received any "plan" booklet or documentation from Interflex regarding the MML Policy issued to me as the policyholder.

23. Although at this time I had never been furnished with or seen the MML Policy, I reasonably believed, based on the information given to me by MML and Johnson, that my disability benefit payments under the Policy would continue monthly until my 65th birthday so long as I continue to meet the definition of "disability" contained in the Policy.

24. My date of birth is July 17, 1947, and I was 48 years old when I became permanently disabled in November 1995.

25. In May 1996 I called MML to inquire about the inflation protection clause referred to in the Annual Policy Reviews I had received, and spoke to Cheryl Wolf ("Wolf"), the MML claims examiner for my claim. I learned for the very first time in this conversation that the Policy, as written, provided for disability benefit payments for a maximum term of only five years, not until age 65 as set forth in the Term Sheet and Application offered by MML and Johnson that I accepted in May 1992.

26. I never reviewed the Policy in detail until after this conversation with Wolf from MML. The Policy as written is contained in a bound folder. Included in this bound folder is a copy of my signed Application accepting the provisions of the Term Sheet. The folder in which the Policy and my

[5] A copy of this document is provided herewith as **Exhibit "5"**.

Application are bound also contains a "Revised Term Sheet" which is inserted, unbound, in the back of the folder. The Revised Term Sheet reflects the material change to the coverage in the Policy as written – the reduction in the maximum benefit period to five years rather than to age 65 as provided in the original Term Sheet and Application. The Revised Term Sheet was never presented to me at all, let alone for my acceptance or consent.

27. In my conversation with Wolf in May 1996 I also learned for the first time of a letter dated July 21, 1992 ("July 21, 1992 letter") that MML purportedly sent to me informing me that it had decided to issue the Policy and stating, among other things, that "it was necessary to make some changes to the policy we are offering."[6] I did not receive this July 21, 1992 letter until Wolf sent a copy of it to me in May 1996 after our conversation as I requested, nearly four years after the letter had allegedly been written and sent and the Policy issued, and more than six months after I had become permanently disabled.

28. Even if I had received the July 21, 1992 letter in July 1992, its contents would not have alerted me to the materially reduced maximum benefit period provided in the Policy as written because the letter contained no information in this regard, and I would have reasonably believed, based on the telephone conversation with MML's agent, Johnson, in July 1992 that the unspecified "changes" mentioned in the letter referred merely to the increased monthly premium that Johnson told me about in the mid-July 1992 telephone conversation.

29. I brought suit against MML and Johnson in Virginia Circuit Court in June 1997 by filing and serving a Motion for Judgment,[7] but the action was concluded without prejudice to this action by way of demurrer. MML and Johnson asserted that the claims asserted were essentially

---

6 A copy of the letter is attached to MML's Statement of Undisputed Facts as **Exhibit "E".**

7 A copy of the Motion for Judgment is attached to MML's Statement of Undisputed Facts as **Exhibit "I"**.

premature since I was still receiving my MML disability payments at the time the suit was commenced.

30. As a result of (1) MML's termination of my disability benefits in February 2001 pursuant to the materially altered terms of the Policy, as written, and issued effective July 2, 1992 over what was offered and I accepted in the Term Sheet and Application in May 1992; and (2) the termination of my disability benefits by Trans-General under the group disability policy offered to all Interflex employees in May 2000, my wife Diane McGill and I filed a Chapter 13 Bankruptcy Petition in the Bankruptcy Court for the Northern District of New York, where we were and had been residents for several years, on May 25, 2001. Our initial Chapter 13 Petition was dismissed without prejudice on October 4, 2001, and we re-filed a second Chapter 13 Petition on October 13, 2001. The Petition was converted to a Chapter 7 proceeding in 2001, and concluded on October 30, 2002. See **Exhibits "J" and "K"** attached to MML's Motion.

31. Before filing for bankruptcy I spoke to approximately 20 attorneys to try to get someone to take my case against MML for disability benefits from February 2001 to July 2013 when I will turn 65 on a contingent fee basis, but no attorney would take the case.

32. I advised both our attorney, Robert Fix, Esq., and the Bankruptcy Trustee, Mark Swimelar, of the potential claim I had against MML for additional long-term disability benefits under the Policy, but I was advised that I did not need to list this potential claim as an asset.

33. I filed this action in December 2005, more than 3 years after the conclusion of our bankruptcy in New York, when I was able to locate an attorney in Rhode Island who would take my case on a contingent fee basis. The conclusion of the bankruptcy three years earlier had nothing to do with the timing of when this action was commenced.

34. I am an attorney admitted to practice law in Rhode Island, Massachusetts, Delaware, and New York.

I swear under the penalty of perjury that the foregoing is true and correct.

Dated: November 30, 2006

JOHN L. McGILL