# EXHIBIT "19"

Wolf EBT Exhibit "H"

MINNESOTA MUTUAL INDIVIDUAL CLAIM MEMORANDA

RE: John McGill

| | |
|---|---|
| 12/11/95 | Agent, Mike Johnson, called. He rec'd his agent copy of the __________ letter, but not the actual packet. Informed him it had been mailed directly to him on 12/6. Ins. is agent's best friend and suffers from terrible sleep apnea. When he falls asleep his heart stops beating and he wakes up constantly. Ins. is over weight, used to play football for West Point. His phone # is (804) 798-2613. |
| 12/29/95 | DS policy 19336894 is noncontestable, but will evaluate for 1st manifest. Life policy 19858020 is contestable. Will verify appt. info in conjunction with claim evaluation. Summary of the 528.92 application includes the following. The following summary also includes life policy of 11-19-93<br><br><u>Income</u> – per 5/28/92 application & review of 1990 & 1991 tax records.<br>income was as follows: <u>1992</u> 100,000+; <u>1991</u> 167,314; <u>1990</u> 209,000<br><u>Occupation</u> – Ins is a V.P. for a food packing company (Eastern Shore Printing) Ins. states on app he is an employee of the company with 0% ownership. His job duties include 50% administration, 25% Engineering, & 25% personnel.<br><br><u>Other DS Insurance</u> – None.<br><br><u>Medical</u><br><br>- Back strain from lifting weight in 4/90. Was treated by a chiro for 1 wk (doesn't remember his name) consisting of 4 treatments w/ 0 residual effects<br>- Kidney stone in 1986. pass w/ 0 residual effects (doesn't remember dr.)<br>- Chest ?? abd pain in 10/92 in 10/92 Thallium stress rest reg.<br>- Bronchitis episode in 1993 treated by Dr. Thomas Hubbard, P.O. Box 958, Ashland , VA 23005 (804) 748-8307<br>- Hayfever<br>- ? knee injury in 1957<br>- has seen a dermatologist (doesn't remember name of dr.) for removal of benign moles et acrochordons<br>- treated for gout, abnormal blood work, obesity. Takes Indocin for gout.<br><br>Treated by Dr. Robert Foles. |
| 1/2/96 | Life policy #19858020 is contestable w/ issue date of 1-17-94. Will request medical records from Drs. Chiancone, Hubbard, Robertson, Steples, Brand, Falio & Ginerol to verify onset of sleep apnea. Refer to page 1 for medical history. |

| | |
|---|---|
| 1-12-96 | ____ and accompanying med. info indicates no physical limitations and ____ 4 mental _______ ______ and surgery advised sleep study notes ___________ frequent awakenings (first manifest?). 95% sleep efficiency notes. Sounds inconsistent and ________ to work in Exec. position. Inadequate deep sleep 2E to arousal ____ account for 5% reduction in sleep efficiency. Suggest medial review upon receipt of records. Wonder if something else going on.<br><br>Income information indicates that ins also has a small law practice and consulting business. Need to clarify. Prior to PAEI calculation suggest also clarifying receipt of Directors fees for 95 (4000?) including associated duties. |
| 2-17-96 | A review of Dr. Chriancone's records neglect an initial office visit on 11-22-95. Dx – severe deep apnea. tx – UPPP-INR. On 11-29-95, Dr. Chriancone composed a "to whom it may concern" letter re the ins sleep apnea. Wonder if ins was referred by employer. On 12-20-95, ins was accompanied by his insurance person and claim forms were completed. (note – the APS is dated 12/20 with an o/v that day). As of 1-9-96, the ins had to change health plans, which Dr. Co. is not a part of. |
| 2-17-96 con't | A review of Dr. Hubbard's records show our 12/8/95 o/v for examination of ins sleep apnea. Ins was recently fired from his job and believes this is why he was fired. He's looking for some medical support of his claim. Believes he may have some baseline depression, but refuses referral. His only other mention of sleep apnea are on 2-16-95, where in he states its getting better and on 3-28-94 where he requests a referral for a sleep apnea clinic as he has a long history of sleep disturbance and obesity.<br><br>A review of Dr. Brands (C.I. spec) records note that on 4-7-95 that ins was doing quite well. The initial o/v in 6/93 noted that ins was married for the fourth time (twice to his third wife). In 8/94, it was noted he had married again. Ins is 6' tall and weighs approx. 270 lbs. He does drink and smoke. |
| 2-27-96 | Called Geoff Graeb at Trans. General. No benefits paid yet as 180 day WP. Benefit is 60% of $11,666 salary. Ins was terminated from employment on 11-30-95, due to poor performance. No surgery done yet as ins medical insurance changed and AP isn't a provider. |
| 3-8-96 | Ins called to inform that as of 1-1-96 his ex-employer changed health insurance companies and he now must find a new primary care MD, ENT and pulmonologist under NY Life Health Plus. His new ENT is Dr Andrew Klein at St. Mary's Hospital. His old pulmonologist, Dr. Charles Robertson had suggested the following surgery to the ins: (1) Uvalaplasty, (2) remove tonsils(3)reconstruct nose(4)remove excess tissue in back of throat. The new ENT Dr. Klein would first like to try:<br><br>(1) C-PAP (continuous air pressure) |

