# EXHIBIT "20"

Rec'd 11-7-96
JK

LAW OFFICES
COATES & DAVENPORT
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
5206 MARKEL ROAD
P.O. BOX 11787
RICHMOND, VIRGINIA 23230

THOMAS F. COATES, III

(804) 285-7000
FAX (804) 285-2849

RECEIVED
NOV 07 1996
LAW DEPARTMENT

November 6, 1996

**BY FEDERAL EXPRESS**

Mr. Robert L. Senkler, President
Minnesota Mutual Life Insurance Company
400 North Robert Street
St. Paul, Minnesota 55101-2098

EXHIBIT
I
6/1/06
MER

**BY REGULAR MAIL**

J. Michael Johnson, CLU
J. Michael Johnson & Associates
5310 Markel Road
Richmond, Virginia 23230

Re: **Our Client: John L. McGill, SSN 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**
**Your Disability Policy Number 1-933-689H**

Gentlemen:

Mr. John L. McGill has retained this firm to represent him in his claim for breach of contract, etc., in connection his disability policy issued by Minnesota Mutual Insurance Company ("Minnesota Mutual"), through your agent J. Michael Johnson ("Mr. Johnson"). The facts which give rise to this claim are as follows:

In early 1992, Mr. McGill became employed by Eastern Shore Printing Corporation ("Eastern Shore"), of Ashland, Virginia as an executive officer (initially, as its Vice-President and subsequently as its President). As a term of his employment, Mr. McGill was to be furnished a disability insurance policy which would provide, in the event of his long-term or permanent disability, monthly payments to him in the amount $3,400 during the term of his disability until age 65.

In furtherance of this, Mr. McGill and Eastern Shore requested and received a proposal for such a long-term disability policy from Minnesota Mutual through Mr. Johnson. On or about May 12, 1992, Mr. Johnson presented to Mr. McGill a bound booklet containing a term sheet issued by Minnesota Mutual, dated 4-7-92, and captioned "Recommended Disability Income Coverage for Jack [McGill]/Eastern Shore Printing, VP Operations," which provided for such disability coverage. The terms presented were accepted by Mr. McGill, as they conformed to those he had requested. At the behest of Mr.

Johnson, Mr. McGill simultaneously filled out and signed the application Mr. Johnson presented, and Eastern Shore's Human Resource's Manager tendered to Mr. Johnson a check to cover the first month's premium under the policy.

Thereafter, on May 28, 1992, per arrangements made by Mr. Johnson, a nurse named Linda Antone visited Mr. McGill at his Eastern Shore office, took a medical history from him and conducted a brief medical examination on behalf of Minnesota Mutual. Several weeks later, in July, 1992, Mr. McGill received a telephone call from Mr. Johnson, who advised Minnesota Mutual had issued the policy as applied for, noting only that the monthly premium would be slightly higher than originally anticipated.

Mr. McGill was not sent a copy of his policy either by Mr. Johnson or by Minnesota Mutual. However, as of approximately August 1, 1992, monthly premium payments were commenced and continued monthly thereafter. Mr. McGill never received any correspondence from either Mr. Johnson or Minnesota Mutual at the time his disability policy was issued, but he has since received annual statements, captioned "Your Annual Policy Review," which in each instance have confirmed his annual premium amount and that the policy provides for a monthly benefit of $3,400.

In November, 1995, Mr. McGill became permanently disabled, as a result of which he was no longer able to work. On November 30, 1995, Mr. McGill duly filed his claim for monthly disability payments under his Minnesota Mutual policy and, after the required 90-day waiting period, those payments commenced. In the spring of 1996, Mr. McGill called Minnesota Mutual to inquire about the mechanics of the inflation protection provision of his policy referenced in Minnesota Mutual's literature he had been given by Mr. Johnson when he initially applied for the policy four years earlier. His call was directed to Ms. Cheryl Wolf, one of your claim administrators in St. Paul. When Mr. McGill asked Ms. Wolf how or at what rate the inflation protection would be computed and compounded on his monthly benefit between then and age 65, he was shocked to be informed by her that, while such compounding would ordinarily occur until age 65, in his case the duration would be only five years, because his policy provided for a benefit payment term of only five years.

This communication by telephone from Ms. Wolf was the first notice Mr. McGill had ever received from any source indicating his Minnesota Mutual long-term disability policy did not conform to his application and did not provide, as issued, for benefits extending

until age 65. At that time, Ms. Wolf also made reference to a letter dated July 21, 1992 which Minnesota Mutual had purportedly mailed to Mr. McGill at that time. Thereafter, Ms. Wolf forwarded a copy of that letter to Mr. McGill at his home, which he received and saw for the first time in May, 1996.

