# EXHIBIT "6"

# Pages 1 - 60

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

---

JOHN L. McGILL,

Plaintiff,

v. Case No. 05-481 S

MINNESOTA MUTUAL LIFE
INSURANCE COMPANY, Alias,
Defendant.

COPY

---

DEPOSITION OF

J. MICHAEL JOHNSON

1:00 p.m. - 4:00 p.m.

April 12, 2006

Richmond, Virginia

Job No. 173707

REPORTED BY: Joseph C. Spontarelli, CCR

Deposition of J. MICHAEL JOHNSON, taken by and before Joseph C. Spontarelli, Notary Public in and for the Commonwealth of Virginia at large, pursuant to Federal Rules of Civil Procedure and by notice or agreement to take depositions; commencing at 1:00 p.m. on Wednesday, April 12, 2006 at Sagemark Consulting, 107 S. 1st Street, Richmond, Virginia.

APPEARANCES:

D'AMICO-BURCHFIELD, LLP
By: Jessica L. Basso, Esquire
536 Atwells Avenue
Providence, Rhode Island 02909
(401)454-1212
hkb@dblawri.com
On behalf of the Plaintiff

HARVEY-PENNINGTON, Ltd.
By: Melissa Lang, Esquire
1835 Market STreet
29th Floor
Philadelphia, Pennsylvania 19103
(215)563-4470
mlang@harvpenn.com
On behalf of the Defendant

Also present:
John L. McGill

INDEX TO WITNESS

| Witness | Examined By | Page |
| --- | --- | --- |
| J. Michael Johnson | Ms. Lang | 7 |
| | Ms. Basso | 68 |
| | Ms. Lang | 110 |
| | Ms. Basso | 113 |
| | Ms. Lang | 116 |
| | Ms. Basso | 117 |

INDEX TO EXHIBITS



| Exhibit No. | Description | Page |
|---|---|---|
| Johnson No. 1 | Policy Delivery Instructions | 7 |
| Johnson No. 2 | Letter dated July 21, 1992 | 7 |
| Johnson No. 3 | Automatic Payment Plan Authorization | 7 |
| Johnson No. 4 | Check #0257 | 7 |
| Johnson No. 5 | Billing Document | 7 |
| Johnson No. 6 | E-mail dated 5-20-96 | 7 |
| Johnson No. 7 | Two-page phone message | 7 |
| Johnson No. 8 | Bill | 7 |
| Johnson No. 9 | Bill dated 5-9-96 | 7 |

INDEX TO EXHIBITS

| Exhibit No. | Description | Page |
|---|---|---|
| Johnson No. 10 | Disability Policy | 40 |
| Johnson No. 11 | Lawsuit documents from the Commonwealth of Virginia | 64 |
| Johnson No. 12 | E-mail dated 6-10-92 | 80 |
| Johnson No. 13 | Individual Claim Memoranda | 84 |
| Johnson No. 14 | Letter dated Dec. 27, 1995 | 99 |
| Johnson No. 15 | Notice of Underwriting Action | 104 |
| Johnson No. 16 | Two-page document including fax cover sheet and 1099 | 106 |

INDEX TO EXHIBITS

| Exhibit No. | Description | Page |
|---|---|---|
| Johnson No. 17 | Two-page document entitled Notice of Complaint | 114 |

P R O C E E D I N G S

1:00 p.m.

(Johnson Exhibit Nos. 1, 2, 3, 4, 5, 6, 7, 8 and 9 Marked for Identification.

J. MICHAEL JOHNSON,

was sworn or affirmed and testified as follows:

MS. LANG: Any stipulations?

MS. BASSO: I would like the witness to read and sign.

MS. LANG: Do you want to reserve objections for trial or not?

MS. BASSO: I usually object during the course of and then instruct the deponent to answer, but I can reserve my objections until trial. I don't have a problem with that.

MS. LANG: We'll stipulate that all objections except as to the form of the question are reserved until the time of

trial.

BY MS. LANG:

Q Mr. Johnson, my name is Melissa Lang. I represent the Minnesota Life Insurance Company in litigation pending in the United States District Court in the District of Rhode Island that was initiated by John L. McGill.

I placed you under subpoena today to take your testimony in that action concerning your recollections of buying of coverage for a disability policy for which Mr. McGill was the named insured.

I'm going to be asking you questions today about that, a little bit about your background and the events that led up to the coverage and then subsequently claimed by Mr. McGill against the policy.

During the course of your testimony today you're going to be testifying under oath just as though you were in court. Do you understand that, sir?

A Yes.

