# EXHIBIT "6"

# PAGES 61-121

recall.

Q I'll ask you to take a look at and see if you recognize this last document which we've marked for identification as Johnson Exhibit No. 9.

A Okay.

Q Do you recognize that document, sir?

A Yes.

Q What do you recognize that document to be?

A This is the automatic plan payment information for plan number 0260920 which was the disability insurance for Virginia Printing and Converting; again Interflex or Eastern Shore Printing.

Q Did that include Mr. McGill's policy?

A It did.

Q There's some handwriting at the bottom of the document. Do you recognize that handwriting, sir?

A That's mine.

Q I can't read it. Can you tell me

what it says?

A It says Jack: Please send Interflex a check for $379.48. They paid the April and May premiums. Thanks, Mike.

Q That's you?

A Yes.

Q Over in the lower right-hand corner it looks like it says paid 5-23. Is that your handwriting as well, sir?

A No.

Q Do you recognize the handwriting?

A No.

Q This automatic payment plan information is dated May 9, 1996. Do you know why you would have sent this note to Mr. McGill back in May of '96?

A Well, I don't know exactly the date of his departure but I assume it was either prior to April or the first of April. Interflex had requested a reimbursement since he was no longer employed there for the premiums that they had paid on his behalf.

Q You're here pursuant to my subpoena today, correct?

A Yes.

Q The subpoena that I served upon you asked that you bring with you to the deposition any file related to Mr. McGill. Were you able to locate a file on Mr. McGill?

A No.

Q You did bring some documents into the room with you.

A Uh-huh. These were the documents you gave me.

Q At some point in time did you become involved as a party defendant in any litigation that was initiated by Mr. McGill?

A Yes.

Q When did that occur, sir?

A I don't recall. About 1997, '98, '99. I'm not sure.

Q Do you have any understanding of what Mr. McGill's claim was against you in that litigation?

A At that time I think he had filed suit against both Minnesota Life and me and -- I don't recall exactly the specifics. If you're asking me do I know exactly why he did that, I don't recall. I don't recall what the document said. I haven't seen it in almost ten years.

MS. LANG: Let's go ahead and mark this.

(Johnson Exhibit No. 11 Marked for Identification.)

BY MS. LANG:

Q Mr. Johnson, having reviewed the document we've marked for identification as Johnson Exhibit No. 11, does that refresh your recollection as to why Mr. McGill brought suit against you back in 1997?

A Yes.

Q What is your understanding of why Mr. McGill brought suit against you?

A Based on page 12, which says breach of contract, those were his thoughts or his attorney's thoughts as to what happened. Do you want me to read the entire page?

Q No, not at all.

I would like you to take a look at page number six of that document.

A Okay.

Q Looking at paragraph number 15 where it says neither Minnesota Mutual nor Johnson mailed or delivered the policy to McGill, nor did they inform him or notify him in any manner of the materially reduced long-term disability coverage to be provided by the policy as written and issued on July 2, 1992. Do you see what I'm referring to, sir?

A Uh-huh.

Q Do you agree with that allegation?

A No.

Q Why do you not agree with that allegation, sir?

A Well, because I think both Minnesota

Mutual and I did inform him of that.

Q When you say that you mean the reduced long-term disability coverage?

A Right.

Q I'd like you to take a look at paragraph number 16 where it says instead of forwarding McGill the policy as written and of duly informing him of the material alterations and discrepancies between the coverage it provided for as written and the coverage he had contracted for as stated in the proposal and of seeking and obtaining McGill's approval, Johnson, as Minnesota Mutual's authorized agent, called McGill by telephone in mid-July 1992 and notified McGill simply that the policy had been issued by Minnesota Mutual "without a hitch," and further informed him in passing merely that Minnesota Mutual would be charging a slightly higher monthly premium of approximately $25 per month more than Johnson originally quoted when the proposal was presented to McGill and

he accepted it. Do you see what I just read to you, sir?

A Yes.

Q Do you agree with the allegations set forth in paragraph number 16 of this document that you notified Mr. McGill simply that the policy had been issued by Minnesota Mutual without a hitch?

A Without a hitch is not something I would say. It's not terminology that I would say. It's not my words. I don't deny that I may have talked to him originally on the phone, but this is something that we would have done in person.

Q Referring to discussing the policy as issued with the five-year benefit limitation?

A Uh-huh.

Q Mr. Johnson, do you recall what the outcome was of the litigation filed by Mr. McGill against you in the Circuit Court of the City of Richmond?

A I think the case was dropped as far

as I can remember. We never did go to court. I think the motion was dropped.

MS. LANG: As of right now I have no further questions. I may have some follow-up after Ms. Basso has questions for you, but I have no further direct examination of this witness. Thank you.

