# EXHIBIT "7"

# Pages 1 - 60

ORIGINAL

VOLUME I
PAGES 1-124
EXHIBITS: Per Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JOHN L. McGILL,
Plaintiff,

v. C.A. NO.: 05-0481/S

MINNESOTA MUTUAL LIFE
INSURANCE COMPANY,
Defendant.

* * * * * * *

DEPOSITION of CHERYL WOLF, a witness called on behalf of the Plaintiff, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Mary E. Rinne, Registered Professional Reporter and Notary Public for the State of Rhode Island, at the offices of D'Amico Burchfield, LLP, 536 Atwells Avenue, Providence, Rhode Island, on Thursday, June 1, commencing at 11:03 a.m.

APPEARANCES:

D'AMICO BURCHFIELD, LLP
BY: Jessica L. Basso, Esq.
536 Atwells Avenue
Providence, Rhode Island 02909
401.454.1212
jlb@dblawri.com
On behalf of the Plaintiff.

HARVEY PENNINGTON LTD.
BY: Melissa Lang, Esq.
1835 Market Street, 29th Floor
Philadelphia, Pennsylvania 19103
215.563.4470
mlang@harvpenn.com
On behalf of the Defendant.

APPEARANCES (cont'd):

SECURIAN FINANCIAL GROUP, INC.

BY: Donna Arbisi, Esq.
400 Robert Street North
St. Paul, Minnesota 55101
651.665.4453
donna.arbisi@securian.com
On behalf of the Defendant.

ALSO PRESENT:

John McGill

INDEX


| DEPONENT: | PAGE |
|---|---|
| CHERYL WOLF | |
| Examination by Ms. Basso | 4 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| A | Two-page document | 11 |
| B | One-page handwritten document entitled McGill | 24 |
| C | e-mail from Mike Johnson to Jon Fasching, 6/10/92 | 26 |
| D | Notice of Underwriting Action | 29 |
| E | Letter from Jon Fasching to John McGill, 7/21/92 | 43 |
| F | Letter from Jon Fasching to John McGill, 7/21/02 | 49 |
| G | Policy Delivery Instructions | 51 |
| H | Claim Memoranda from John McGill's claim file | 52 |
| I | Letter from Thomas Coates, 11/6/96 | 93 |
| J | Letter from Harold Oien to Thomas Coates, 11/21/96 | 94 |
| K | Letter from Cheryl Wolf to Thomas Coates, 1/20/97 | 97 |

# EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| L | Letter from Mike Johnson to Cheryl Wolf, 12/27/95 | 107 |
| M | Fax from Mike Johnson to Cheryl Wolf and Geoff Graeb, 3/22/96, with attached 1099 | 109 |
| N | Letter from Geoff Graeb to Cheryl Wolf, 2/8/96 | 111 |
| O | Notice of Complaint | 113 |
| P | Letter from Cheryl Wolf to Eleanor Doyle, 12/15/97, with fax cover sheet and 1996 W-2 | 114 |


(Exhibits attached to original transcript)

PROCEEDINGS

CHERYL WOLF, Sworn.

* * * * * * *

MS. LANG: We'll read and sign. And usual stipulations as to objections?

MS. BASSO: Yes.

* * * * * * *

EXAMINATION BY MS. BASSO:

Q. Could you please state your full name for the record.
A. Cheryl Wolf.
Q. And your date of birth?
A. 4/10/57.
Q. Where do you currently live?
A. In Oakdale, Minnesota.
Q. And what's your home address?
A. 6476 15th Street Place North, Oakdale, Minnesota 55128.
Q. And are you currently employed?
A. Yes, I am.
Q. Where?
A. At Securian Financial Group.
Q. In what capacity? What do you do?
A. I'm a field benefits specialist.

Q. And what's your business address?
A. 400 Robert Street North, St. Paul, Minnesota 55101.
Q. Is this the same company as Minnesota Mutual?
A. Yes, it is.
Q. But with a different name?
A. Yes.
Q. When did the name change?
A. It changed about two years ago.
Q. When did you start working for Minnesota Mutual?
A. April of 1977.
Q. And you've been with that same company ever since?
A. Yes.
Q. Okay. How long have you been a field benefits specialist?
A. A little over three years.
Q. Before you were a field benefits specialist, what did you do?
A. I was a supervisor and a broker dealer.
Q. A supervisor of what?
A. It was called the client reporting unit.
Q. Okay. How long did you perform that job?

A. From 2001 to 2003.
Q. What did you do prior to 2001?
A. I was a disability claims examiner.
Q. For how long?
A. From 1993 to 2001, eight years.
Q. Okay. And briefly, what's your educational background?
A. One year of college.
Q. Do you hold any particular certifications or licenses in connection with your career at Minnesota Mutual?
A. I have what is called a FLMI, a Fellow of a Life Management Institute, and I also hold four securities licenses.
Q. Did you review any documents before coming here today?
A. Yes.
Q. What did you review?
A. The claim file.
Q. When did you review the claim file?
A. Last week.
Q. Did you bring the claim file here with you to Rhode Island or is it still in Minnesota?
A. It's still in Minnesota.