| | |
|---|---|
| | (2) Bi-PAP (intermittent air pressure, like breathing)<br>(3) D-PAP (new procedure, ins not sure what it does)<br><br>He will be scheduling a new sleep study in the next few days and expects that the study won't be conducted for another 2 to 3 weeks. His new internist is a Dr. Donald Ganley. There has also been mentioned a more radical XX of performing a tracheotomy, where a hole is made in the throat and a tube inserted so that during sleep, he breathes through his neck. During the day, he can remove the tube and breathe normally.<br><br>The ins previously worked for Interflex, which was formerly known as Eastern Shore Printing. Interflex manufactured packaging materials for chicken, poultry and pork, such as the trays and printed film that covered the meat. Informs that half of the time he was out traveling, appx. 60,000 miles per year, mostly to the "chicken belt, but all over the US, South America and Puerto Rico, dealing with the chicken producers to use or continue to use their product. His duties in the office were to lead or manage as president and COO. He is an employee only and the gentleman who is the owner and CEO is semi-retired. However, since the ins was terminated on 11-30-95, he has taken over the ins duties. The ins has not been replaced yet and there is a likelihood that he would return. It was a mutual parting of the ways, which started in approx. May '95. Beginning then the ins stated he was extremely fatigued, was falling asleep at meetings and had to be driven around as he would fall asleep at the wheel. He likened it to narcolepsy, where it comes on suddenly with no warning. He was irritable and feeling depressed. Because he had the 1994 sleep study done, he knew he had sleep apnea and was working out and dieting to help control it. Ins claims he had never sought treatment(XX) or received a diagnosis( dx) for it prior to 1994.<br><br>He was given 3 mo. of salary continuation. His last paycheck was on 12/3 for appx 178,000. This w/b his PAEI. He was 1099'd as a bonus for the insurance premiums on his policy, as they were no longer employer paid. He also is a principal for Sun Ribbon, where he works appx 1 day a month doing all their legal and consulting work and personnel mgmt. His 1995 W-2 from them s/b $3000, not $4000.<br><br>Currently, he is still experiencing profound fatigue and falling asleep. However, he tries to work out for 3 hours and networks on the phone. He has been interviewing for executive positions within his industry, but there are only 3 in the country that are similar and he's not sure he wants to relocate. In fact, at an interview, he actually fell asleep in front of 3 to 4 people and lost his balance. Mentioned he also roller blades.<br><br>Informed him to send APS and C/S now if he has. |
| 3-23-96 | Medical Dept.(Med REV)<br>Ins is a 48 year old president of a firm that manufactures poultry packaging. He |