Mr. McGill's policy with Minnesota Mutual bears an issue date of July 2, 1992. It was apparently forwarded to Mr. McGill's employer, but never to Mr. McGill directly. The bound booklet which comprises the policy contains his application for coverage taken by Mr. Johnson, which clearly specifies he is to receive monthly disability payments to age 65. It does not contain any other application for a lesser term approved by Mr. McGill or any amendment approved by him. At the end of the booklet, not contained within the binding, is a term sheet, materially different from the one presented to and approved by the insured, limiting the benefit period to five years and showing the increased monthly premium. The letter mentioned by Ms. Wolf states that "it was necessary to make some changes to the policy we are offering," but fails to specify what the changes are. This letter was not even dated until nearly three weeks after the policy was issued.

As indicated, Mr. McGill did not receive the letter in 1992. However, even if he had, there is nothing in the letter notifying Mr. McGill of the critical information that the term of the disability benefits he had applied for had been denied and shortened to five years. Thus, even if Mr. McGill had had occasion to see the letter before his disability arose, he would have had no way of knowing from its contents that it was intended to inform him of any change other than the increased monthly premium amount for the disability coverage he had originally applied for and reasonably believed he had received.

Significantly, almost all correspondence sent to Mr. McGill by Minnesota Mutual pertaining to his disability coverage, except for the policy itself, which he was not sent at all, and the July 21, 1992 letter, was mailed to him at his home address. Thus, whether by design or neglect, Mr. McGill was not advised and was effectively deprived of any realistic opportunity of knowing the policy Minnesota Mutual issued did not conform to his application. Mr. McGill could not possibly have gleaned that information or even suspected it from the fact that the monthly premium payment was slightly higher than the amount originally quoted by Mr. Johnson when his application was solicited. Eastern Shore, now known as The Interflex Group, was just as surprised as Mr. McGill to learn in 1996 that the policy Minnesota Mutual had issued was not the policy Mr. McGill had applied for in 1992.

It is noteworthy that within approximately eighteen months after Minnesota Mutual issued Mr. McGill this non-conforming disability policy, it then issued him a $350,000 life insurance policy in accord with his application. A similar physical examination of Mr. McGill was conducted for the $350,000 life insurance policy and no exceptions were taken. Mr. Johnson was Minnesota Mutual's agent in the sale of the life insurance policy as well.

Why Minnesota Mutual would have issued a non-conforming disability policy to Mr. McGill in the manner it did, without either informing him as the insured or seeking to obtain an amended application from him, is and will remain a mystery. It is perfectly obvious the discrepancy between the coverage Mr. McGill applied for and the coverage Minnesota Mutual actually issued is both substantial and material. Mr. McGill would not have considered accepting the coverage as issued had he been properly informed of the five year benefit limitation at the time. Mr. McGill relied in good faith on the coverage in the original term sheet provided by Minnesota Mutual and Mr. Johnson. Mr. McGill's end of the bargain has been completely performed by the payment of premiums from the application date until the premium waiver became effective after he was disabled.

It is clear that Minnesota Mutual's issuance of a non-conforming policy without due notice constitutes a breach of its contract for which Mr. McGill is entitled to recover his damages. And, whether or not intended, the circumstances herein had the effect of perpetrating a constructive fraud on Mr. McGill as the insured. Mr. McGill's damages include eleven years and seven months of monthly disability payments (commencing at the expiration of the five year term stated in the policy) for which Minnesota Mutual, per its non-conforming policy, is denying coverage. The sum of the monthly payments Mr. McGill is entitled to receive but is being wrongfully denied is $671,260.04. To compute this we have factored in 3% as an average, annually compounded, inflation protection increase (the policy limit being 4%). The present value of those future payments to which Mr. McGill is duly entitled but being denied, discounted at a capitalization rate of 6%, is $497,117.10, which Mr. McGill considers a substantial sum.

We offer you two settlement options, either of which will fully resolve Mr. McGill's claim if accepted. The first is simply to revise the monthly payment term of Mr. McGill's policy to conform to the contract, i.e., from five years to age 65, thus curing the breach. The second is to pay Mr. McGill the present value of his lost payments in the amount stated above.

Mr. McGill would like to amicably settle this claim if possible, and that is the purpose of this letter. Unfortunately, his previous attempts to effect a resolution through your agent, Mr. Johnson, have been unsuccessful. Mr. Johnson, after searching his files during the summer of 1996, acknowledged no amended application had been solicited or received from Mr. McGill and stated the situation looked "pretty clear-cut," or words to this effect, that Mr. McGill was entitled to monthly benefits to age 65. But since making such acknowledgement, Mr. Johnson has avoided any further communication with Mr. McGill. This matter has now reached a point where it must either be settled amicably or resolved by litigation.

Accordingly, we hereby make demand for immediate settlement on the basis of either option offered above. Please be advised, however, that if neither is accepted by 5:00 p.m., E.S.T., on November 18, 1996, we shall, as directed by Mr. McGill, thereupon institute suit to recover his damages. Given the facts, we wholeheartedly agree with Mr. Johnson's observation that this situation is clear-cut, and we believe a jury would have no difficulty awarding our client his damages, but the choice whether to settle or litigate is yours to make.

We look forward to your prompt response.

Very truly yours,

Thomas F. Coates, III

TFCIII/slhp

cc: Mr. John L. McGill