Q During the course of the deposition it's very important that you give verbal responses to the questions so that the court reporter can take down everything that you say. Do you understand that, sir?

A Yes.

Q During the course of the deposition since this is not like a normal conversation I'll ask that you please wait until I completely finish speaking even if you know the answer to the question before I finish it because it is very difficult for the court reporter to take down two people speaking at one time. Do you understand that, sir?

A Yes.

Q If you need to take a break for any reason please say so and we'll go off the record and we can take a break for any reason at all.

A Okay.

Q Mr. Johnson, please state your name

for the record.
A My name is James Michael Johnson.
Q Are you currently employed, sir?
A Yes.
Q By whom are you employed?
A Lincoln Financial Advisors.
Q What do you do for Lincoln Financial Advisors?
A Financial planning. I'm a financial planner.
Q How long have you been doing that for Lincoln Financial Planners?
A For Lincoln probably four years.
Q What is your educational background beginning with high school, sir?
A I graduated from West Rome High School in Rome, Georgia. I attended Furman University. I graduated from there with a degree in business and economics. I have several professional designations that I've basically taken tests for since that time.
Other than that I have continuing ed

and I've taken many classes on insurance, investments, taxation, estate planning, financial planning; all those kinds of things.

Q What insurance designations do you have, sir?

A The insurance designation really is a chartered life underwriter.

Q When did you obtain the designation of chartered life underwriter?

A 1978.

Q Do you have any professional licenses?

A Other than driver's license?

Q Yes.

A I'm registered with the NASD.

Q How long have you been registered with the NASD?

A I don't know. Probably over 20 years.

Q After you graduated from Furman can you briefly run through your employment

history up until becoming a financial planner for Lincoln Financial?

A I worked for Don Reed & Associates right out of college. I was there for three years.

I moved to Roanoke, Virginia and I was with Shenandoah Life Insurance Company in their home office. I was sort of a liaison between the field and the home office.

In 1978 I moved to Richmond. I was with a company called Financial Planning Associates. I think I was there about three years.

In 1981 I moved to Connecticut Mutual. I was with Connecticut Mutual for several years and actually worked here in Richmond and in South Carolina for them.

In 1988, I believe it was, I moved back to Richmond and that's when I worked with Virginia Asset Management, which was the organization that I was with during the time when I sold the insurance through The

Interflex Group and that was with Minnesota Mutual.

Do you want me to continue to go on?

Q No. That brings us to the relevant time period. If I have any more questions about your background I'll ask later on in the deposition.

Virginia Asset Management, is that company still in existence?

A Yes.

Q Where is it located?

A It's located at 9122 Forest Hill Avenue now. They're building a new building on Midlothian Turnpike and I don't know if they moved but that's where they used to be.

Q What kind of company was Virginia Asset Management?

A It's a company that specializes and works with business owners, small businesses doing executive and fringe benefit planning for executives and employees.

Q What was your position with Virginia

Asset Management?

A There were two people that were sort of the mentors that had experience and we worked with all the new guys on developing cases and helping them work with their clients. We were sort of the senior advisors that worked with the young guys. They basically scheduled appointments for me and then I would assist them on developing a plan and working with them.

Q When you say developing a plan, what kind of planning are you referring to?

A It depends. Sometimes it was pretty simple, sometimes it was an executive fringe benefit plan which could have been deferred comp, it could have been key man insurance, it could have been for buy-sell agreements, it could have been a number of different things.

We would talk to the clients, obviously, and listen to them and try to determine what their goals and objectives

were and then see if we had any way of helping them or some means of helping them work more efficiently to achieve those goals.

Q Do I understand correctly that in general you're talking about providing plans of employee benefits to businesses?

A Primarily.

Q At some point in time did you come to have a relationship with the Minnesota Mutual Life Insurance Company?

A Yes.

Q When did you first develop that relationship?

A I can't recall. I think it was 1989.

Q What was the nature of your relationship with the Minnesota Mutual Life Insurance Company?

A I was a licensed agent with them, registered rep with them and was approved to do business through that entity.

Q When you say approved to do business, what kind of business are you referring to,

sir?
A Life insurance, investments, annuities, all those type things.
Q Would that include disability insurance?
A Yes.
Q When you say licensed agent can you explain what that term means?
A Simply that I have been approved and passed certain tests to be licensed with the state of Virginia to solicit insurance within the state of Virginia. You have to be both licensed and appointed to do business. You have to be licensed by the state and appointed by each company to do business with them.
Q Am I correct in my understanding that at some point you came to have a business or a professional relationship with Mr. McGill who is the plaintiff in this action?
A Yes.
Q I also understand that you had a

professional relationship with Mr. McGill's former employer who I understand is now known as The Interflex Group; is that correct, sir?