BY MS. BASSO:

Q Mr. Johnson, my name is Jessica Basso and I represent John McGill in his action against Minnesota Mutual brought in the District Court for the State of Rhode Island.

If I ask you any questions that don't make sense or you can't understand just let me know and I'll rephrase the question. Is that okay?

A Sure.

Q My first question that I have for you regards TransGeneral. Is it true that TransGeneral was the insurance carrier for the group policy that you were referring to that was purchased for Interflex employees?

A I think so. TransGeneral, or the company that at one time was TransGeneral, has been several different things. The name has changed a number of times over the last several years. I have no idea what it is now. I don't do any business with them at this point.

Q You did do business as an agent for TransGeneral back in 1992, is that correct?

A Yes.

Q When did you stop doing business with TransGeneral, do you remember?

A I don't remember.

Q We're in 2006. Would it have been more than ten years ago?

A No. Probably three, four years ago.

Q Do you recall why you stopped doing business with TransGeneral?

A Probably because the last case I had with them was no longer competitive. We changed to some other insurance company or they changed their management structure and

we were no longer doing that line of business. I don't recall. That's typically the reason.

Q That was going to be my next question. Now that you're doing financial planning do you write or procure any more insurance policies for people or are you out of that line of work?

A We still do that if our clients want that.

Q But it's not your primary work right now.

A We charge a fee for our services. Our clients are not required to buy any products.

Q You testified earlier that your relationship with Minnesota Mutual began perhaps in 1989. When did your relationship with Minnesota Mutual end?

A I can't recall. Somewhere between '96 and '99. I can't remember.

Q Between '96 and '99?

A Yeah.
Q Do you recall why that relationship ended?
A I stopped doing business with them.
Q Was that for a particular reason?
A I didn't like the general agent that represented Minnesota Life very much. I didn't trust him. I felt like I had the opportunity to do business with anybody I wanted to.
When I was at Virginia Asset Management they encourage you strongly to do all the business through Minnesota Life and since I was no longer located in their office I could do business with anyone I chose.
Q Why didn't you trust Minnesota Mutual?
MS. LANG: Objection.
THE WITNESS: I didn't say I didn't trust Minnesota Mutual, I said I didn't trust Mike White.

BY MS. BASSO:

Q Who exactly is Mike White?

A He was the general agent, manager, whatever you want to call him for Minnesota Life.

Q When is the last time you spoke to Mr. White?

A I don't know. A long time ago.

Q More than ten years ago?

A Five to ten years ago, I assume.

Q The group long-term disability policy that you sold to Interflex through TransGeneral, do you know when you sold that policy to Interflex?

A No, I don't.

Q Do you recall how many participants were in that group plan?

A No, I don't. Typically with group insurance you have to have a certain percentage of employees otherwise the group insurance carrier will not issue the contract.

Q Do you know what that percentage was
back then or the typical percentage?
A The typical percentage might have
been 50 percent. I don't know what
percentage we had.
Q The group participants or the
participants in the group long-term
disability policy you sold to Interflex, did
those individuals have to submit to physical
examinations in connection with that group
policy?
A I don't think so. Typically not
unless it's extremely high limits for group
insurance for that type group.
Q Is it fair to say you were
compensated on each sale of these policies by
making a commission on the sale of the
policy?
A I was compensated, yes.
Q Would you call it a commission?
A I guess. You can call it whatever
you'd like.

Q Do you remember what your compensation was for --

A Not enough.

Q I need to finish my question.

A Sure.

Q -- selling the group long-term disability policy to Interflex through TransGeneral?

A No, I don't.

Q Do you remember what your compensation was for selling the individual policies through Minnesota Mutual to the executives at Interflex?

A No.

Q With respect to the group long-term disability policy, sir, who paid the premium for that?

A Interflex. Sometimes it's a cost sharing where Interflex pays part of it and an employee may pay part of it. I can't remember who paid the premium and the percentages.

Q Physical exams were required for each of the executives who were interested in purchasing the individual disability policy for Minnesota Mutual, correct?

A I think so.

Q I believe you referred to it as a paramedic exam.

A Yes.

Q Is it fair to say that a nurse or a paramedic went to Interflex to conduct these examinations?

A I don't know where they went. Sometimes they would go to their homes and sometimes they would go to their place of business. I have no way of knowing.

Q It is a health care provider that's selected by Minnesota Mutual, correct?

A They approve a number of them. I don't know who did the examines. They all do the same thing.

Q Just to take a step back for a moment, I know you testified earlier that you

could not locate your file that pertains to John McGill and the only documents you brought with you were documents that Attorney Lang had given to you.

My first question is: Were you provided with documents pertaining to your testimony today prior to today by Attorney Lang?

A Yes.