Q. Did you review that file with anybody or just on your own?
A. Just on my own.
Q. Did you discuss this case with anyone other than your attorney before coming here today?
A. No.
Q. Did you speak to anyone at your company about this case before coming here today?
A. Just Donna Arbisi, our counsel.
Q. Okay. When is the last time you had any contact either written or telephone or in person with Eleanor or Mickey Doyle who's the same person?
A. I would have to look at the file.
Q. Okay. Has it been, let's see, more than -- strike that.
Have you had any contact with her since 2001?
A. No.
Q. Okay. How about any contact with Joseph Doyle since 2001?
A. No.
Q. Have you had any contact with Michael Johnson since 2001?

A. No.
Q. Have you ever met Eleanor Doyle in person?
A. No.
Q. Have you ever met Joe Doyle in person?
A. No.
Q. And have you ever met Michael Johnson in person?
A. No.
Q. Have you ever met the plaintiff, John McGill, in person?
A. No.
Q. Okay. It's fair to say to while you were a disability claims examiner you were one of the individuals who oversaw John McGill's disability claim that he made with Minnesota Mutual. Correct?
A. Yes.
Q. Were you the lead claims examiner on his claim?
A. Yes.
Q. Okay. Now, Mr. McGill's policy that we're gonna be talking about was purchased in July of 1992 and he made his claim towards the end of 1995, beginning of 1996. Did you oversee

that claim from the time the claim was filed
up until the time that you left that position
as a disability claims examiner?
A. Yes.
Q. Okay.
MS. BASSO: The first thing I'm gonna do is show you an exhibit. It consists of two pages. I would like it marked as Plaintiff's Exhibit A.
(Exhibit A marked for identification)
Q. Now, ma'am, I've handed you two pages. The top page is entitled Contracts Associated With a Client and the second page is entitled Contract Summary Display. Did I read that accurately?
A. Yes.
Q. Okay. Do you recognize these documents?
A. Yes.
Q. And you've seen them before my showing them to you today?
A. Yes.
Q. What exactly is a Contracts Associated With a Client document?
A. That's a listing of all the contracts

associated with a client.
Q. By policy number?
A. Yes. And owner and insured.
Q. Okay. Is contract number the same thing as a policy number?
A. Yes.
Q. Okay. Who generates these documents?
A. It would have been someone in the claims staff. When a claim is called in, we have staff that puts together the file and they would have printed this off of our system.
Q. And then given it to you?
A. Yes.
Q. Okay. Now, in looking at the second page entitled Contract Summary Display, I know on the top there's a contract number and it says 1933689H. Did I read that correctly?
A. Yes.
Q. Okay. Now, just to look back to the first page, we've got relationship and contract number. And first we have owner, and then it says 1933689H. Did I read that correctly?
A. Yes?
Q. And then insured is 1933689H. Did I read that

correctly?
A. Yes.
Q. Now, in looking at the Contract Summary Display, page 2, the contract number 1933689H pertains to John L. McGill's disability policy with Minnesota Mutual. Correct?
A. Yes.
Q. So is it fair to say that based upon the information contained in these documents that Mr. McGill was both the owner of that policy and the named insured on that policy?
MS. LANG: I object to the extent that it calls for a legal conclusion by the witness. But you can answer it based on your understanding of the documents.
A. Yes.
Q. What does "owner" mean?
MS. LANG: If you know.
A. It just meant that they were the owner of the policy.
Q. And what does "insured" mean?
A. That they were the ones insured in case of -- in the case of disability.
Q. Now, looking at the second page of this

exhibit, the Contract Summary Display, there is on the bottom half of the page a questionnaire section that appears to have the answers handwritten in. And my first question is, is this your penmanship?
A. Most of it, yes.
Q. Okay. Which penmanship is not yours?
A. The claim number and the agent's phone number.
Q. Okay.
A. And this note about the waiver only as of 2/15/01.
Q. Okay. The rest of the handwriting on here is yours?
A. Yes.
Q. And I note where it says Onset Date, 11/30/95, is that the same date upon which you would have filled out this information?
A. No.
Q. Okay. What is "onset date"?
A. That's the onset of disability that Mr. McGill was claiming.
Q. Okay. Do you know when you filled out this information on this contract summary?
A. It would have been at some point when the file

was given to me after the claim was called in. I cannot say specifically what day I wrote that down.
Q. Well, typically, how much time elapses from the time a person makes a claim to the time you receive the assignment to administer that claim?
A. Within a day or two.
Q. Okay. These documents, do you have personal knowledge of the information contained in these documents?
A. I don't understand the question.
Q. Do you know whether or not the information contained in these two pages is accurate?
A. Yes, I assume so.
Q. Okay. You have no reason to question any potential inaccuracy in these documents?
A. No, I assume the policy was issued correctly.
Q. Okay. Is it the regular practice of Minnesota Mutual to generate this document entitled Contracts Associated With a Client?
MS. LANG: You mean back then?
Q. Generally speaking, is it something that Minnesota Mutual did on a regular basis?

A. When I was a claims examiner, yes.
Q. Okay. And the Contract Summary Display, is this a document that Minnesota Mutual generates on a regular basis or that it generated on a regular basis during the period of time that you were a claims examiner?
A. Yes.
Q. Okay. And is it fair to say that these documents would be kept by Minnesota Mutual in the regular course of its business?
A. Yes.
Q. Now, in looking at the Contract Summary Display, on the fourth line down of the question and answer -- I call it the question and answer section where you've written in some answers. Where it says Premium Paid By Employer, what response is circled?
A. N.
Q. And that stands for?
A. No.
Q. Where did you receive the information to complete this form?
A. My recollection of the file tells me that -- there were some conversations regarding that.