| | |
|---|---|
| | is claiming on 11-30-95 onset of disability due to sleep apnea. Please review the medical information available and comment on the ins limitations, plus the extent and duration of disability. Thanks, Cheryl<br><br>Please note we have just ordered records from the ins new physicians – Dr. Ganley and Dr. Klein. |
| 4/2/96 | Records indicate "severe sleep apnea" with 4/94 RDI of 46.7 and apnea index of 41.8. Apparently CPAP was tried in 1994 but he found it intolerable. He tried weight loss but was not successful in correcting the problem. He may well have had significant work problems with fatigue and cognitive dysfunction back since 4/94. He's falling asleep apparently without warning and has been unable to drive himself because of this.<br><br>I do not see hope for improvement here unless some form of PAP is found to be tolerable or tracheotomy is performed. Upper airway surgery – uvulaplasty, tonsillectomy, nose surgery and pharyngoplasty is not usually successful in relieving the sleep apnea.<br><br>This condition has high mortality rates (especially after age 50 when CAD sets in and the hypoxia with sleep apnea can cause fatal cardiac dysrhythmeas) if not treated successfully.<br><br>Will need to see what treatment he has with his new ENT and pulmonary physicians. If treatment is successful – should see improvement on subsequent sleep study in sleep lab and cognitive function and daytime fatigue and sleepiness should quickly resolve. |
| 4-5-96 | Medical opinion noted. |
| 4-5-96 | Contestable period on life policy #1985802 expired on 1-17-94, therefore there is no contestable review. Also appears that no information that reflects a rx of sleep apnea prior to _DI__ policy issue of 7-2-92 exists. |
| 4-12-96 | Called Wanda Taylor at employer. Left message for her to call me. |
| 4-17-96 | ? re onset of disa when?(MED REV)<br><br>Apparently he kept working despite sleep apnea test until 11/95 when his position as president was eliminated<br><br>1/4/96 medical record indicates that he became so irritable with his colleagues that he lost his job as president having difficulty from a psych. standpoint. Irritability and emotional/psych problems related to sleep apnea and its effects on the brain's functioning (with lack of sleep & hypoxia) can certainly result from sleep apnea. |

| | |
|---|---|
| | 1/4/96 his weight is noted as 262 lbs. 6'0"<br><br>At time sleep study, 4/94 his weight was 259 lbs. 6'. So he had not gained enough weight to expect a significant worsening of the sleep apnea to have occurred from 4/94 to 1/96.<br><br>Appears he did continue to work till 11/95 though quality of his work may have been in question. Initialed by LO@3520 |
| 4/22/96 | Wanda Taylor returned my call. However, the referred call to Eleanor "Mickey" Doyle, manager of human resources, who discussed the 1099's with me. She state that ins has received a 1099 each year since inception of insured's employment with Interflex. The 1099 include director's fees, medical and MML disability insurance premiums, (which are paid by the corp then 1099'd to him). This arrangement was part of the employment agreement with the Insured. All other officers of the corp have the same arrangements. She confirmed that the premiums paid for the other individuals on the APP plan are also 1099'd to him. Ins' severance package provided the corp would pay his premiums out of the app plan through 3-31-96. Ins should not be ion the company app plan for premiums due after 3-31-96.<br><br>Note that employer's letter also received report ins' job eliminated due to downsizing. Also note that his job involved less than 10% travel (Ins told examiner on 3-8-96 that ½ of his time was spent traveling). Ins severance agreement also included note that he has a non-compete agreement for 2 years – since no geographical limitation on it – it would apply nationally. Therefore, Ins cannot work in this field for 2 years from 11-30-95. |
| 5-7-96 | Mickey Doyle, H.R. Manager at Interflex called as she rec'd a follow-up on our 3-23 letter which she had already responded to. Informed her the follow-up had been sent in error and that we had rec'd her letter. Mrs. Doyle informed that she was also part owner of the company with her husband who was the CEO. She stated the ins position was eliminated due to the downsizing at the company. Both management and hourly employees were let go. 1995 was a bad year, as they lost sales volume plus they invested heavily in new factory equipment in order to handle supermarket accounts, but those accounts never panned out. She informed that the Ins did very little traveling (approx 10%) and when he did it was only to their plants in Carolina and Texas, plus a few trade shows. He was an "operations manager" in charge of the VA plant and not involved in sales at all. In fact, it is her husband and the sales team who travel around the world, mostly to South America. As of 4-1 they will no longer be paying insureds premiums from their APP plan.<br><br>Note: The info rec'd in Mickey's 4-6 letter and conversation above contradicts what the Ins related on 3-8 regarding his duties and future.<br>(804) 798-0571 – Mickey's phone number. |