A That's correct.

Q Did you have a relationship with Mr. McGill first or with The Interflex Group first?

A Interflex.

Q How did you come to have a relationship with Interflex?

A Actually one of the people that Sylvia, who I haven't seen in quite a while, actually called Joe Doyle and set up the initial meeting.

Q Sylvia was with Virginia Asset Management?

A Yes.

Q Who is Joe Doyle?

A He was the principal in Eastern Shore Printing; president of the company at that time, I think.

Q Is Eastern Shore Printing a

predecessor of Interflex?

A Yes.

Q What was the business of Eastern Shore Printing?

A They did some pretty sophisticated printing for the food industry primarily where they would print on some kind of Cryovac; very clear, thin paper. As I understand it the trick was to print it so that the printing would not be distorted and you could still read it after wrapping it around a chicken or grapes or whatever they were packaging. They did mostly food packaging.

Q Did you know of Eastern Shore Printing before Sylvia set up the appointment with Mr. Doyle?

A No.

Q When did you first meet Mr. Doyle, if you recall?

A I don't know. I have no idea. I could probably go back and maybe dig it up,

but it was quite a number of years ago.

Q Was it before or after you had a professional relationship with Minnesota Life?

A It was after.

Q Sometime after 1989?

A That's correct.

Q When you met with Mr. Doyle was anyone else present at that meeting?

A I'm not sure at that particular meeting. The first meeting it was probably just Mr. Doyle. Typically when I met with him his wife, Mickey, was there and accompanied him.

Q What was the subject of the first meeting that you had with Mr. Doyle?

A Just a very general discussion about what my business entailed. I simply just asked him a number of questions about his business, about his planning, about everything from insurance to wills and fringe benefits, what the business was doing, what

he had done in terms of planning. It was really just a basic data gathering meeting.

In a brief time we told him a little bit about what we did and he told us what he had already been doing. We just basically tried to discover if there was any common ground and need to go further.

Q Was there any common ground in going forward?

A Sure.

Q What did you agree to move forward on with Mr. Doyle at that first meeting?

A We didn't really come to any conclusions. We weren't really selling anything at that meeting. We just talked and we agreed to continue the discussions.

Q Did the discussions in fact continue?

A Yes.

Q Can you describe for me generally how those discussions continued and when they continued?

A I can't give you exact dates, but I

can tell you that over the next several months we met a number of times talking about Joe's personal planning, he and Mickey, and also about Eastern Shore Printing and about some of the things he wanted to do and felt like were important to him and the company.

Q I recognize this was a long time ago. Is there anything you can recall specifically that was important to Mr. Doyle with respect to his business planning at that point?

A Disability insurance was a big deal so we looked at both group and individual policies for him and some of the key people that were there.

Q What was Mr. Doyle looking for in terms of disability insurance?

A He just wanted a disability policy that would cover his executives. Like most business owners he didn't know any of the specifics of the contracts. We showed him both individual policies and group policies and basically we provided a menu of here are

a number of choices, tell me what you want, tell me what appeals to you and certainly that was driven by both the benefits and the cost.

Q At the point in time that Mr. Doyle indicated to you that he was interested in purchasing disability insurance for his executives at Eastern Shore Printing, had you had an opportunity to meet Mr. McGill yet?

A I'm not sure what time in that process Mr. McGill became employed. I think I had already done some work for Eastern Shore Printing prior to Mr. McGill arriving.

Q How did you meet Mr. McGill?

A I'm sure either Joe or Mickey Doyle introduced us. I don't remember the exact date or how we met.

Q When you met Mr. McGill did you have any discussion with him concerning obtaining an individual policy for him for disability coverage?

A Are you asking me if I had that

discussion the first time we met?

Q Yes.

A No.

Q At any time after your first meeting did you ever have a discussion with Mr. McGill regarding obtaining an individual disability insurance policy for himself?

A Yes.

Q What was the substance of those discussions?

A It's hard to summarize it in just a few sentences. We talked about the benefits. When Mr. McGill came to Eastern Shore Printing there were certain benefits that he would be eligible for that the company had established for the key employees. At some point we got into that discussion and we applied for both group insurance and an individual policy for disability for Jack.

Q When you say we applied for both a group and an individual disability policy for Jack, who is we?

A It was primarily me and it might have been Sylvia who was assisting me.