Q May I review what documents you were provided?

A I don't have any problem with that. This is everything I have. I'm the only one who has no financial interest in this so it makes no difference to me.

BY MS. BASSO:

Q When was the last time you sold any type of insurance policy to anyone at Interflex or to Interflex?

MS. LANG: Objection to the form of the question. You can answer.

THE WITNESS: About three years ago I

referred them to a friend of mine, Jim Barnett. Because everything they do is in North Carolina and Jim works in that area he went by to see them and I think he sold them some insurance but I did not.

BY MS. BASSO:

Q Is it fair to say that since that point three years ago you have not done any more business with Interflex?

A I don't know if it's fair to say, but that's absolutely true.

Q Did you keep records of your business transactions with Interflex?

A Did I?

Q Did you.

A I did for a while.

Q Do you still have those records?

A No.

Q Have you since gotten rid of them?

A After a while we shread those things when they're eight to ten years old especially now with all the privacy issues

and identity theft and those kinds of things.

Q When is the last time you had contact with Mickey Doyle either in person, by telephone or through written correspondence?

A I don't remember. Several years ago.

Q When is the last time you had contact with Joe Doyle?

A Same time. I don't ever talk to them.

Q You have not maintained a social relationship with them?

A No.

Q Did you ever have a social relationship with Mr. and Mrs. Doyle?

A I would say they were an acquittance. I don't know what your definition of social relationship is. I didn't get drunk with them, I didn't play golf with them.

Q I want to talk a little bit about the policy application process that you went through with Mr. McGill for the Minnesota Mutual policy. Is it fair to say that you

filled out the application for that policy?
A Yes.
Q That was your practice to fill out applications on behalf of potential insureds?
A Yes. That's what I always do.
Q The policy that was proposed to Mr. McGill would have provided monthly benefits for him up to the age of 65 when and if he became disabled, correct; that was the proposed policy?
A That was the proposed policy, correct.
Q Mr. McGill then had to submit to a physical exam, correct?
A Yes.
Q Do you know where Jack had his physical?
A I have no idea.
Q Did you, yourself, receive the results of that physical?
A No.
Q Is it typical that you would not have

received those results?

A They would not send that to me. That goes directly to the home office.

Q After you completed the application you would forward it to Minnesota Mutual and it would go to underwriting, correct?

A Right.

Q Once his application was in underwriting you were in contact with underwriting regarding his application, is that correct?

A I could have been. I'm not sure that I was. After the decision was made I probably called him because, as I said earlier, that was my typical practice to call.

MS. BASSO: Could I have this marked?

(Johnson Exhibit No. 12 Marked for Identification.)

BY MS. BASSO:

Q I'm going to ask you to review Johnson Exhibit No. 12 and I'm going to ask you if you recognize what's contained in that document.

A Yes.

Q What is it?

A I just gave some basic statements about Jack.

Q Is it fair to say that's an e-mail to underwriting at Minnesota Mutual?

A Yes.

Q What's the date of the e-mail, sir?

A 6-10-92.

Q In this e-mail you said you were giving some background information on Jack.

A Uh-huh.

Q Do you know if this information was solicited or if you provided it voluntarily?

MS. LANG: Solicited by who?

MS. BASSO: Minnesota Mutual.

THE WITNESS: I don't know.

BY MS. BASSO:

Q It's fair to say that in this e-mail you were indicating that Jack's weight is muscle and that he played football and bench presses 400 pounds.

A Yes.

Q Do you know if as of the date of this e-mail, June 10, 1992, you knew whether or not the policy that was ultimately issued to Jack was modified?

A I don't know. Do you really want me to answer that question?

Q That's fine.

A I might be able to answer it if I look back. I don't know.

Q According to the policy that you have seen today which was marked as Exhibit 10 you know that the policy was issued on July 2, 1992, correct?

A Yes.

Q From the time the policy was issued up until the time that Jack filed his lawsuit

in Virginia for not receiving the policy that he thought he had purchased is it fair to say that you did have some telephone conversations with representatives at Minnesota Mutual regarding the issues of modification and delivery of Jack's policy?

MS. LANG: Objection to the form of the question. You can answer. It's just an objection for the record.

THE WITNESS: I don't know.

BY MS. BASSO:

Q You don't remember whether or not you had telephone conversations with anyone at Minnesota Mutual regarding the modifications in Jack's policy?

A I may have. I don't remember. I probably did. I can't remember.

Q Would you, yourself, have kept notes of any such conversation?

A I may have. I probably did.

Q You wouldn't have those now, correct?

A Huh-uh.

MS. BASSO: I would like to mark for identification as Exhibit 13 Minnesota Mutual Individual Claim Memoranda which were submitted to us by Minnesota Mutual.