There were a notice of disability form that states who pays the premiums. There was a -- I believe it's called a FICA withholding tax form stating who pays the premiums. But then there were also discussions and other documentation regarding that.
Q. You do rely in part on a FICA withholding form to make the determination as to who pays premiums on policies?
A. Yes.
Q. Okay. And where it says here Disability Letter Instructions and there's an X next to each instruction, notice of disability, attending physician's statement, FICA withholding, and other with which is C/S #20, and then two return envelopes, does the X mean that this information is requested or that it's been received?
A. It's been requested.
Q. Okay. Under Special Handling Instructions, it says, Return to Cheryl when done in order to complete c-o-n-t. review of life policy. Did I read that correctly?
A. Yes.

Q. Is that continued review of life policy?
A. No.
Q. What does that mean?
A. Contestable.
Q. Is that your penmanship?
A. Yes.
Q. Who were you sending it out to in order to have it then returned to you?
A. The disability letter instructions that we spoke of earlier, this goes to our staff and they're the ones that actually send the letter and all the claim forms to Mr. McGill. And then once they're done mailing them, I ask for it to come back to me.
Q. Do you know who specifically you gave this to to do that work?
A. No.
Q. It says on the very bottom, Route to PC/New Claim/Reopen Update and Update Completed By and then there's a set of initials. Do you know whose initials those are?
A. No. I don't.
Q. Okay. There's some black handwriting on here that says 2/15/01 Waiver Only. I believe you

testified that that is not your handwriting?
A. Correct.
Q. Do you know who wrote that on there?
A. No.
Q. When you said you left your position or you changed out of your position as a claims supervisor in 2001, do you know when specifically that was?
A. May of 2001.
Q. And once you left your position as a disability claims examiner in May of '01, did you have any further dealings with this particular file pertaining to John McGill?
A. No.
Q. Are you familiar with the application process in which potential insured would apply for disability benefits with Minnesota Mutual?
A. No.
Q. You have no idea what a potential insured has to do in order to secure disability benefits?
A. Well, I know they have to complete an application.
Q. Have you ever seen an application?
A. Yes.

Q. And you receive them after they're completed. Correct?

MS. LANG: I'm sorry. I'm having some trouble following you. I thought the first question had to do with applying for coverage and your second question had to do with applying for benefits.

MS. BASSO: You're right. I mixed up my words. I'm sorry.

Q. I'm talking about applying for coverage. Do you have any knowledge of the process through which a potential insured would go in an effort to obtain coverage?

A. Only the bare minimum, that they would have to make application.

Q. And once a person makes application, would you ever have in your possession a copy of that application?

A. There's one in the claim file.

Q. Okay. So when a claims file is assigned to you at a time when somebody makes a claim for benefits, you would have a copy of that application in the claims file?

MS. LANG: Objection to the form of

the question. You can answer.
A. It is actually part of the underwriting file that I'm also given along with the claim file.
Q. Are you given the entire underwriting file? Or were you? I should speak in the past tense because you don't do this anymore. When you would be assigned a claim to handle, would you be given the entire underwriting file?
A. Yes, to my knowledge it is.
Q. Okay. And that would include the initial application for coverage?
A. Yes.
Q. The policy that was sold to Mr. McGill, that was an individual policy. Correct?
A. Yes.
Q. Okay. And with respect to medical examinations, is it fair to say that medical examinations are required for someone who is trying to obtain an individual insurance policy, trying to obtain coverage in the first place?
A. I don't have any knowledge of underwriting guidelines.
Q. Okay. Just looking back to Exhibit A, the

handwriting that's not yours that says 2/15/01 Waiver Only, do you know what that means?
A. Yes. That means that the benefit period has expired and the insured is still considered disabled and we continued to waive the premiums on his policy.
Q. So in this case with John McGill as of 2/15/01, he was still considered to be disabled by Minnesota Mutual. Correct?
A. Correct.
Q. And his premiums were to be waived after that point. Correct?
A. Yes.
Q. Yet he wasn't receiving benefits any longer because whatever the benefit period was had expired?
A. Correct.
Q. All right. Now, Minnesota Mutual made the decision that as of 2/15/01 Mr. McGill was still disabled. Correct?
MS. LANG: Objection to the form of the question. You can answer.
A. Yes.
Q. Who would have made that decision?

A. I would have as a claims examiner.
Q. Based on a review of his medical records?
A. Based on the information I would have had at that time.
Q. Which would have been what?
A. I don't recall what I had received at that time to make that determination.
Q. Well, generally speaking. I mean, you were a claims examiner for almost ten years. What kind of information would you generally need in order to make the determination that an insured continues to be disabled?
A. The claimant's statement and attending physician statement, possibly medical records. Whatever I had at that time to make that determination.
Q. Is it fair to say that if you were able to make that determination as of February 15th, 2001 that Mr. McGill was still disabled that in your opinion you had sufficient medical evidence to draw that conclusion?
MS. LANG: Objection to the form of the question. You can answer.
A. At that time, yes.

Q. Okay.

MS. BASSO: I'm gonna mark the next page as Exhibit B, please.