| | |
|---|---|
| 5-22-96 | PC from agent Mike Johnson, he needs us to stop APP draw from his employer and to bill insured directly. I called 5970 (Chad L. Vake) he said he will take care of this but will have to bill insured quarterly. |
| 6-3-96 | Ins called informed that APP had been mailed last week. Also wanted to know if are to WPD(direct deposit into Insured's bank account) could he started. Informed Ins once APS rec'd and disability verified would consider an to WPD Ins had another sleep study, which showed no change-- still sever.<br><br>He also questioned his 5 yr BP, thought he had to age 65. Informed him he was issued a modified contract w/a rating. He was unaware of this. He will discuss with his agent, but would like a copy of the 1992 letter sent to him by U/W. (804) 798-2613 / girlfriend's home. |
| 6-4-96 | Discussed w/Dr. Olson. Unless the Ins loses weight, which may help the sleep apnea, there is really nothing to be done. Appears that the Ins can't tolerate the C-PAP & Bi-Pap, which is unfortunate. Given the fact that no medicine xx can be given, an APS or updated records would not be needed very often – 6 mo. or 1 yr. After age 50, mortality drops to 55%, as CAD enters the picture. |
| 8-21-96 | Ins called to inform that he had mailed his forms and was moving to NY. His new address will be: 6 Thistle Dr., Oswego NY 13126, (315) 342-2545<br>He will also be starting a 9 month advanced degree program in taxation law in Boston. He will be living with his sister in R.I. and commuting to school. He plans to go home to NY every other week. He will only be going to school for 4 days, as his condition has not improved. He still experiences major fatigue. After he receives the degree he plans to work PT consulting for a firm who has said they are willing to employ him only PT. He asked how often an APS w/b needed. Informed him in another 6 mo., unless something changed. |
| 11-14-96 | Spoke w/ Mike White, general agent, regarding the complaint and his agency's practices with regard to modified contracts. He informed that Mike Johnson had not been housed in his office for 2 years. However, all of his agents are aware of when they have a modified contract and how to handle them. All e-mail from H.O. are given directly to agent, who then may choose to instruct other office personnel to respond. Also, they place their policies for delivery to a client in a black 3-ring binder. |
| 11-14-96 | Spoke w/Geoff Graeb (sp) at Trans-General. Their policy was not issued as modified as there was no U/W done (open enrollment). Their agent is also Mike Johnson. When their policy was issued in 1992, they initially issued an incorrect booklet with an escalator option. They then discovered their error and sent the correct booklet. However, at claim time, both the Ins and agent denied ever receiving the correct booklet. Therefore, the Ins. demanded the $4000 esculated benefit amount (instead of the $2500 issued). Based on counsel's advice, they are paying the esculated amount . This occurred in 6/96. Re the claim they had |

| | |
|---|---|
| | an IME performed, which supported disability. |
| 11-14-96 | Left message for Mike Johnson, agent to call re the complaint. (804) 288-9303 |
| 11-15-96 | Rec'd VM from agent that he was out of town and would try to reach me later. |
| 11-18-96 | Mike Johnson called. He is quail hunting in Texas, so if I need to reach him just leave a message on his voice mail.<br><br>Mike states that most of what Ins atty alleges in the 11-6-95 letter is untrue. He even called the atty and left him a message stating the comments were untrue. The atty retuned his call, but Mike had already left town and has not spoken with him. Mike says he did speak with the atty previously and he was asked if there was an amendment signed. He did not see one in his files, but does not really remember.<br><br>Mike does admit that he knew the contract was modified. He also says both the employer (Mickey Doyle) and Ins knew it also. (Mickey is the office manager of Interflex, in addition to being the owner's wife). Its been so long, but he doesn't recall exactly who he delivered the policy to. He believes he delivered several policies to Mickey Doyle (as he also sold contracts to the other executives) who was then going to pass them out to the various insureds. He thought maybe the Ins was out of town at policy delivery and since the corp was paying premiums, left it with Mickey. He knows that he discussed the modified policy w/Mickey at some point, probably at delivery, because he would have had to collected add'l premium. He also recalls discussing it with Ins, but doesn't remember when exactly. However, he's almost certain he did when the Ins applied for life insurance, as they discussed the fact that the life ins may be modified as the D I policy had been. Because he has 2000+ clients, it's difficult for him to recall what occurred over 4 years ago. However, he does recall telling the Ins that if had lost 50 lbs. he would have no trouble getting insurance, but he doesn't recall when he told him.<br><br>Mike has no set procedure as to when he tells a client that their policy has been modified. Sometimes it's before delivery, sometimes at delivery.<br>Mike has known Ins socially for years(even before policy bought). They'd play golf and talk. However, Ins policy was bought as part of Mike working closely with Joseph Doyle, the owner of Interflex. Mike sold them both group and individual policies. The Ins'individual coverage was part of an employment agreement between Ins and Interflex, so that's why Mike probably delivered the policy to Mickey Doyle.<br><br>He suggests we speak to Mickey(804) 798-0571, as he belives she delivered policy to Jack when he returned from out of town, plus discussed the fact that it was modified. Also, Mickey informed him that there was no medical reason the Ins left. He was terminated due to his management style and the direction he was taking the company. |