Q Was the individual coverage that you discussed with Mr. McGill separate and apart from the program of disability insurance that you had discussed with Mr. Doyle?

A No. Essentially all the policies were with Minnesota Mutual and the reason for that is it's not really group insurance, it uses individual contracts. When you do it on a franchise-type basis where you have more than two or three employees you get a discount. I can't recall what the discount was. It seems like it was ten to 20 percent off the regular premium.

Q Without reference to any documents do you have any recollection of what you proposed in terms of a disability insurance program for the executives of Eastern Shore Printing?

A All executives basically had the same coverage, or we tried to get everybody the

same coverage. It was basically a non-cancelable disability policy that provided benefits to age 65.

Q Do you recall the names of the other executives besides Mr. McGill who were going to be participating in this program of insurance?

A Eric Bumgarner was one, Glen Hunahan I think was one. I'm trying to think. If you had a list of names I could probably pick out those names. I haven't talked or communicated with them. Most of those folks left The Interflex Group and it's been a long time -- at least ten years -- since I've had any communication with any of them. There was a guy named Danny something. I can't remember Danny's last name. I think he had disability insurance.

Q I'm going to show you a document that we've marked for identification as Johnson Exhibit No. 3.

A Danny Phillips.

Q Do you recognize this document at all?

A Yes, ma'am.

Q What do you recognize this document to be?

A This is a bank draft authorization for Minnesota Mutual disability insurance.

Q There's a center section of that document where it says client's name. Do you see where I'm showing you, sir?

A Yes.

Q Do you recognize the names there as people who were to participate in the executive disability insurance plan we've been discussing this afternoon?

A Yes.

Q The first name there appears to be Joseph R. Ambs.

A Right.

Q Who is Mr. Ambs?

A He was one of the management people at Eastern Shore Printing at the time.

Q Do you know where Mr. Ambs is today?
A I have no idea.
Q Next name is Eric N. Bumgarner.
A Uh-huh.
Q That was one of the names you did recall. Do you recall what Mr. Bumgarner's position was?
A I think he was the plant manager in North Carolina.
Q Do you know where he is today?
A The last I heard he was still working for what is now called The Interflex Group in the capacity of a plant manager down there.
Q In North Carolina?
A In North Carolina.
Q Timothy W. Carter.
A I have no idea.
Q Joseph S. Doyle.
A That's Joe Doyle. Joe is probably in a place called Sunapee, New Hampshire. He's retired. I don't have any contact with him either.

Q John McGill is the plaintiff.

A Right.

Q Daniel L. Phillips.

A Danny moved here from Maryland. He lived here for a while. He changed jobs two or three times. I don't know where he is now.

Q What about William R. Wilson?

A I don't have any contact with him either.

Q Do you recall what Mr. Wilson's position was?

A No, I really don't. If I remember correctly he was someone that had actually worked with Jack McGill in a previous plant -- I think, I'm not sure. I don't know what he did.

Q Now, your discussions with Mr. Doyle concerning the disability insurance coverage to be provided by Minnesota Mutual, was there any discussion as to who would pay for that coverage?

A I'm sure there was.

Q Do you recall what that discussion was?

A Not really. I can tell you from this form here whether it was -- I can't tell you ultimately whether it was charged as income to the employees but I can tell you that Interflex paid the premium.

Q Earlier you testified that initially the discussion with Mr. Doyle was that all the executives would get the same coverage which would be non-cancelable to age 65. Was that in fact the coverage that you obtained through Minnesota Mutual for all of the executives that were going to participate in the program?

A No.

Q What did you end up getting?

A I can't recall. There might have been a couple people other than Jack that we couldn't get exactly what we had tried to obtain. On Jack McGill's policy the contract

was issued with a five-year benefit period rather than age 65 benefit period.

Q Do you know why you were not able to get a policy issued for Mr. McGill with benefits to age 65?

A That was just an underwriting decision by Minnesota Mutual.

Q What did you have to do in order to get coverage bound for this program?

A What I had to do or what the proposed insureds had to do?

Q What did you have to do? What steps did you have to take to get the process started?

A The first thing I had to do was secure the census data from the human resources department which at that time was Mickey Doyle and she gave me the salaries, names, age, income and then the hire date for all the employees. That was the first thing.

Then I took that data and was able to put together a proposal and brought that back

for each employee and we looked at both the price of the individual coverage and the cost of group insurance. Ultimately both of those were implemented.

Q Both of those were what?

A Implemented, both group and individual policies.

Q The group insurance, was that for all employees of Eastern Shore Printing?

A Yes, it was.