(Johnson Exhibit No. 13 Marked for Identification.)

BY MS. BASSO:

Q I'm going to ask you some questions regarding these Minnesota Mutual Individual Claim Memoranda. Have you ever seen these notes before?

A I don't think so.

Q I would like to draw your attention to the top right-hand corner. Each page is numbered, 1, 2, 3, 4, 5, 6, 7, et cetera.

A My first page is 15.

Q Your first page is 15?

A Uh-huh.

MS. BASSO: Off the record.

(Discussion off the record.)

BY MS. BASSO:

Q If I can bring your attention to page 12. There's a note dated 11-18-96.

A Okay.

Q I'm going to read from the note and ask you if I'm reading it correctly -- it says Mike Johnson called -- do you see where I started that?

MS. LANG: Is that the 11-11-96 note?

MS. BASSO: Yes. It's the seventh line down.

BY MS. BASSO:

Q Mike Johnson called. He's quail hunting in Texas so if I need to reach him just leave a message on his voice mail. Did I read that correctly?

A I don't see where you're reading.

Q Page 12, 11-18-96.

A Okay.

Q Mike Johnson called. He's quail

hunting in Texas so if I need to reach him just leave a message on his voice mail. Did I read that correctly?

A Yes.

Q You do remember going quail hunting in Texas in November of 1996?

A I did go. I don't remember what date it was.

Q It goes on to say Mike states that most of what insured's attorney alleges in the 11-96 letter is untrue. He even called the attorney and left him a message stating the comments were untrue. The attorney returned his call but Mike had already left town and has not spoken with him. Did I read that correctly?

A Uh-huh. Who's writing this?

Q I'm sorry?

A Who's writing this information?

Q It is, I believe, a Minnesota Mutual claims representative. It's not your handwriting, correct?

A No, it's not mine.

Q I'd like to move down to the next paragraph, sir, where it says Mike does admit that he knew the contract was modified. He also says both the employer (Mickey Doyle) and insured knew it also. (Mickey is the office manager of Interflex in addition to being the owner's wife). Has been so long but he doesn't recall exactly who he delivered the policy to. He believes he delivered several policies to Mickey Doyle, as he also sold contracts to the other executives who were then going to pass them out to the various insureds.

He thought maybe the insured was out-of-town at policy deliver, and since the corporation is paying the premiums left it with Mickey. He knows that he discussed the modified policy with Mickey at some point probably at delivery.

MS. LANG: I don't have the next page.

MS. BASSO: The next page is page 13.

MS. LANG: I don't have a page 13.

THE WITNESS: Me either.

BY MS. BASSO:

Q Look back to number 12. I'm going to ask you if I read the paragraph regarding he knows that he discussed the modified policy with Mickey -- did I read that paragraph correctly?

A I think so. I can't see it very well.

Q You testified earlier, sir, that you did indeed deliver the policy to Mr. McGill. Does reading these notes refresh your recollection as to whether or not you actually delivered the policy to Mr. McGill or whether you gave it to Mickey Doyle?

A I don't recall who I physically gave it to. I remember discussing it with both.

Q When you discussed the policy with Mickey you discussed the policy modification with her, correct?

A Yes.

Q Do you know what modifications you discussed with her?

A I don't know. I assume that I would discuss the changes in the contract which would have been the benefit period and the premium increase.

Q Typically Minnesota Mutual would mail the policies to you, correct?

MS. LANG: Objection to the form of the question. You can answer.

THE WITNESS: Yes.

BY MS. BASSO:

Q It would be up to you typically to deliver those policies to the respective insureds, correct?

A Yes.

Q You already discussed the delivery instructions which are marked as Exhibit 2 which you indicated that you recognized, correct?

A Yes.

Q Do you know when you received the delivery instructions or if you received the delivery instructions pursuant to Mr. McGill's Minnesota Mutual policy?

A You're asking me when?

Q When or if you received those delivery instructions.

MS. LANG: Objection to the form of the question.

THE WITNESS: I don't know when. I'm sure I received the delivery instructions. They typically came back with the policy.

BY MS. BASSO:

Q The delivery instructions do indicate that his policy was modified, correct?

A Yes.

Q You testified earlier that you couldn't recall how you specifically learned that the policy was modified, correct?

A That's correct.

Q Would you agree that the change in benefit term from up to 65 years to a

five-year limitation constitutes a material change in the policy?

MS. LANG: Objection to the form of the question. It calls for a legal conclusion from a lay witness. You can still answer the question if you can.

BY MS. BASSO:

Q I'm asking you as an insurance professional.

A It's certainly a change. It's certainly a big change.

Q Mr. McGill's policy also was changed by way of a 50 percent premium increase. My question is: As an insurance professional would a premium increase constitute a material change in a policy?