(Exhibit B marked for identification)

Q. What I've shown you is a single page of handwritten notes, and on the top line of the page it says McGill with a double underline and then there are dates on the left-hand side and then notes next to each of those dates. My first question is, have you seen this page before or these notes?

A. Yes.

Q. Is this your handwriting?

A. Yes.

Q. Is there anyone else's handwriting on this page?

A. No.

Q. When were these notes created?

A. I can't tell.

Q. Well, you've got, for example, on the first line 6/8/92, then it says tentative offer of 5/5, 30 percent discussed with Kim at agency 030. Did I read that correctly?

A. Yes.

Q. So would you have had a discussion with Kim at the agency regarding this offer on 6/8/92?
A. No.
Q. Okay. So I guess my next question -- well, let me back up. It appears that each of these dates has next to it some kind of action that you took. Is that a fair characterization?
MS. LANG: Objection to the form of the question. I don't think it's a fair characterization, but you can respond to the question.
A. No.
Q. Why did you create these notes?
A. This was a review of the underwriting file.
Q. And when would you have done that review?
A. I don't know. After the claim was incurred. I don't know what date I did it.
Q. Did you create this document all at one time?
A. I don't recall.
Q. And you don't know when you created it?
A. Correct.
Q. Why did you create these notes?
A. I believe I created it after the question of the benefit period came up, after speaking

with Mr. McGill and realized there was a difference in the benefit periods.
Q. When you created these notes, were you looking directly at the underwriting file and then creating the notes at the same time?
A. Yes.
(Exhibit C marked for identification)
Q. Here you go. I'm just gonna ask you to take a look at what has been marked as Exhibit C. Do you know what this is?
A. Yes. It's a document that was in the underwriting file.
Q. Okay. And do you know what it is?
A. It looks like it's an e-mail.
Q. Okay. From who to whom?
A. From Mike Johnson to Jon Fasching.
Q. Does Jon Fasching still work for your company?
A. I'm not sure.
Q. Okay. When's the last time you had any contact with him at work?
A. Over five years.
Q. Was this e-mail in the underwriting file that you were given when you took over Mr. McGill's claim?

A. Yes.
Q. Okay. So you've seen this before today?
A. Yes.
Q. Now, Mike Johnson, he was the agent who sold the policy to Mr. McGill. Correct?
A. Correct.
Q. And Jon Fasching worked in underwriting at the time?
A. Yes.
Q. Do you know what his position was in the underwriting department?
A. Not exactly.
Q. You didn't have anything to do with the solicitation of this information or have anything to do with this conversation between Fasching and Mike Johnson. Correct?
A. Correct.
Q. This was simply in the file when you received the file?
A. Yes.
Q. I want to just backtrack for a second to Exhibit B which you should have in front of you, your handwritten note. Now, on 6/30/92 or where it says 6/30/92, it says U/W

approved. In parentheses, would not have
without agency okay. Did I read that
correctly?
A. Yes.
Q. And what does that mean exactly?
A. It means underwriting approved.
Q. Approved what? The application?
A. Yes.
Q. Okay.
A. And that they would not have approved it
without the agency saying it was okay to
approve a modified policy.
Q. And that parenthetical remark, would not have
without agency okay, was that something that
you took from the underwriting file or was
that your own comment?
A. It's my own comment. I believe I may have
spoke to an underwriter at that time.
Q. Do you know whether or not you did?
A. I don't recall.
Q. All right. And when you say "at that time,"
that would have been when you were reviewing
the underwriting file. Correct?
A. Yes.

Q. And you wouldn't have gotten that file until the claim was made. Correct?
A. Correct.
Q. Do you know whether or not specifically the agency approved the issuance of the modified insurance policy?
A. No.
Q. Okay.
MS. BASSO: Next I'm gonna have marked as Exhibit D a document entitled Notice of Underwriting Action.
(Exhibit D marked for identification)
Q. Have you seen this document before?
A. Yes.
Q. And when is the first time you saw it?
A. When I reviewed the underwriting file.
Q. That would have been back in 1995?
A. Yes, or '96.
Q. When the claim was made?
A. Yes.
Q. When's the last time you saw this document?
A. I don't know.
Q. Okay. It looks like it was signed by the underwriter Jon Fasching. Is that correct?

A. That appears to be his name.
Q. And it's 6/30/92?
A. Yes.
Q. Now, it says on the bottom in handwriting, The white copy of this form is mailed to the agent. Is that your handwriting?
A. Yes.
Q. And when did you write on this form or on this notice, The white copy of this form is mailed to the agent?
A. During my review of the claim.
Q. Do you know whether, in fact, this form was mailed to the agent?
A. No.
Q. Why did you put that note on there when you were reviewing the file?
A. This came up when I was reviewing the file for the benefit period contradiction, and I was just making a note of what happened with this form.
Q. Okay. Because it was your -- you knew at that point that Mr. McGill had indicated that he had no idea that his benefit period was reduced to five years. Correct?

MS. LANG: Objection to the form of the question. You can answer.
A. Yes.
Q. And once he expressed that to you, you then did another review of the underwriting file to sort of trace its steps and see what was supposedly sent to whom in this regard?
MS. LANG: The same objection. You can answer.
A. Yes.
Q. So when you say, The white copy of this form is mailed to the agent, you mean generally speaking. Correct?
A. Yes.
Q. But again, you don't know if it was done so in this particular case?
A. Correct.
Q. You didn't have anything to do with the early underwriting of this policy?
A. Correct.
Q. Okay. What's a GIA benefit?
A. Guaranteed increase agreement.
Q. And what does that mean?
MS. LANG: If you know.