| | |
|---|---|
| | Mike has tried to contact the Ins as they are friends. Ins was in Richmond 2 to 5 weeks ago staying at Ralph Churchill;s house, an employee of Interflex he hired. He left several messages, but Ins never called him. A few months ago the Ins informed Mike that he was going to sue Interflex because they didn't give him what he wanted. He stated that it was important that Mike was on his side. Mike replied that all he could do was tell the truth.<br><br>Mike believes that the Ins has nothing to do but get add'l funds from MML. When he realized the benefits would be taxable, the Ins instructed Interflex to produce a W-2 to reflect that the premiums were bonuses back to him. He also informed that the Ins dropped out of school in Boston after only one month. Mike asked if he needed to do anything at this point. Informed him no, the home office will be responding to Ins atty. |
| Page 15<br><br>missing | Spoke with Mickey Doyle, head of HR at Interflex(804)798-0571.<br>Insured was hired by their company as the highest ranking executive below her husband, Joe, the owner (she also owns part of the company). He was hired as the executive V.P. and was eventually promoted to President. To their executives they offered "company LTD" through Trans General, which Interflex would pay for. They also offered "key-man" LTD which each executive was responsible for paying except for the Ins. Because he was the highest ranking, Interflex offered to also pay for his key-man LTD through MML. They offered the "key-man" as the "company LTD" maxed out at $2500 per month. Mike Johnson was the agent for both, and they told the executives that if they wished to pursue "key-man" coverage they would need to contact Mike Johnson directly. Seven of the executives, including her husband and the Insured did so. The Insured's premiums were paid from the corp. and the other executives were taken from payroll deductions.<br><br>Asked Mickey if the Ins ever paid his own premiums. She replied, "No." Asked if she was aware of the 1995 1099 where the Ins claims it was for payment of DI premiums. She wasn't. Asked if she remembered phone-call with Kim in 4/96 where she stated the Ins did pay, or at least was 1099'd for the premiums. She did not recall. As of today, she states that premiums were paid by Corp and therefore Ins benefits should be taxable. Asked her if she knew what 1099 amount represented or if there was any bonus in the W-2. |
| 11-20-96<br><br>Con't | She will contact her accountant and get back to me.<br>Asked Mickey if she had ever received Ins DI policy. She stated no, all she did was make sure the premiums were paid for as the executives were on their own with Mike for the key man insurance, there was no reason for her to get involved. Asked he if she had ever seen a letter from MML addressed to Ins, she stated no. She went on to say that any mail that came into the office for Ins went directly to his in-box for him to open. There was no mailroom or secretary opening his mail. It all went directly to Ins. There was a secretary (Patsy Whatey?), who would make sure he got all of his mail, but it was not opened by |