Q And the individual policies, was that restricted to the executive employees as you testified to previously?

A Yes.

Q After you presented the proposals -- let's confine it to the individual policies because the group coverage isn't at issue here -- you had the census information, you created the proposals -- what was the next step?

A The next step was to fill out applications on each person and then each

proposed insured had to have a paramedic exam and depending on their age and income level they may have required more things for higher benefit levels of coverage. For example, some people may have had to have an EKG and some people may not have had that requirement.

Q So after the proposal the next step was to get health information on proposed insureds, do I understand you correctly?

A When they do the exam typically they do a urinalysis, a blood test and they ask all the medical history type questions and then the insurance company will write to a personal physician to secure that back-up data, whatever the proposed insured has told them on the application, then they make the underwriting decision.

Q After all this information was provided to Minnesota Life was coverage bound for all of the executives for the individual policies?

A I think so. I'm not sure. I don't think anyone was absolutely declined.

Q Was coverage bound for Mr. McGill?

A Yes.

Q I understand from your earlier testimony that Mr. McGill's coverage was bound with a five-year benefit limitation.

A That's correct.

Q How did you learn that, sir?

A I can't recall whether I was told that or I saw it in an e-mail type of correspondence.

I've been doing this for 33 years and every time I have a client's contract that's issued differently than I propose it I always call the underwriter and talk to them about it. I asked them what happened, what's going on. I try as much as I can to get the type coverage that we wanted to secure initiated, but sometimes you can do that and sometimes you can't.

Q Do you know whether you had any

contact with an underwriter at Minnesota Life concerning Mr. McGill's individual disability policy?

A As I said, I call on every one of them that's issued differently than I apply for so I assume that I did. I don't remember whether I did or not.

Q Would it be fair to say you don't recall the name of any underwriter you may have spoken to?

A Absolutely not.

Q What timeframe are we talking about here in terms of getting these policies bound, do you recall?

A Generally it takes about 90 days. The longest holdup is typically getting the information from personal physicians.

Q Do you recall what year these policies were issued?

A No, but I could look it up.

Q We'll get to that later. We'll take a break and we'll go through those later.

Do you know whether any change was made in the policy that was issued for Mr. McGill after any telephone conversation you may have had with Minnesota Life's underwriting staff?

A No, they didn't change it.

Q I'm going to ask you to take a look at a document we marked for identification as Johnson Exhibit No. 1.

A Okay.

Q Do you recognize that document, sir?

A Uh-huh.

Q What do you recognize that document to be?

A Well, it's just as it says at the top right, Policy Delivery Instructions.

Q Is that a Minnesota Life document?

A Yes.

Q What are Policy Delivery Instructions, to your understanding?

A Typically when you receive a policy back that's been modified, changed there are

delivery instructions and most of the time there are amendments. Things have changed so much in the last ten, 15 years back. In today's world anything that's modified both the client and the agent would have to sign off saying that they agreed to it. I don't really recall what the requirements were at that time.

Q Did you deliver this policy to Mr. McGill?

A Yes.

Q Do you have a specific recollection of the circumstances under which you delivered the policy to him?

A No.

Q Did you have any conversation with Mr. McGill concerning the modification of the policy?

A I'm sure I did. I talked with both he and Mickey Doyle about it.

Q What did you discuss with Mrs. Doyle?

A I don't remember the specifics of the

conversation. I just basically told her that the policy had been issued differently than what was applied for and gave her the facts of the case.

Q When you say the facts of the case what facts are you referring to, sir?

A I'm talking about the premium, the coverage period; the specifics that relate to that particular policy.

Q Would that include the modification?

A Yes.

Q What was the modification?

A I know the benefit period was reduced from being a policy that covered him from age 65 -- from his current age that the policy was issued to age 65 it had being reduced to a five-year benefit, meaning in the event of disability he would have been paid benefits for that five-year period.

I can't recall whether the premium increased or not as a result of that. Sometimes that happens, sometimes it doesn't.

I don't remember.

Q When you spoke with Mrs. Doyle was Mr. McGill present?

A I'm not sure. I don't remember.

Q Did you speak to Mr. McGill about the modification to the policy?

A Yes.

Q What did you tell Mr. McGill as best you can recall?

A The same thing I would tell anyone; that the contract had been modified. Typically when I talk to the underwriter I try to get specific things. For example, if they limited a contract because of someone's health was it due to high blood pressure, was it because someone had cancer before or simply because they were overweight. If they're overweight then I would explain to them that if they lose some weight and they keep it off for a while then we can always reapply. For example, if someone has cancer there's not a lot we can do about that

rating. It's pretty much a permanent rating.