MS. LANG: Same objection.

THE WITNESS: Yes.

BY MS. BASSO:

Q The underwriting notes further indicate that the policy that would ultimately be issued to Mr. McGill would omit

GIA. My first question is what does GIA stand for?

MS. LANG: Objection to the form of the question.

THE WITNESS: Guaranteed insurability option or guaranteed insurability something. I'm not sure. I assume that that's what it is. It's an opportunity to buy more coverage regardless of your health.

BY MS. BASSO:

Q Does that also provide more opportunity to any beneficiaries?

A No.

Q Would the omission of GIA constitute a material change in a policy?

MS. LANG: Same objection.

THE WITNESS: I assume so.

BY MS. BASSO:

Q Drawing your attention to the letter dated July 21, 1992 from Minnesota Mutual to Mr. McGill -- I believe you testified earlier that was a letter that would not typically be

sent to you, correct?

A That's correct.

Q Or that you typically would not see it.

A That's right.

Q Yet you have seen this letter before today, correct?

A I don't remember if I've seen it or not. I probably saw it back in 1997.

Q In reading that letter is there anything in that letter that indicates that Mr. McGill's benefits period was changed from up to the age of 65 to five years?

MS. LANG: Objection to the form of the question.

THE WITNESS: It says it was necessary to make some changes to the policy they were offering.

BY MS. BASSO:

Q But it doesn't make any specific reference to a change in the benefits term, is that correct?

MS. LANG: Same objection.
THE WITNESS: That's correct.
BY MS. BASSO:
**Q Is it also fair to say that that letter does not indicate that there is a premium increase?**
**A That's correct.**
MS. LANG: Same objection.
BY MS. BASSO:
**Q There's no mention of GIA in that letter, correct?**
**A That's correct.**
**Q Do you know if Mr. McGill received this letter?**
**A How would I know that? I'm not his postman. I have no idea.**
**Q You testified earlier, sir, that you did discuss the modification of the policy with Mr. McGill. Do you know when you discussed that with him?**
**A No, I don't. I don't know the specific date.**

Q Do you know whether it was in person or over the telephone?
A Probably both.
Q Were the terms of the modified policy or the modification reduced to writing before the policy was issued?
A Explain to me what you mean by reduced to writing.
Q Did you give any written notice to Mr. McGill regarding the modifications to his policy?
A Prior to the policy being issued?
Q Correct.
A I don't recall having done that. I probably would not have done that. I would have waited until I got the policy so I knew exactly how the policy was issued.
Q After the policy was issued did you provide written notification to Mr. McGill regarding the modifications in the policy?
A I'm not sure. I might have.
Q If you did would you have kept that

in your file?
A I kept everything else.
Q You don't know whether or not you gave him written notification?
A Huh-uh.
Q I know you said you did deliver the policy to Mr. McGill but you may not have delivered it to him personally. Does that mean you may have left it at Interflex with Mickey Doyle?
A To more clearly outline that I may have taken the policy out there and given it to Mickey Doyle, but there was discussions with Jack from Mickey and me regarding the contract, the changes, the reasons for the changes. The GIA or the premium increase was fully disclosed as to what the changes were going to be.
Q That was at Interflex?
A Yes.
Q But you're not sure when that was?
MS. LANG: Objection. It's been

asked and answered.

THE WITNESS: No.

BY MS. BASSO:

Q How was the policy contained or all the policies when you brought them to Interflex? Were they in binders, folders, simply stapled together?

A They were all individual contracts.

Q In binders or folders?

A Just like the policy you see here. Typically they came from the home office in a plastic sleeve. Other than that they were not in a binder.

Q You knew that Interflex was going to be making the initial premium payments on the individual policies, correct?

A That's correct.

Q I believe you said you weren't sure if those premium payments were charged back to the executives, correct?

A That's correct.

Q It makes sense then that you would

have told Mrs. Doyle about the increased premium in Mr. McGill's policy, correct?

A That's correct.

MS. LANG: Objection to the form of the question.

BY MS. BASSO:

Q Do you know if you told Mrs. Doyle about the other changes to the policy or just the premium increase?

MS. LANG: Objection. Asked and answered.

THE WITNESS: I would have told her about all the changes.

BY MS. BASSO:

Q Your may have already answered this -- when did you become aware that Mr. McGill was filing a disability claim on his Minnesota Mutual policy?

A I don't recall the exact date, ma'am, but I'm sure it was as a result of a phone call from Mr. McGill.

Q Did you know that his disability was

due to the obstructive sleep apnea?
A Yes.
Q How did you know that?
A He told me.
Q Did you ever question the nature or extent of his disability?
A No.
MS. BASSO: I would like to have this marked as Exhibit 14.