A. It means at some point, I just don't remember
how often, that the policy would increase. If
you have an increase of income, then your
policy would also increase along with it.
Q. The limits of the policy or the benefits that
would be paid out?
A. The benefit amount.
Q. Okay. Proportionate to the increase in your
income?
MS. LANG: If you know.
A. I'm not sure. I know it increased somehow,
but I don't remember all the mechanics behind
it.
Q. Okay. And based upon this Notice of
Underwriting Action, it's fair to say that the
contract that was issued to Mr. McGill had --
the premium was set 50 percent more than what
he was initially quoted. Is that fair to say?
MS. LANG: If you know.
A. Based on this document, it appears to be.
Q. Do you have any reason to think that this
document is inaccurate?
A. No.
Q. Okay. And is this type of form regularly --

is it the regular practice of Minnesota Mutual to keep this Notice of Underwriting Action form or to produce it?
MS. LANG: Objection to the form. You can answer.
A. I don't know.
Q. Well, did you have one of these in each file you received?
A. I don't know.
Q. Had you seen this form prior to seeing it in Mr. McGill's file pertaining to other insureds?
A. I don't recall.
Q. So it's possible that when you saw this form it was the first Notice of Underwriting Action you had ever seen?
MS. LANG: Objection to the form of the question. You can answer.
A. It could have been. I don't know.
Q. But again, you don't have any reason to question the accuracy of the information contained in this document. Correct?
A. Correct.
Q. And also it indicates here that the benefit

period was changed to five years from what he had initially applied for. Correct?
A. Correct.
Q. And the GIA benefits were omitted. Correct?
A. Correct.
Q. With the decision to be reconsidered in two years. Is that correct?
A. That's what's marked.
Q. Do you know if this decision was ever reconsidered?
A. I don't know.
Q. You got the file in two thousand -- I'm sorry, in 1995 when Mr. McGill made a claim, and you were the claims administrator for this file up until you left your position in 2001. From 1995 to 2001, was this decision ever reconsidered?
A. Not to my knowledge.
Q. You would have known if it was reconsidered, wouldn't you have?
MS. LANG: Objection to the form of the question. You can answer.
A. That would be the underwriting department, and I wasn't in underwriting.

Q. Right. But they would have had to have notified you as the person who was overseeing the claim. Correct?
A. I don't know.
Q. As a claims examiner, what were your duties? What were your duties as a claims examiner?
A. To review claims and determine if an insured was disabled under the contract.
Q. And what if someone was receiving benefits because they were disabled and then all of a sudden they were no longer considered to be disabled by Minnesota Mutual, what would you do next?
MS. LANG: Objection to the form of the question. You can answer.
A. If they were no longer disabled under the terms of the contract, then the claim would be closed.
Q. And would you have to notify underwriting that the claim was closed?
A. No.
Q. What if the policy was modified for some reason, would that be a decision you would make or would that go through underwriting?

A. I don't understand.
Q. Someone's receiving benefits and something happens that changes the nature of the benefits, for example. Okay? Let's say someone is eligible to have that increase -- the benefits increased with their income increase. Okay? So let's say a person's benefits change during the course of their receiving those benefits. Would you be notified of that?
MS. LANG: Objection to the form of the question. You can answer.
A. You know, I simply don't remember how everything worked back then.
Q. Well, you did that until 2001. Right?
A. Correct.
Q. And you did that for almost -- well, for eight years it looks like, seven or eight years?
A. Yes.
Q. And it's your testimony that you don't remember any longer how -- what you had to do as a claims examiner?
MS. LANG: I'm gonna object. I think that mischaracterizes her response to your

question.

Q. You know what, I'll withdraw that question. I'll ask you another one. Do you remember what you would have to do in the event of an insured's having a change in situation that required a benefits change or something?

MS. LANG: I'm gonna object to the form of the question. I'm troubled by the question because I think you're mixing underwriting principles in terms of change in benefits with claims, which is evaluating whether the claim comes within the scope of the contract.

MS. BASSO: What I'm trying to figure out is whether or not -- if underwriting makes changes, would the claims examiner be notified of those changes?

MS. LANG: That's a different question.

Q. If underwriting makes changes to someone's policy or coverage or benefits, would you be notified of those changes?

A. I don't know.

Q. You don't know?

A. I don't work in the underwriting department or I didn't work in the underwriting department.
Q. No, I'm not asking you about what underwriting does. All I'm asking you is that if underwriting takes action on an existing -- that affects an existing claim, would you as a claims examiner be notified of that action?
MS. LANG: I'm gonna object to the hypothetical nature of the question. And I'm not telling you what to do, but you might want to ask her if that has ever actually happened because I'm sensing some confusion on the part of the witness in responding to the question.
Q. Well, let me back up and say first of all, if you don't understand my question, tell me. Because if you answer it with either a yes, no or an I don't know, I'm gonna assume that you understood the question. Okay?
A. I understand.
Q. Okay. So if you say I don't know, I'm gonna assume that you understood the question and you just don't know the answer.
A. Correct. I understand that.
Q. Okay. From 1993 to 2001 when you were a

disability claims examiner, was there ever an occasion where some sort of underwriting action was taken on an existing claim that you were examining or that you were in charge of that you were then notified of?