| | |
|---|---|
| | her. She had no reason to have the Ins policy, or any of the other executives. She never took receipt of the policies either. The only policies Mike ever delivered to them were her own and her husband. She assumed that Mike would have personally delivered all of the other policies like he did theirs. She finds it hard to believe that the Ins never was delivered his policy. That is an important legal instrument and he was an attorney and knew that. Also, when Mike delivered the Ins life policy shortly after that, wouldn't the Ins have asked where his other policy was?<br><br>Asked Mickey if she knew the contract had been modified she replied yes. Mike informed them that the premium was higher because the Ins was a smoker and over weight. In fact, she was surprised that we even gave the ins any coverage due to his smoking and weight. She distinctly remembers having a meeting with her husband to see if they could get Ins to do something so that the premiums could be reduced. Appx 6 mo to one year after the policy was issued, they approached the Ins and said they'd pay for the patch for him. Ins. tried it for appx 3 months, but failed to stop smoking. They never approached him again on it. They and a no smoking policy in the company and he was one of the few people who smoked. When they were buying their policies, Mike informed them at that time that the coverage may be modified by MML due to weight, smoking or medical history. Again, they assumed this was part of Mike's "interview"? Asked Mickey how they knew Mike. She informed that he was a social friend of the Ins. and that the Ins introduced him to herself and her husband. They were impressed with Mike's honest, up-front approach. Didn't pressure them. They still do business with him. Mike was in and out of their office quite frequently, and had a lot of contact with Ins.<br><br>Mickey informed that she has a copy of the complaint from the Ins atty. She was not shocked to learn that the Ins policy was not as applied for as stated in complaint, as she knew and had been paying the increased premiums for 3 years. However, she is not surprised that the Ins wants to sue us. He tried to sue them initially, but when their attorneys pointed out the fact that the Ins had signed a severance agreement agreeing not to sue for any reason, he backed off. In the 3 years she knew the Ins he was always in litigation with someone. (his house in NY, his landlord, or real estate agent). He likes to sue people.<br><br>The Ins was terminated from Interflex eff. 11-30-95, as they disagreed with his management style and where the company was heading. They decided to reorganize and eliminate the president's position. (It's still eliminated). They had discussed this with the Ins prior to 11-30. One week prior to 11-30, he came in and gave them a letter from a dr. stating that he had sleep apnea. Until then, they had no idea he had that problem. They did know that he had gout and various other problems, as he was out of the office sick a lot for tests, etc. However, he did used to mention that he couldn't drive at night as he used to fall asleep. They have had no contact with him since he left. |

| | |
|---|---|
| | Mickey was surprised and dismayed to learn that we were paying disability benefits. He did not lose his job for medical reasons. She doesn't understand why he couldn't do a job much as his old one, pretty much sitting behind a desk. Ins was the operations manager for the plant. He traveled very rarely, only once over seas to Germany for 2 days with the plant manager. Occasionally, he'd fly to their plants in NC & TX.<br><br>Mickey is willing to answer any future questions we may have and will call me back re the 1099 and Ins W-2 for 1995. |
| 2-19-97 | Ins called. He was concerned that forms were coming every 3 mo instead of 6 mo. Informed him that we were only requesting C/S in April , not APS. He understood<br><br>He recently had bone spur surgery for an Achilles heel and his developed HBP. He had to drop out of his Master of Law program in Boston due to excessive fatigue. He had hoped to start a pt tax practice. He continues to explore 3 or 4 different avenues of working on a pt basis. He still refuses to have a tracheostomy done due to the life altering condition. (No water sports, difficulty in bathing). His neurologist told him he has a defective breathing trigger.<br>He will send his 1995 taxes now and the 1996 when complete. In 1996, he earned appx 11,800 from Inn Ribbon. His 1995 taxes will reflect a few extras from Interflex – stock transactions, 401K, distributions and salary continuation. He earned appx 190,000.<br><br>He asked why I haven't responded to his attorney's letter. Informed him I did in January. He was surprised to hear this as his attorney has not told him anything. He asked what our position was and if he could receive a copy of the letter. I faxed a copy and outlined our position. He still doesn't understand why it was rated, as he was a weight lifter and had a lot of muscle, not fat. This also led to increased cholesterol. |
| 3-18-97 | Reviewed Ins 1995 1040, (predisability) In addition to the W-2 for Interflex, there was a 1099 from SunRibbon (sch c) and two 1099's from Interflex (other income). The 1099's reflect 1) med ins & director's fees; 2) LTD premiums for MML and Trans General.<br><br>Even though we don't have the 1099's for 1993 and 1994, it appears that the Ins was not 1099'd previously for his LTD premiums in those years.<br>The 1099 for 2560.32 [LTD prems] is inconsistent with what Mickey Doyle informed us of in her 10-29-96 letter. Will write to her to clarify.<br>Note: FICA earnings for 1995 reflect a total of $191,657.11. |
| 4-29-97 | Rec'd 1996 tax return & C/S.<br>These are 2 W-2's from Interflex 1) 29650.95 (pension annuity on 1040) identified as DCR/RNB Benefit Distr.; 2) 51,891.01; 3) business loss –$1784 1, #2-#3 =$50,117 |