Q Do you recall what the reason was for the limitation of the benefit period on Mr. McGill's policy to five years?

A No, I don't. I really don't remember.

Q When you delivered the policy to Mr. McGill and you had the conversation that you just previously described, do you know if anyone else was present?

A I don't remember that.

Q Did you meet with the other individual disability insurance insureds for this particular program for Eastern Shore Printing much as you described for Mr. McGill?

A Yes.

Q When you met with Mr. McGill did he discuss with you the limitation of the benefit period to five years?

A I really can't recall the conversation. I'm sure that we had a typical

conversation that anyone would have. He would want to know why it was changed, if it's permanent, if there is anything we can do about it and those kinds of things. I can't remember the specifics of the conversation.

Q Do you know what year you delivered the policy to Mr. McGill?

A Do I know just off the top of my head?

Q Yes.

A No.

Q If I showed you a copy of the policy do you think that might refresh your recollection?

A Sure.

(Johnson Exhibit No. 10 Marked for Identification.)

BY MS. LANG:

Q Mr. Johnson, if you could just take a

look at the document we marked for identification as Johnson Exhibit No. 10.

A Uh-huh.

Q Can you take a minute to go through it? I know it's not the best copy in the world, but it's the best one we could get.

A Okay.

Q Do you recognize that document, sir?

A Uh-huh.

Q What do you recognize that document to be?

A It's a disability policy on Mr. McGill.

Q When was that policy issued, sir?

A July 2, 1992.

Q Does that refresh your recollection as to when you would have delivered the policy to Mr. McGill?

A Because the insurance company requires you to deliver it typically, depending on the contract, within ten to 30 days it was certainly, I would think, between

July and the end of August at the latest when I delivered the contract.

Q Of 1992?

A Uh-huh.

Q Would it be fair to say that any conversation that you had with Mr. McGill concerning the benefit limitation period on the policy as issued would have occurred during that time period as well?

A Yes.

Q After you delivered the policy to Mr. McGill did you continue to have any type of personal or professional relationship with him?

A Yes.

Q What was the nature of that relationship, sir?

A Which one, the personal or business?

Q Let's start with business.

A The Interflex Group was one of my clients so as a result I think at that point we handled the group disability, the group

health insurance and the executive disability insurance and, I think, we also had applied for some life insurance. Jack and his wife had applied for some personal life insurance that was not paid for by Eastern Shore Printing.

Q How long did that business relationship continue after 1992?

A It continued until shortly after Mr. McGill left the company.

Q When was that?

A I have no idea. I can't remember whether it was two or three years or five years after that. I would imagine it was before 1997, '98, somewhere around there. I don't recall.

Q Looking again at the document we've marked for identification as Johnson Exhibit No. 10, I'd like you to turn to the third page of that document.

A Okay.

Q Looking in the bottom left-hand side

of the page -- it's actually page 1A -- the third page of the exhibit -- where it says type of coverage, disability income/own occupation insurance policy. Do you see that, sir?

A Yes.

Q Do you see two paragraphs down where it says maximum benefit period for disability five years?

A Yes.

Q Do you have any reason to believe that the policy that you delivered to Mr. McGill differed in any way with its page 1A?

A No, it was just like this.

Q So it did bear the legend there maximum benefit period for disability five years?

A That's correct.

Q What was your personal relationship with Mr. McGill?

A We played golf together. We did a

lot of things socially together.

Q During what period of time, sir?

A I would say 1992 to 1995 would be my guess. I'm not sure.

Q Is there some reason why the social relationship ended in 1995?

A No, only that Mr. McGill moved to New York.

Q Do you know why Mr. McGill moved to New York?

A I guess he wanted to. I don't know. You'd have to ask him.

Q I would like you to take a look at a document that we've marked for identification as Johnson Exhibit No. 2.

A Go ahead.

Q Do you recognize that document, sir?

A Yes, I do.

Q What do you recognize that document to be?

A This is a letter that came from Minnesota Life to Mr. McGill at his business

address relating to application number 1933689H. It simply states that there was an adverse decision made related to his disability application. It says that the decision was based on his build, abnormal blood tests and information from Dr. Staples.

Q Have you seen that letter before today?

A I don't recall. Typically I do not see this letter. This letter for privacy reasons wouldn't come to me, it would go directly to Mr. McGill. Anything that they usually send to me they would have carbon copy on the bottom.

Q You referenced in your testimony it was sent to Mr. McGill's business address. Is that the 125 Dow Gil Road, Ashland, Virginia address?