(Johnson Exhibit No. 14 Marked for Identification.)

BY MS. BASSO:
Q Do you recognize that document, sir?
A Uh-huh.
Q What is it?
A This is a letter to Cheryl Wolf from me.
Q What does that letter indicate?
A It just indicates that I enclosed additional information that might be helpful

in the processing of the claim.
Q You wrote that letter?
A I assume I did, yes.
Q After selling Mr. McGill the Minnesota Mutual policy you also sold him a life insurance policy, correct?
A Uh-huh.
Q Was that also from Minnesota Mutual?
A Yes.
Q In fact, you sold life insurance policies to him, his wife and his children, correct?
A I think so.
Q Do you remember when you sold those policies to Mr. McGill?
A No.
Q Do you recall whether or not Mr. McGill's life insurance policy was rated?
A I don't remember whether it was rated or not. It could have been.
Q Do you recall whether or not you were concerned about his life insurance policy

being rated?

A I'm always concerned with my clients paying more in premiums than I propose in the beginning.

Q Do you know when Mr. McGill claims to have learned that the policy with Minnesota Mutual had a five-year benefit as opposed to a benefit up to the age of 65.

A What was the question again?

Q Do you know when Jack claims to have learned that the Minnesota Mutual policy had only a five-year benefit period?

A I only know what's written in this motion back in 1997 as stated there. I have no proof that that's true.

Q At some point did Jack come to your office to discuss the fact that his benefit period was only five years as opposed to up to the age of 65?

A I don't remember. He may have.

Q You wouldn't remember then when that would have been?

A No, ma'am.

Q With respect to the TransGeneral group policy there was an issue with Mr. McGill's TransGeneral policy regarding --

A It was a misstatement in the booklet.

MS. LANG: Wait. I just want to place an objection to the form of that question before we go any further.

MS. BASSO: I'll actually rephrase the question.

BY MS. BASSO:

Q Was there an issue with the TransGeneral policy sold to Mr. McGill as part of his group benefit plan at Interflex?

A Was there an issue?

Q Yes.

A Explain what you mean by was there an issue.

Q Was there an error in the policy or in the language of the policy?

A Not in the policy. An employee booklet had some erroneous information in it.

Q Do you recall what the erroneous information was?

A Well, as near as I can remember the benefit was supposed to increase over a period of years and that was either deleted or written down improperly inside that booklet. I can't recall which. I believe it was resolved and the claim was paid based on what the contract said, not the booklet.

Q Did you assist in resolving that issue?

A Yes, I did. I can't remember the extent of it, but I remember I was aware of it.

Q Do you recall when that issue was resolved?

A No.

MS. BASSO: Let's take a five-minute break.

(Recess.)

MS. BASSO: This is a Minnesota Mutual life document entitled Notice of Underwriting Action. Can I have that marked, please?

(Johnson Exhibit No. 15 Marked for Identification.)

BY MS. BASSO:

Q I'm going to ask you to take a look at that, Mr. Johnson, and tell me if you have ever seen that document.

A I assume I have. I don't remember seeing this exact document.

Q It's dated 7-21-92, correct?

A Uh-huh.

Q It's signed by the underwriter, is that correct?

A I guess. It looks like it.

Q It says the white copy of this form is mailed to the agent in handwriting at the bottom. Do you know whose handwriting that

is?

A No, I don't.

Q Is it fair to say that on the top of this form there's a note that says date of letter 7-21-92, is that correct?

A That's what it says.

Q We showed you a July 21, 1992 letter from Minnesota Mutual to John McGill, correct?

A Yes, that's correct.

Q I know you said that you would not have received that July 21, 1992 letter but it is your testimony that you would have received this Notice of Underwriting Action?

A I assume I would have received it, ma'am. I don't know. That's 14 years ago. I don't remember reading this particular document. Just as a matter of practice I assume I would have gotten this.

MS. BASSO: I have another document that I would like to have marked as the next exhibit.

(Johnson Exhibit No. 16 Marked for Identification.)

BY MS. BASSO:

Q I'm going to ask you to take a look at both pages, Mr. Johnson.

A Okay.

Q That is a fax from your office to Minnesota Mutual, correct?

A Yes. It went to TransGeneral and Minnesota Mutual.

Q What's attached to that fax cover sheet?

A That is a 1099.

Q Is it fair to say that in that communication you're advising or telling Minnesota Mutual and TransGeneral that Mr. McGill was issued a form 1099 for premiums?

MS. LANG: Objection to the form of the question.

THE WITNESS: I assume so. At that

time I'm sure Jack told me that his 1099 reflected premiums he had paid toward the insurance and this was a breakdown of the premiums that he was charged as income. That's actually not my writing but it did come from my office.