A. I don't recall that ever happening to me.

Q. Generally speaking, if an insured is disabled and then is no longer disabled for whatever reason during the course of their benefits period, okay, someone's disabled and then they get better or whatever, they're no longer disabled, what action would you take at that point?

MS. LANG: I object to the hypothetical nature of the question. You can answer.

A. The claim would then be closed.

Q. What would you do to close the claim? You close the file and put it away?

A. No, I would notify the insured that his claim was closed and the reasons why.

Q. Would any other action be taken by Minnesota Mutual?

A. No.

Q. And what would you do with the file?
MS. LANG: You mean the physical file?
MS. BASSO: Yup.
MS. LANG: Okay.
A. It would just go to our filing area.
Q. Back when you were a disability claims examiner, were you familiar with the actual disability policies that covered the claimants?
A. Yes.
Q. Okay. So not just the term sheets or the dec. pages, but you knew the actual terms of the policies?
A. Yes.
Q. And would you have copies of the policies in your claims file?
A. No.
Q. How was it that you would come to know those policies?
A. I had a copy of the policy on my desk, of all our various policies.
Q. A person receiving disability benefits at Minnesota Mutual, would you typically ask for

income tax returns each year that the person
was receiving benefits?
A. Yes.
Q. And what for?
A. Are you asking for predisability or
post-disability?
Q. Post-disability.
A. It would verify the activities of the insured,
whether they were working or not working, what
type of income they were making.
Q. Okay. And what difference would what type of
income they were making make?
A. Some of our policies allowed an insured to
work, and up to a certain percentage you could
pay benefits.
Q. And then others didn't?
A. Correct. I believe some of the older ones.
Q. Okay. Again, it's a hypothetical based upon
the fact that according to your testimony you
did this type of work for a number of years.
Post-disability, you request a claimant's
income tax returns, okay, you want to verify
how much money they made for that previous
year. If that insured had the type of policy

that limits their benefits if they make a
certain amount of money for that particular
year -- are you following me so far?
A. Yes, I am.
Q. -- and if that insured for a particular year
is over the amount of money that he or she is
allowed to earn and still receive full
benefits, what action would you take at that
point?
MS. LANG: Objection to the form of
the question. You can answer.
A. The benefits would either be reduced or the
claim would be closed as he would have been
considered recovered.
Q. If the benefits were going to be reduced, what
process or what procedure would you have to
take in order to effectuate that?
A. You would compare the predisability income
with the post-disability income, and it was a
sliding proportionate scale.
Q. Is that something that you would do or would
you have someone else do that for you?
A. I would do it.
Q. Okay.

MS. BASSO: We can mark that as Plaintiff's Exhibit E.

(Exhibit E marked for identification)

Q. I'm gonna ask you to take a look at what I've marked as Exhibit E and tell me if you've ever seen it before.

A. Yes, I have.

Q. What is it?

A. It's a letter to Mr. McGill from Jon Fasching in underwriting.

Q. And what's the date of this letter?

A. July 21st, 1992.

Q. Have you seen this letter before today?

A. Yes.

Q. When's the first time you saw this letter?

A. On my review of the underwriting file after speaking to Mr. McGill about the difference in benefit periods.

Q. When was that that you spoke to Mr. McGill about the difference in benefit periods?

A. I would have to look at the file. I realize that I wrote down our conversations.

Q. I have your claims notes so we'll go through that. Now, I notice some handwriting on the

bottom of the copy of this letter that I've given to you. It says, This letter is mailed two to three weeks after the policy is sent to agent for delivery. Gives agent time to discuss with insured. Letter is mailed directly to insured. A copy of this letter is mailed to the agent one to two weeks before mailed to insured. Did I read that correctly?
A. Yes.
Q. Is that your penmanship?
A. Yes.
Q. And again, are these notes that you made when you reviewed the underwriting file?
A. Yes.
Q. Now, when you say this letter is mailed two to three weeks after the policy is sent to the agent for delivery, is that generally speaking or in this particular case?
A. That would be generally speaking. My recollection is that I got this information from the underwriting department. I didn't know this person myself at the time.
Q. Okay. So you don't know whether or not this letter was sent to the agent at any time. Is

that fair to say?
A. Yes.
Q. Okay. Why would Minnesota Mutual send a letter -- I'm sorry. Let me back up. Let's talk about the context of this letter for a second. What's your understanding of what this letter is saying?
A. It appears that it's a letter offering modified coverage to Mr. McGill.
Q. Is there anything in this letter that specifies what the modifications to the coverage were?
A. It doesn't appear to show it.
Q. There's no mention of a 50 percent premium increase. Is that fair to say?
A. Yes.
Q. And there's no mention in this letter of a benefits period being reduced to five years.
A. Correct.
Q. And there's no mention in here of the omission of GIA benefits. Is that correct?
A. Yes.
Q. So based upon your handwritten notes here, is it fair to say that Minnesota Mutual typically

sends the policy to the agent so that the agent can give it to the insured?

MS. LANG: I'm gonna object. The witness has already testified that she doesn't have any personal knowledge and that she only got some information from the underwriting for making her notes. So I don't see how she can answer the question. I'm not gonna instruct her not to answer.

MS. BASSO: I'm just asking her generally speaking.