| | |
|---|---|
| | Ins indicates tx consists of wt loss via diet & exercise. Rt heel spur surgery 2-24-97. _______ & things. Sleep apnea persists, gouty arthritis<br>According to severance agreement, Ins was to be paid $37,692 in salary continuation and $22,282 representing company stock. |
| 5-2-97 | Late entry – During the week of 3/29, Mickey Doyle left a VM message asking to call her before she was out of the office on 4-10. Upon my return to the office, I left a VM for her on 4-9. |
| 5-2-97 | Also wanted to note that gross revenues from SunRibbon in 1995 were $11,700 and 1996 were $7,200 net revenues for both years were loses.<br>Left VM for Mickey Doyle. |
| 5-2-97 | Mickey Doyle returned my call. She stated that to her knowledge, Interflex did not have the 1995 1099 for $3560.32. In 1995, they used a CPA firm to prepare the 1099's, which were created on a laser printer (attachment A) She pointed out that "attachment B" appeared to be produced manually on a typewriter. However, if we could provide the name of who may have produced it and the date, she could check into it. She also pointed out that if a 1099 were to be issued to Ins, it would be only for the Ins MML premiums for his keyman insurance. The Trans-General was LTD for all employees as a benefit.<br><br>In 1995, they also used an outside payroll firm, in addition to the CPA firm. In 1996, they switched to just an inside payroll dept.<br><br>Thanked her for the information and asked if needed, would she verify this in writing. She said yes. Also, if we needed any assistance to call. |
| 7-23-97 | Spoke with Susan Thomas, new claims examiner, at Trans General. (800) 551-0332. She verified that the benefit amount they were paying was the $4000, based on the incorrect booklet. A formal suit was never filed, just an attorney letter. Even thought they had mailed a corrected booklet later, they felt it best to pay the $4000 and not the $2500 as sold. She is also faxing a copy of the IME report. |
| 11-3-97 | Rec'd PC from insured. He requested 2 day priority mail, he won't pay over $3.00. I called our mail room and they can't do it because there's no way to bill receiver. Check will go out normal mail. |
| 12-5-97 | Reviewed records from Dr. Hyla, rhematologist. First saw in 11/96 for chronic gouty arthritis with arthralgias. Ins feels joint symptoms increase his sleep apnea problems. Had gout attack in 1/97 and went to ER. Meds are allopurinal (300 to 600 mgs alternate days) and colchicine (.6) ds of 3/97, was less stiff.<br>Reviewed records from Dr. Loughran, orthopedic surgeon. In 10/96 underwent partial medial menisectomy after arthroscopy showed a tear. Also had a rotator |