A Yes, ma'am.

Q Was that Eastern Shore Printing's address?

A Yes.

Q Do you know if Mr. McGill had an office at that address?

A He did have an office there.

Q Do you know if Mr. McGill regularly received mail at that address?

A I don't know.

Q I would ask you to take a look at another document we've marked for identification as Johnson Exhibit No. 4 and I'll ask you again, sir, do you recognize that document?

A It looks like a check to me.

Q Do you recognize the check as one that you would have seen before in connection with the executive disability insurance plan for Eastern Shore Printing?

A Yes. I can't swear to it. This is just a blank check, so I really don't know where it came from. It is a check for Virginia Printing and Converting which is also the same name as Eastern Shore Printing, Interflex depending on the time of the

company's existence.

Q In connection with obtaining this coverage was it necessary for you to obtain a copy of a Virginia Printing/Interflex/Eastern Shore Printing's check?

A Yes. Typically these two forms, which would be Johnson Exhibit 3 and 4, would be together.

Q Why would they be together, sir?

A This is an authorization to draft a bank account. This tells them which bank account to draft. Exhibit 3 authorizes the bank draft. Exhibit 4 is a voided check to show them which account to draft for these premiums.

Q Did that include payment of the premium for Mr. McGill's disability policy number 1933689H?

A Yes, it did.

You will notice down here at the bottom on this page here it stays NationsBank of Florida, which I assume is the same

account.

Q As on the voided draft?

A Yes.

Q Johnson Exhibit No. 3 references Mr. McGill's name and then a policy number 1933689H; is that correct, sir?

A Yes.

Q I would ask you to take a look at a document we marked for identification as Johnson Exhibit No. 5. Do you recognize that document, sir?

A Yes.

Q What is that?

A This was a list bill that was sent to The Interflex Group to Mickey Doyle and it was a bill reflecting all the premiums due on disability insurance for The Interflex Group.

Q Is Mr. McGill's policy included on that list?

A Yes.

Q Is that document dated, sir?

A Yes, ma'am. It's dated December 16,

1993.

Q So as of October 16th of 1993 Mr. McGill's policy was still in force?

A Yes. However, it does show that the premium was late. It shows the past due amount and that's why it was changed to make sure that the policies did not lapse. It was changed to a bank draft effective 2-94 which I think you will find is the same date -- if you look at the bottom here it's 2-17-94 on this.

Q You're referring to Johnson Exhibit No. 3?

A Yes.

Q At some point in time do you know whether or not Mr. McGill made a claim for benefits against his disability policy?

A Yes, he did.

Q How did you learn about that claim, sir?

A I think Mr. McGill called me and told me he was going to file a claim due to his

sleep apnea.

Q Do you know whether that was before or after he moved to New York?

A That was before.

Q When Mr. McGill gave you this advice what, if anything, did you do in response?

A I had to notify the insurance companies, both the group insurance company and Minnesota Life, of the claim and they forwarded to me or Mr. McGill, I can't recall, the forms that needed to be completed by both Mr. McGill and his doctor related to the disability.

Q Did you assist in this claims process?

A I can't recall exactly what assistance I provided, but typically when these insurance forms come down from the home office there's lots of room for misinterpretation and most clients have questions on some of those forms so I'm sure I answered those questions for him.

I do remember that I did assist Jack in filling out the forms. I can't remember to what extent. Obviously I didn't fill them out for him but I helped answer any questions.

Q Do you recall specifically any questions that he may have had?

A No. They were just general questions.

Q Do you know whether or not Mr. McGill was still employed by Interflex, Virginia Printing, Eastern Shore or whatever entity it may have been at that time as of the date he filed the claim for benefits?

A I don't remember exact dates, but I do remember that it was not a big time difference there.

Q You say there was not a big time difference there. Did you come to understand at some point in time that Mr. McGill was no longer an employee of Interflex?

A Right.

Q How did you learn that, sir?
A I think Mr. McGill told me. I think he was the first to tell me. I probably had conversations with Joe and Mickey Doyle regarding that.
Q And thereafter you received advice from Mr. McGill that he was submitting a claim for disability benefits, is that correct?
A That's correct.
Q I'd like you to take a look at a document we marked for identification as Johnson Exhibit No. 6.
A Okay.
Q Do you recognize that document, sir?
A Yes.
Q What do you recognize it to be?
A It looks like an old fashioned e-mail.
Q Who's the e-mail from?
A It looks like it's from me to Crystal Walton.