BY MS. BASSO:

Q You faxed that to Minnesota Mutual and TransGeneral?

A I didn't fax it, somebody else did. I don't know who did it. It could have been my secretary. It probably was.

Q Do you remember sending this communication?

A No.

Q Does seeing it refresh your recollection as to your sending it?

A I remember that Jack was very concerned about whether or not he was going to have to report the disability benefits. I remember he was working hard to provide me with information to show that he had reported

at least a portion of the premium as income, and that his objective was so that he would not have to pay income taxes on the disability benefits. I was trying to assist him in making sure if he in fact had paid the premiums that he did not have to pay any income taxes on this.

Q Back in 1992 did you have a set procedure that you, yourself, followed to notify your potential insureds of policy modifications?

A Yes, ma'am.

Q What was that set procedure?

A I've been doing this for 33 years. I've only had one person to say that they never got the policy or had any discrepancies whatsoever so I obviously have a procedure for doing it and I follow that procedure every time.

That procedure is to make sure that everyone understands clearly what the decision was, what it was not and I make sure

that everything is disclosed.
Q What was your procedure in terms of the sequence or the timing of telling somebody about a modification? Would you do it prior to delivery of a policy, at delivery or subsequent to?
A Typically I would call and setup an appointment and schedule a time to review the contract. If they ask me a question is it issued the way I wanted it I may give them a brief explanation but then I would go into more detail as we reviewed the contract.
Q When you sold the life insurance policies to Mr. McGill and his family after selling the disability policy did you sell life insurance policies to any of the other executives at Interflex?
A I think there were a couple of them.
Q Do you recall to whom you would have sold life insurance policies?
A No, I don't.
Q John Fasching was an underwriter at

Minnesota Mutual back in 1992. Do you know him personally?

A No.

Q Have you ever met him in a professional capacity?

A No.

Q Who was Kim at your agency back in 1992? Did you have a woman named Kim working at your agency?

A I don't recall, ma'am.

MS. BASSO: That's all I have. Thank you.

BY MS. LANG:

Q Mr. Johnson, just a few follow-up questions.

I'd like you to take a look at Johnson Exhibit No. 14, please. There's handwriting down at the bottom of this letter. Do you recognize that handwriting, sir?

A That's my handwriting, yes.

Q I would like you to take a look at

Johnson Exhibit No. 16 which includes the 1995 form 1099 MISC. Where did you get this document from, the 1099?

A I think Jack gave me a copy of that.

Q Did you undertake any investigation of your own to determine whether or not this 1099 was in fact issued by The Interflex Group?

A No, I did not. I assumed it was valid.

Q Did you ever present a copy of this document to anyone who was a current employee of The Interflex Group and ask that person whether or not this 1099 was reflected on the books and records of Interflex?

A I had no reason to believe it was not an authentic document.

Q Would it be correct to say that all of the information you obtained concerning whether or not Mr. McGill paid income tax on the amount that was charged for the premium for the disability insurance policy at issue

came from Mr. McGill?
A I believe that's true.
Q There were some questions posed to you earlier about an employee booklet referencing the TransGeneral group policy in which there was an error. Who prepared that booklet?
A TransGeneral.
Q Is TransGeneral an affiliate of Minnesota Mutual?
A No.
Q You were provided Johnson Exhibit No. 13, Individual Claim Memoranda, from Minnesota Mutual and you were asked to read handwriting on that particular document. That's not handwriting of yours, is that correct?
A No, it's not.
Q Do you know whose handwriting it is?
A No, I don't.
Q Do you know whether or not anything that's written on these documents is in fact

accurate?

A I have no way to prove whether it is or whether it's not.

MS. LANG: Thank you. I have nothing further.

MS. BASSO: I just have a couple of follow-up questions.

BY MS. BASSO:

Q Do you have reason to believe that a Minnesota Mutual claims representative taking notes on claims would misrepresent statements of its agents?

A I have no idea, ma'am. I can't judge that. I don't know the people. I didn't have any personal relationship with them and I have no idea.

Q You have been referring to the Minnesota Mutual policies as individual policies, correct?

A Yes.

MS. BASSO: I would like to just mark one more document as the next exhibit. Its

the Minnesota Mutual Notice of Complaint. It's a two-page document. I would just ask that Mr. Johnson take a look at it.

(Johnson Exhibit No. 17 Marked for Identification.)

THE WITNESS: Okay.

BY MS. BASSO:

Q Have you ever seen this document before, sir?

A No.

Q And the document pertains to the complaint of John L. McGill, correct?

A Looks like it.

Q The policy number indicated on this Notice of Complaint is 1-933-689H, correct?

A That's true.