MS. LANG: If you know what they generally do.

A. I don't know what they generally do. I know what I wrote on this letter.

Q. When you wrote these notes on this letter saying that this letter is mailed two or three weeks after the policy is sent to the agent for delivery, is that your own independent knowledge or was someone from underwriting saying to you this letter is mailed two to three weeks after the policy is sent to the agent for delivery?

MS. LANG: Objection to the form of

the question.
A. Yeah, someone from underwriting gave me that information. I didn't have any personal knowledge.
Q. Did someone from underwriting give you that information contemporaneous with your writing the notes on this letter?
A. Could you rephrase that?
Q. Were you writing the notes on this letter as someone from underwriting was explaining to you this process?
A. I don't recall exactly, but I believe it was a phone call and then I made notes on this.
Q. And you don't know whether or not this letter was actually mailed to Mr. McGill. Correct?
MS. LANG: Objection to the form of the question. It's also been asked and answered, but go ahead and answer it again.
A. Correct.
Q. Based upon what you say you learned from underwriting, Minnesota Mutual would send the policy to the agent and then a letter, this letter purportedly about the policy, about two to three weeks later. Correct?

MS. LANG: Objection to the form of the question.
Q. The letter is mailed two to three weeks after the policy is sent. And then it says, A copy of this letter is mailed to the agent one to two weeks before it's mailed to the insured. And again, you got that information from underwriting?
A. Correct.
Q. So according to underwriting, it sends the policy to the agent, then a letter such as this July 21st letter to the agent, and then two weeks after that it sends a copy of this letter to the insured?
MS. LANG: Objection to the form. You can answer.
A. Yes, that's what they had told me and what I wrote down on this letter.
Q. Now, did you ever discuss this letter with Jon Fasching?
A. I don't recall.
Q. So you may have?
A. Yes.
Q. I'm gonna show you another copy of the same

letter which I'm gonna have marked as
Exhibit F.
(Exhibit F marked for identification)
Q. Take a look at that. Do you recognize this
document?
A. Yes.
Q. And what is it?
A. It's a letter to Mr. McGill from Jon Fasching
in underwriting regarding his modified policy.
Q. This is the same letter that is marked as
Exhibit E, correct, it's just a different
copy?
A. Yes.
Q. All right. Now, on Exhibit F there's
penmanship at the bottom. It says, Mailed
copy to insured in 6/96. Is that your
handwriting?
A. Yes.
Q. Did you mail a copy of this letter to
Mr. McGill in June of '96?
A. Yes.
Q. Okay. This isn't information that you got
pertaining to someone else's conduct, this is
your own?

A. Yes.
Q. Jon Fasching here, did you know him when you were a claims examiner? Did you know him at work?
A. Yes, I knew him.
Q. It wasn't like the type of corporate situation where you had no idea who he was?
A. No, I had met Jon previously.
Q. Okay. On how many occasions?
A. I'm not sure, but I -- you know, half a dozen times maybe.
Q. And did you have an understanding of what his role was at Minnesota Mutual?
A. Yes, he was an underwriter.
Q. All right. And it says here under his name Individual Underwriting. Did I read that correctly?
A. Yes.
Q. And what does that mean?
A. That he was an underwriter that wrote individual policies.
Q. Do you have any knowledge of the policy delivery procedure that Minnesota Mutual had?
A. No.

Q. Okay. You had nothing to do with delivery of policies. Correct?
A. Correct.
Q. I'm gonna show you a document marked as Exhibit G.
(Exhibit G marked for identification)
Q. This document is entitled Policy Delivery Instructions. Have you seen this before?
A. Yes.
Q. All right. And when's the first time you saw it?
A. Upon my review of the underwriting file.
Q. Would that have been when you first received the file or after Mr. McGill learned that his benefits period was only five years?
A. It would have been reviewed at both times.
Q. And then there's handwritten notes on the bottom. It says, This form is stapled to agent's copy of policy pages and mailed with actual policy. And that's your penmanship. Correct?
A. Yes.
Q. And is this information that came from you or did you obtain that information from

underwriting?
A. I obtained it from underwriting.
Q. Do you have any reason to question the accuracy of this document?
A. No.
Q. All right. And it's fair to say that -- well, back up. The first box checked on here says, Important: Agent must verify the following with the client. And then there are several instructions. Correct?
A. I'm sorry. I don't --
Q. I know it's dark. This is the only copy I have.
A. I understand.
Q. And that box is checked off. Correct?
A. Yes.
Q. And do you know whether or not the agent in this case followed any of those instructions?
A. I don't know.
Q. Okay.
MS. BASSO: I'm gonna mark this as Exhibit H, please.
(Exhibit H marked for identification)
Q. Take a look at each page there, if you would.

There are 28 pages.

(Witness reviews document)

Q. Are you all done looking through?

A. Yes.

MS. LANG: Before we address Exhibit H, I just want to clarify something for the record. The copies of the Individual Claim Memoranda that's been marked as Exhibit H have highlighting on them and sometimes stars or other kind of markings such as that. Those are all your markings. Correct?

MS. BASSO: Correct. I'm sorry. It's the only copies that I have.

MS. LANG: I understand.