| | |
|---|---|
| | cuff tear.<br><br>Reviewed records from Dr. Xie, internist. High chol & trigs. Drinks one bottle of wine per day. As of 8/97, gout well controlled, currently unemployed. Advised to reduce calories and alcohol. Referred to a pulmonologist for his sleep apnea, Dr. Mandanas. |
| 12-8-97 | Spoke with Susan Thomas at T-G. She has no record of the 3-22-96 fax and F-1099 for 1995. However, they have not considered the Ins benefits taxable. She spoke with Mickey Doyle at InterFlex, who informed that the corp paid 60% of the premium and the Ins 40%, for their policy. Will fax her the 3-22-96 info that should be in her file. Also they had rec'd a letter from Ins stating benefits were tax free. |
| 1-13-98 | Called Mickey Doyle to follow-up to my 12-15 letter. She had rec'd it & thought she had responded before Christmas, but I never rec'd. She informed me that the handwriting on the 1099 was her payroll managers. The payroll manager remembers being asked by the comptroller to create the 1099. Therefore, InterFlex did issue the 1099, however Mickey was unaware of it and had never rec'd a copy of it, even though she is to receive a copy of all 1099's. Mickey informed that the Ins and the comptroller were close friends and that the comptroller is no longer employed by InterFlex.<br><br>The 1996 W-2 consists of the remaining salary and severance pay thru 8/96 due to the Ins.<br><br>REDACTED as privileged, legal analysis of claim. |
| 2-6-98 | Ins called. He wanted to know if he could receive his benefit earlier. Informed him he could and we decided to pay his benefits on the 25th of the month. He lives in a very rural area and mail is slow. He understands that his Feb benefit w/b only 25 days<br><br>Ins informed that in April he will start school at Temple University for a Master of Laws Degree. It's a 12-month program. He's taking this in the hopes of being able to teach some day. Either law school or at a community college in business law or criminal justice. He may try to work pt while at Temple. Most of the time its volunteer only for experience at the public defender's office, etc. We discussed the definition of disability on his policy and what occurs if he starts earning income. |
| 3-11-98 | PC to Dr. Ganley's off. left message and his nurse Nancy will call me back. |
| 3-13-98 | Reviewed Dr. Ganley's records. Lat o/v was 12-29-97. States Ins lost 20 lbs. BP good. Chol good. He feels great. Trying to return to law practice. |
| 4-30-98 | Reviewed Ins 1997 individual tax return. Only earned income is for consulting he does for SunRibbon. However, gross revenues were $14,400, which is an increase over the last two years. Continue to monitor. |

| | |
|---|---|
| 2-1-99 | Records from Dr. Ganley reviewed from 12-24-98. Insured reports sleep apnea is worse. Continue to monitor. |
| 5-5-99 | Reviewed 1998 tax return. Reported earned income of $3762 for legal consulting. |
| 10-19-99 | Rec'd Ins 10-15-99 ____ which reports he started pt work as an attorney in 9-199. Agree to (1) additional monthly be ___ as we obtain more details from the Ins concerning his current work activity and obtain medical file to evaluate the extent of the Ins. current limitations. |
| 11-11-99 | Called Susan Thomas at Trans-General for an update on their claim handling. Susan no longer works there and the claim has been transferred to a different Company: NATLSCO 1-800-949-3414, Plantation, FL |
| 1-18-00 | Ins called after faxing his claim form #20. Asked me to add Ins. info re the date he returned to work (RTW):<br>-Ins RTW P.T. as a consultant – May '96<br>-Ins. RTW P.T. as an attorney – July '98<br>He has not been able to RTW on a full time basis in either avocation. |
| 3-20-00 | Spoke to Julie, Ins claims examiner, at NATLSCO. They continue to pay the Insured benefits and have not performed an IME. Their benefits are to age 65. She has the file marked for review in April. If anything comes up, she will let me know<br><br>Noted that Ins just saw Attending Physician again on 2-29-00. Will get these records & get updated medical review.<br><br>Ins was an attorney prior to onset and provided consulting advices. Appears that he continues to do that in addition to actual legal duties. His earned income is at appx 8.6% of PAEI. |
| 5-31-00 | Julie from NALSCO called. They are closing the handling of their claim as they received a questionnaire from Dr. Ganley who stated the Ins had no restrictions in performing his own occupation. |
| 7-13-00 | 1999 1040 reflects Sch C for legal consulting of $3,086. |
| 8-24-00 | Called Julie at NATLASCO. 1-800-949-3414 x2830. The claim is still closed and the Ins continues to provide information to try and support his disability. He has a sleep study scheduled on 8-28 and an appt for C-PAP on 9-11. He is also seeing a rheumatologist as his gout and arthritis are aggravated by his sleep apnea.<br><br>Dr. Ganley also wrote a letter stating the Ins is working only 20 hours per week and that his sleep apnea would always cause problems. |

| | |
|---|---|
| 10-3-00 | Rec'd updated sleep study completed 8128100 confirming severe sleep apnea. |
| 12-21-00 | Noted that Ins Return To Work Full Time (RTWFT) in another occupation eff 10-24-00. He and his AP continue to claim that he is disabled from his own occupation but may work in another occupation. Ins is now earning 29.7% of his PAEI from another occupation.<br><br>According to the def of dis contained in the Ins policy, Ins continues to qualify for disability benefits. |