Q Who is Crystal Walton?
A I don't remember. Based on the code there behind -- see it says Mike Johnson 0030, White and then Crystal White Walton has 0030 White -- that code on Exhibit 6 -- she was probably the person that handled this. I think in fact Terry, who was my secretary -- do you see thanks Terry for Mike Johnson -- Terry sent this e-mail to Crystal Walton to change the billing address to Mr. McGill's home address.
Q Do you know why that was requested?
A Because he was no longer employed at Interflex and he knew they weren't going to pay any more premiums and he wanted to continue the coverage.
Q Had Mr. McGill already filed his claim for benefits at this point in time?
A I don't remember.
Q Do you know what a waiver of premium provision is, sir?
A Uh-huh.

Q Do you know if Mr. McGill's disability policy had a waiver of premium provision?

A I don't remember that. I could look and see.

Q If you don't mind that would be, I believe, Johnson Exhibit No. 10.

A Typically it would be stated on page 1B where the Inflation Protection Agreement is included. It does say waiver of premium here on page....

Q I'm afraid there are no page numbers. It's actually at the bottom of 90-565, I believe. I believe it's the eighth page of Johnson Exhibit No. 10.

A Okay.

Q You're referring to in the lower left-hand corner waiver of premium?

A Yes.

Q What does the waiver of premium provision mean with respect to Mr. McGill's obligation to continue payment for the

premiums once he was no longer an employee of Interflex and had filed a disability claim?

A The premiums have to be paid until the 90-day elimination period has expired. After the 90-day elimination period has expired and if in fact he is disabled and he's satisfied the waiting period Minnesota Mutual under this provision would refund each premium which had previously became due during the period of disability. It also says we will also waive the payment for the future premiums as it becomes due during the period of disability.

Q Looking again at the e-mail from May 20th of 1996, now understanding that this policy had a waiver of premium provision can you now tell me whether or not Mr. McGill was in his waiting period at the time that the request was made to direct bill to the Ashland, Virginia address?

A I cannot tell you that because I don't know. If you show me a copy of the

claim form then I can tell you, but without that I don't recall.

Q Did you have any involvement in the administration of Mr. McGill's claim for disability benefits other than assisting with the initial form to place the carrier on notice of the claim?

A I can't recall having any. I can't remember anything else I would have done. If his doctor in filling out the forms would have had some questions we could have answered those. I can't remember if we visited with the doctor or not. We may have. I can't remember.

Q I'm going to ask you to take a look at a document we marked for identification as Johnson Exhibit No. 7.

A Okay.

Q I'm not going to ask you if you have seen this document before because it's an internal document of Minnesota Mutual. There are references to J. Michael Johnson, agent,

called and spoke with Kathy Bihan in claims. Does that refresh your recollection, sir, as to whether or not you had any interaction with Minnesota Mutual's claims staff in 1996? It looks like this is dated May of 1996.

A Evidently I did, but I don't recall having spoken with Kathy.

Q You've read the substance of what's written on the telephone call notes that we've marked as Johnson Exhibit No. 7. Can you tell me whether or not this accurately reflects how the payment arrangement for this policy was changed?

A It looks to me as though it's changed from a monthly bank draft, which Minnesota Mutual called APP plan, automatic payment plan, to a quarterly billing.

Q On the first page where it says action taken client is on claim and they are refunding premium payments after they have been made. They do not want wrong deducted from company APP plan. Is that something

that you discussed with Minnesota Life's claims staff?

A I think that says they do not want money deducted from the APP plan.

Q You're right. I was unsure of the handwriting, but I think you're right.

A That's not exactly the right spelling for money. What was your question?

Q The question was: Does this accurately reflect what you would have discussed with Minnesota Life's claims staff?

A It could have been. It's a typical type thing that would come up in a claim situation.

Q When it says they do not want money deducted from company APP plan would it be fair for me to assume that that is referring to Interflex?

A Since they were having to deduct it from their plan I would assume so. I don't like to assume things.

Q I understand.

I'm going to ask you to take a look at a document we marked for identification as Johnson Exhibit No. 8.

A Okay.

Q Do you recognize that document, sir?

A Yes.

Q What do you recognize that document to be?

A It's a bill.

Q What is it a bill for?

A It's a bill for a disability policy on Mr. McGill.

Q To whom is the bill directed?

A To John L. McGill at his home address in Ashland.

Q What is the date of that bill?

A It says amount needed by 6-2-96. Billing date was 5-23-96.

Q Was that after Mr. McGill had left his employment with Interflex?

A Again, ma'am, I don't know the date of his departure from Interflex. I don't