Q In looking at what has been marked as Exhibit 1, which is the Automatic Payment Authorization -- I'm going to ask you, Mr. Johnson, to take a look at Exhibit No. 1.

A Okay.

Q What was it marked as?

A Exhibit 3.

Q There are policy numbers listed for each of the clients on Exhibit 3, correct?

A That's correct.

Q On this document, the Automatic Payment Plan Authorization, Mr. McGill's policy number is listed as 1933689H, correct?

A That's true.

Q Would it be fair to say then that the Notice of Complaint pertains to the same Minnesota Mutual policy for which there was the Automatic Payment Plan Authorization?

MS. LANG: Objection. The witness already testified he's never seen the document before and he doesn't know what it is.

BY MS. BASSO:

Q There's the same policy number referenced both on the Notice of Complaint and on the Automatic Payment Plan

Authorization for Mr. McGill, correct?
A Same policy number.
Q On the Notice of Complaint, sir, towards the middle of the page it says please circle the type of policy or contract the insured or proposed insured had or was trying to secure. Did I read that correctly?
A Yes.
Q There is a policy or a type of policy that is circled, correct?
A Yes.
Q What type of policy is circled?
A Individual health.
Q You didn't circle that, correct?
A No.
Q That's not your penmanship anywhere on this form?
A No.
MS. BASSO: That's all I have.
BY MS. LANG:
Q You testified earlier that in your 33 years of doing this you have only had one

complaint concerning policy delivery or discussion of modifications to a policy. Who was that complainant, sir?

A Mr. McGill.

Q Did you have any reason to deviate from your policy with respect to discussing modifications to a policy with Mr. McGill?

A No.

MS. LANG: Thank you. I have nothing further.

BY MS. BASSO:

Q Just one follow-up question.

I know you testified that you did have conversations with claims representatives at Minnesota Mutual regarding the modifications and the delivery of Mr. McGill's policy, correct?

A It depends on when you're asking. During the underwriting process?

Q No, after the policy was issued.

A After the policy was issued?

Q Correct.

A I may have. I'm not sure. Prior to the policy being issued I wouldn't have talked to claims.

Q In any of your conversations that you may have had with Minnesota Mutual after the issuance of Mr. McGill's policy and about Mr. McGill's policy you would have been truthful in speaking with Minnesota Mutual, correct?

MS. LANG: I'm going to object to the form of the question. I'm not sure I followed it.

THE WITNESS: Yes.

MS. BASSO: That's all I have.

MS. LANG: Thank you very much for your time, sir.

(Signature reserved.)

(Deposition adjourned at 3:55 p.m.)

C E R T I F I C A T E

I, J. MICHAEL JOHNSON, do hereby certify that I have read the foregoing deposition given by me on Wednesday, April 12, 2006, and I certify it to be a true and correct transcript of my said deposition. In the event that I desire to make changes in the form or substance of my deposition, said changes will be listed below along with my reasons for making them.

| PAGE | LINE | CHANGE AND REASON FOR MAKING CHANGE |
|---|---|---|
| ----- | ----- | ---------------------------------- |
| ----- | ----- | ---------------------------------- |
| ----- | ----- | ---------------------------------- |
| ----- | ----- | ---------------------------------- |
| ----- | ----- | ---------------------------------- |
| ----- | ----- | ---------------------------------- |
| ----- | ----- | ---------------------------------- |
| ----- | ----- | ---------------------------------- |
| ----- | ----- | ---------------------------------- |
| ----- | ----- | ---------------------------------- |
| ----- | ----- | ---------------------------------- |
| ----- | ----- | ---------------------------------- |

----- ----- ------------------------------------
----- ----- ------------------------------------
----- ----- ------------------------------------
----- ----- ------------------------------------
----- ----- ------------------------------------
----- ----- ------------------------------------
----- ----- ------------------------------------
----- ----- ------------------------------------
----- ----- ------------------------------------
----- ----- ------------------------------------
----- ----- ------------------------------------
----- ----- ------------------------------------

______________________________

J. Michael Johnson

Sworn and subscribed
to before me this
_____ day of _______________, 2006

Notary Public:____________________
My Commission Expires:_______________

COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

I, Joseph C. Spontarelli, CCR, Notary Public in and for the Commonwealth of Virginia at Large, and whose commission expires October 31, 2007, do certify that the aforementioned appeared before me, was sworn or affirmed by me, and was thereupon examined by counsel; and that the foregoing is a true and correct transcript taken to the best of my ability.

I further certify that I am neither related to nor associated with any counsel or party to this proceeding, nor otherwise interested in the event thereof.

Given under my hand and notarial seal at Richmond, Virginia, this 20th day of April 2006.

Joseph C. Spontarelli

Joseph C. Spontarelli,
Court Reporter/Notary Public
Va. CCR #0315028