Q. All right. My first question is, Exhibit H, do you recognize these documents?

A. Yes.

Q. What are they?

A. It's our claim memoranda.

Q. And what are claim memoranda?

A. It's the information where we review medical records or record our conversations with the insured or doctors or --

Q. And you keep these in the file?
A. Yes.
Q. And these are memoranda that you as a disability claims examiner would maintain. Correct?
A. Correct.
Q. This Individual Claim Memoranda, looking at the first page, page No. 1, is it fair to say that would have been the first page when you started keeping notes --
A. Yes.
Q. -- on this claim? And the first date is 12/11/95?
A. Yes.
Q. All right. Do you know if there are any claim memoranda pertaining to Mr. Gill (sic) that predate 12/11/95?
A. No.
Q. This very, very first page here, let's look at the first paragraph, 12/11/95. Is that your penmanship?
A. Yes, it is.
Q. Then it says 12/29/95, there's an entry. And do you know whose penmanship that is?

A. Based on the initials on the sheet, yes, I do.
Q. Who?
A. Sharon Richmond.
Q. And did she work for you at the time?
A. She was just a fellow claims examiner.
Q. Okay. Back in 1995 when you were assigned Mr. McGill's claim, was it assigned to you primarily or would several different people work on that claim at one time? How did it work?
A. One of our senior examiners would assign claims. They were assigned randomly.
Q. Okay. And you were assigned Mr. McGill's claim?
A. Correct.
Q. If there are other people's notes in here, other claims examiners' notes, would you assign those out to other claims examiners to do a particular task or would the senior claims examiner say, for example, Okay, Cheryl, I'm giving you this claim to handle but I want to give it to Sharon or whatever to do this part of it?
A. No. Typically another examiner would look at

the file if I was out of the office.
Q. Okay. So if something happens on a claim and you're not in, someone else will pick up the ball for that particular day?
A. Yes.
Q. And then keep notes of what they've done?
A. Yes.
Q. And then when you return to the office, you have sort of a continuous flow of what's been happening on the claim?
A. Correct.
Q. Okay. Now, looking at the 12/29/95 entry, it says DI policy 1933689H is noncontestable. Did I read that correctly?
A. Yes.
Q. What does that mean?
A. That means that the policy -- the claim was incurred beyond the policy's two-year contestable period.
Q. Okay. Gotcha. So if someone makes a claim for disability benefits -- or actually, if Mr. McGill had within two years of purchasing the policy, then that would have been a contestable claim?

A. Yes.
Q. Okay. I just want to look at your first entry, 12/11/95, where it says, Agent, Mike Johnson, called. Did you create these notes or these comments at the same time that you had that conversation with Mr. Johnson?
A. Yes.
Q. Was it your practice back then when you were doing this kind of work to keep notes as you were speaking to somebody?
A. Yes.
Q. And would you keep those notes on this actual form or would you like, for example, keep notes in a spiral notebook and then transfer them over to the claim memoranda?
A. I would either just remember and not take any notes or I would just take notes on a scratch pad and then transfer them and write them up on the claim memoranda.
Q. So is it fair to say that with your claims notes if they reflect you having conversations with people, okay, that those notes were made at the time of the conversation or shortly thereafter?

A. Yes.
Q. And do you believe that your claims notes that reflect conversations you had with people are accurate?
A. Yes.
Q. Okay. That was a part of your job. Correct?
A. Yes.
Q. Okay. Now, I'd like you to turn, if you would, to page 2. I'm gonna be referring to the page numbers that are written in just for the sake of ease, I guess. And I want to call your attention to the entry dated 2/17/96. Is this your penmanship?
A. Yes, it is.
Q. And it looks like it begins with a review of Doctor Chiancone's records?
A. Yes.
Q. All right. As a disability claims examiner, part of your job was to review medical records?
A. Yes.
Q. And do you have any medical background or is it from on-the-job experience that you can read and understand medical records?

A. On-the-job experience.
Q. Now, let's look at page 3, if we could. Again, an entry 2/27/96. Called Geoff Graeb at Trans-General. Is that your penmanship?
A. Yes, it is.
Q. And what was Trans-General?
A. They were another insurance company that had issued a disability policy to Mr. McGill.
Q. And how did you know that?
A. I believe he told us on the claim form.
Q. Who? Mr. McGill?
A. Mr. McGill, yes.
Q. And who was Geoff Graeb? G-r-a-e-b.
A. He was the claims examiner at Trans-General.
Q. How did you obtain his name?
A. I don't remember.
Q. Now, it says in this note here, Called Geoff Graeb at Trans-General. No benefits paid yet as 180-day waiting period. Benefit is 60 percent of $11,666 salary. I-n-s, which stands for insured. Correct?
A. Correct.
Q. Insured was terminated from employment on 11/30/95 due to poor performance. Where did

you get that information?
A. From Mr. Graeb.
Q. Okay. It's not based on any personal knowledge at that point as to why he left Interflex?
A. No.
Q. These claims memoranda, just generally speaking, was it your practice to keep these types of memos in every claim file?
A. Yes.
Q. And these are kept in the regular course of Minnesota Mutual's business?
A. Yes, they were.
Q. And we actually received these memoranda from your attorney. Correct?
A. Yes.
Q. Now, I'm gonna ask you to please turn your attention to page No. 6. On the 4/2/96 note that indicates med review underneath it, this is not in your handwriting. Correct?
A. Correct.
Q. And the medical review is continued on page 7 and then there are initials at the bottom, it looks like an LO?