# EXHIBIT "7"

# PAGES 61-122

A. Yes.
Q. And do you know whose initials those are?
A. Linda Olsen.
Q. And what was her role at Minnesota Mutual?
A. Medical director.
Q. To your knowledge, does she have a medical background or medical education?
A. Yes.
Q. So did you give Mr. McGill's records to her to review or is that something she undertook on her own?
A. No, I sent them to her.
Q. All right. And you would give her the claims file as well so that she could keep notes on your flow sheet?
A. Yes.
Q. And then she would return the records and the actual claims file back to you?
A. Yes.
Q. It says on the very last line here, I do not see hope for improvement -- and then it continues on page 7 -- unless some form of PAP is found to be tolerable or tracheostomy is performed. Do you know -- I'm just asking if

you know, you may or may not -- if she obtained that information from the medical records or if that's her own conclusion?
A. I don't know.
Q. Okay. Did you ever discuss it with her?
A. The claim file reflects that I discussed the claim again with Doctor Olsen at some point, but I don't recall all the exact --
Q. On page 7 there's an entry 4/5/96, Medical opinion noted, CW. That's your note. Correct?
A. Yes.
Q. And Medical opinion noted, does that mean you read what Linda wrote down?
A. Yes.
Q. Do you know whether or not you had an actual conversation with her about it or --
A. I don't recall.
Q. Okay. Now, looking on to the bottom of page 7, 4/12/96, Called Wanda Taylor at employer. Left message for her to call, and then it's cut off. Is that your note? It's on the very bottom of page 7.
A. No.

Q. That's not your penmanship?
A. No, it's not.
Q. Do you know whose it is?
A. Based on a later claim note, I can see who it is.
Q. Who is it?
A. Kim Harrison.
Q. And who is she?
A. She was a claims examiner.
Q. Did she do the same kind of work that you did?
A. Yes, she did.
Q. So if you were out of the office at a particular time, she would be able to take action on the file?
A. Yes.
Q. Now, there are two page 8's, two pages identified as page No. 8, but one begins with a medical review of 4/17/96 and the second page 8 begins with 4/22/96.
MS. LANG: This is the second page 8.
THE WITNESS: Mm-hmm.
Q. So I want to look at the second page 8 that begins with 4/22/96. Now, this note is also written by Kim. Correct?

A. Correct.
Q. Would you see Kim every day when you were both at work?
A. Yes.
Q. Did you guys work closely together?
A. Yes.
Q. And were you aware of her note-taking method with claims memoranda?
A. I would assume it's the same as mine.
Q. All right. Was it a Minnesota Mutual policy to keep notes as you were speaking to people or write it down shortly thereafter?
A. Yes.
Q. Okay. Do you have any reason to think Kim would have done anything differently?
A. No.
Q. Kim clearly had this file on 4/22/96, according to this note, and spoke to Wanda Taylor. Is that fair to say?
A. Yes.
Q. And then there are subsequent claims notes. And specifically page 9, 5/7/96, that's in your handwriting. Correct?
A. Correct.

Q. When you got the file back, if you will, from Kim certainly as of May 7th, 1996, did you have any reason to doubt the accuracy of her notes?
A. No.
Q. Okay. Now, I want to talk a little bit about Kim's April 22nd, 1996 comments here that begins with, Wanda Taylor returned my call. However, she referred call to Eleanor "Mickey" Doyle, manager of human resources, who discussed the 1099s with me. Did I read that correctly?
A. Yes.
Q. And then Kim's note goes on to say, She stated that insured has received a 1099 each year since inception of insured's employment with Interflex. The 1099 includes director's fees, medical, and MMI disability insurance premiums (which are paid by the corp. and then 1099'd to him.) Did I read that correctly?
A. Except for MMI is MML.
Q. Okay. I'm sorry. What's MML?
A. Minnesota Mutual Life.
Q. Okay. I'm sorry. I was thinking Minnesota

Mutual Insurance.
This arrangement was part of the employment agreement with insured. Did I read that correctly?
A. Yes.
Q. And it also says, All other officers of the corp. have the same arrangements. She confirmed that the premiums paid for the other individuals on the APP plan -- which is automatic payment. Correct?
A. Correct.
Q. -- APP plan are also 1099'd to them. Did I read that correctly?
A. Yes.
Q. And it goes on to say, Insureds' severance package provided the corp. would pay premiums out of their APP plan through 3/31/96. Did I read that correctly?
A. Yes.
Q. All right. It also says in the next paragraph, Note that employer's letter also received, report insured's job eliminated due to downsizing. Did I read that correctly?
A. Yes.

Q. And there's no mention in Kim's notes about Mr. McGill leaving Interflex due to poor job performance or due to poor performance. Is that correct?

A. Yes.

Q. So while you received that information from Geoff Graeb at Trans-General, Mickey Doyle who was the human resources manager at Interflex appears to have given different information to Kim on April 22nd, 1996. Is that correct?

MS. LANG: I'm gonna object to the form of the question and also as to the foundation. The foundation is because the entry by Kim Harrison appears to be reflecting something that Wanda Taylor said Mickey Doyle said.

MS. BASSO: It says, However, she referred call to Eleanor "Mickey" Doyle.

MS. LANG: Oh, I'm sorry.

MS. BASSO: That's okay. I thought that initially when I read it, but then it looks like she did indeed speak to "Mickey," Eleanor.

Q. So just to back up, the information Kim

received from Mrs. Doyle, according to the claims note, appears to be different from the information you received from the gentleman at Trans-General regarding why Mr. McGill left Interflex.
A. Yes.
Q. Okay. Now, when we look at page 9, the first entry is dated May 7th, '96. Correct?
A. Yes.
Q. And this is your handwriting?
A. Yes.
Q. And it says, Mickey Doyle, HR manager at Interflex, called as she received a follow-up on our 3/23 letter which she had already responded to. Did I read that correctly?
A. Yes.
Q. Again, did you take this note at or about the same time you spoke with Mrs. Doyle?
A. Yes.
Q. And do you know if you had had any conversation with her on the telephone prior to May 7th, 1996? This is the first reference to her in your notes.
A. No, then this would have been the first time.

Q. Okay. Now, it says here, Mrs. Doyle -- and I'm going down five lines, okay -- Mrs. Doyle informed that she was also part owner of the company with her husband who was the CEO. She stated that the insured's position was eliminated due to downsizing of the company. Both management -- and it looks like OT something were let go. 1995 was a bad year as they lost sales volume plus they invested heavily in new factory equipment in order to handle supermarket accounts, but those accounts never panned out. Did I read that correctly?
A. Yes.
Q. And that's information that you obtained yourself on the telephone from Mrs. Doyle?
A. Yes.
Q. And there's no reference in your notes here to poor performance on the part of Mr. Gill (sic). Correct?
A. Correct.
Q. Okay. Just for my own reference, the next note down, 5/22/96 that says, PC from agent Mike Johnson, that appears to be initialed by

KB. Do you know who that is?
A. Kathy Behan (phonetic).
Q. Does she still work for your company?
A. No.
Q. Does Kim Harrison?
A. Yes.
Q. What does Kim do there now? Do you know?
A. I'm not sure of her title.
Q. Okay. Is she someone who you still see at work on a regular basis?
A. Yes.
Q. Okay. Now, I'd like to call your attention to page No. 10 of the claim memoranda. And the first entry is dated 6/3/96. Is that correct?
A. Yes.
Q. And this is your penmanship next to this entry. Correct?
A. Yes.
Q. And it says, Insured called. Informed that APS -- what are APS?
A. Attending physician statement.
Q. -- had been mailed last week. Also wanted to know if auto WPD could be started. What's that?

A. Waiver of premium disability.
Q. Okay. Informed insured once APS received and disability verified would consider auto WPD. Insured had another sleep study which showed no change, still severe. Did I read that correctly?
A. Yes.
Q. And then it goes on to say, He also questioned his five-year benefit period, thought he had to age 65. Informed he was issued a modified contract with a rating. He was unaware of this. Did I read that correctly?
A. Yes.
Q. He will discuss with his agent, but he would like a copy of the 1992 letter sent to him by underwriting. Did I read that correctly?
A. Yes.
Q. Had you informed him at that time of this 1992 letter?
A. I must have, you know, based on my notes.
Q. Okay. From that point, June 3rd of 1996, forward, you knew there was a question as to whether or not Mr. McGill had known that his benefits period had been reduced.

A. Right.
Q. And that was based upon his saying to you on the phone that he had no idea that his benefits didn't go up to the age of 65. Is that correct?
A. Yes.
Q. All right. Now, I'd like to ask you to move up to page 11, if you would. And there's an entry in the middle of the page dated 11/14/96. It's initialed CW. So that entry was written by you. Correct?
A. Yes.
Q. And it says here, Spoke with Mike White, general agent, regarding the complaint and his agency's practices with regard to modified contract. He informed that Mike Johnson had not been housed in his office for two years. Did I read that correctly?
A. Yes.
Q. And then your note goes on to say, However, all of his agents were aware of when they have a modified contract and how to handle them. All e-mails from HO -- home office, is that right?

A. Yes.
Q. -- are assigned directly to agent who then may choose to instruct other office personnel to respond. Also, they place their policies for delivery to a client in a blank -- I'm sorry, in a black three-ring binder. Did I read that correctly?
A. All except for the one word, all e-mails from the home office are "given" directly to the agent.
Q. Okay. Thank you.
Now, Mike White, general agent, where was he located? Do you remember?
A. Richmond, Virginia.
Q. And how did you get his name?
A. He's the general agent, basically Mike Johnson's boss.
Q. Okay. This is the first mention of Mike White in your claims notes. So is it fair to say that this would have been your first actual contact with him?
MS. LANG: On this particular claim?
MS. BASSO: Correct.
A. On this claim, yes.

Q. Okay. You knew him from his selling other policies to other insureds?
A. Yes.
Q. Was Mike White an independent agent or did he just sell policies for Minnesota Mutual? If you know.
MS. LANG: And I'll also object to the form of the question. That calls for a legal conclusion by the witness. But you can answer.
A. Our company is considered a general agency system so they primarily have to sell our products to stay with our company.
Q. Okay. Now, it looks like on that same day, according to the next entry, you spoke with Geoff Graeb again at Trans-General and said, Their policy was not issued as modified as there's no underwriting done (open enrollment). It goes on to say, Their agent is also Mike Johnson. Is that correct?
A. Yes.
Q. And why did you contact Geoff Graeb on that same day?
A. In researching the benefit period change, you

know, I believe I was just asking them what had happened on their contract to try to research what had happened.
Q. What do you mean, what had happened with their contract? Were you aware of some problem with their contract?
A. I think I just wanted to know what had happened on their end, if it was a modified contract or not.
Q. You wanted to see what benefits they were providing to Mr. McGill?
A. Yes.
Q. To compare them with the benefits that Minnesota Mutual was providing?
A. Yes, as far as benefit period.
Q. And do you have a copy of that Trans-General policy in your claims file?
A. No.
Q. It does say in the last line here -- I'm sorry, the second to the last line, Re the claim: They had an IME performed which supported disability. Did I read that correctly?
A. Yes.

Q. And who's "they"? Trans-General?
A. Yes.
Q. Now, looking on to page 12, 11/14/96, the same day, Left a message for Mike Johnson, agent, to call regarding the complaint. Is that correct?
A. Yes.
Q. And the complaint that you are referring to was what? Do you know offhand?
A. It was a letter from an attorney, Mr. McGill's attorney.
Q. What was the nature of the complaint?
A. It stated that Mr. McGill had no knowledge that his policy had been modified and he wanted either the policy he had asked to be issued or a settlement.
Q. Now, it looks like, according to your notes, Mr. Johnson returned your call on November 18th, 1996. He was quail hunting in Texas. Is that correct?
A. Yes.
Q. Now, do you remember having this particular conversation with Mr. Johnson or do you remember it simply by virtue of looking at

your notes?
A. I only remember it from my notes.
Q. Okay. Any reason to believe that these November 18th, 1996 notes memorializing your conversation with Mike Johnson are inaccurate for any reason?
A. No.
Q. Okay. It says here that he called you back and that he states that most of what the insured's attorney alleges is untrue. Did I read that correctly?
A. Yes.
Q. It goes on to say, He even called attorney and left him a message stating the comments are untrue. The attorney returned his call, but Mike had already left town and has not spoken with him. Mike says he did speak with the attorney previously and he was asked if there was an amendment signed. He did not see one in his files, but does not really remember. Did I read that correctly?
A. Yes.
Q. So Mike Johnson would have said to you that he didn't see any signed amendment in his file

and he can't even remember if there was a signed amendment to Mr. McGill's policy. Correct?

A. Based on this note, yes.

Q. Based upon your experience, if somebody is issued an amended policy by Minnesota Mutual, is there a requirement that the insured sign an acknowledgment of that amendment?

MS. LANG: Object to the hypothetical form of the question. It also goes to underwriting issues and policy --

MS. BASSO: If she doesn't know, she doesn't know. But I'm just asking in her experience. I mean, none of this is new terminology.

A. In my experience, which would be Mr. McGill's file, no, there's not an amendment that needs to be signed.

Q. There isn't a signed amendment for Mr. McGill. Correct?

A. Correct.

Q. But in your experience, do insureds typically have to sign acknowledgements stating that they know they're receiving an amended policy?

A. I don't know that.
Q. Okay. Going down in the notes here, the last paragraph, it says, Mike does admit that he knew the contract was modified. He also says both the employer and the insured knew it also. Mickey is the office manager of Interflex in addition to being the owner's wife. It's been so long, but he doesn't recall exactly who he delivered the policy to. Did I read that correctly?
A. Yes.
Q. He believes he delivered several policies to Mickey Doyle, as he also sold contracts to the other executives, who was then going to pass them out to the various insureds. Did I read that correctly?
A. Yes.
Q. So according to Mike Johnson in November of '96, he thinks he gave a bunch of Minnesota Mutual policies to Mickey Doyle to then hand out to the executives at Interflex. Correct?
A. Yes.
Q. He says he knows that he discussed the modified policy with Mickey. Correct?

A. Yes.
Q. Okay. And it says, continuing on the next page, At some point, probably at delivery, because he would have had to -- he would have had to collected additional premiums. Did I read that correctly?
A. Yes.
Q. Okay. Now, looking down at the second paragraph on page No. 13, this is still your penmanship. Correct?
A. Yes, it is.
Q. It says, Mike has no set procedure as to when he tells a client that their policy has been modified. Sometimes it's before delivery, sometimes at delivery. Did I read that correctly?
A. Yes.
Q. And where did you receive that information?
A. From Mike.
Q. The next paragraph down goes on to say, Mike has known insured socially for years even before policy bought. Did I read that correctly?
A. Yes.

Q. It goes on to say, looking at that last sentence of the paragraph, The insured's individual coverage was part of an employment agreement between insured and Interflex, and that's why Mike probably delivered the policy to Mickey Doyle. Correct?
A. Yes.
Q. So Mike Johnson thinks that he delivered Mr. McGill's policy to Mickey Doyle, but that he didn't really have a set procedure as to how he would deliver policies to Minnesota Mutual's insureds?
A. Yes, that's what he told me.
Q. Okay. Now, I'd like to call your attention, if I could, to page 15 of your claims memoranda. And this note begins 11/20/96. Correct?
A. Yes.
Q. Okay.
MS. BASSO: And then we'll take a break, if that's okay, because I know we've been sitting here for a long time. I didn't notice how much time had gone by.
Q. 11/20/96, Spoke with Mickey Doyle, head of HR,

at Interflex. And then it lists her phone number. Did I read that correctly?
A. Yes.
Q. And this is your penmanship. Correct?
A. Yes.
Q. And this note which continues for page 15, page 16, page 17, and page 18 all the way on to page 19, that's all your handwriting. Correct?
A. Yes.
Q. And did you take these notes at the same time or shortly after your speaking with Mrs. Doyle on this date?
A. Yes.
Q. Okay. Now, in looking at the second paragraph, Mrs. Wolf, it says, Insured was hired by their company as the highest ranking executive below her husband, Joe, the owner. She also owns part of the company. He was hired as the executive VP and was eventually promoted to president. Did I read that correctly?
A. Yes.
Q. And then it goes on to say, To their

executives, they offered company LTD through Trans -- it looks like Trans-General, which Interflex would pay for. Did I read that correctly?
A. Yes.
Q. They also offered key-man LTD which each executive was responsible for paying except for the insured because he was the highest ranking. Interflex offered to pay for his key-man LTD through MML. Did I read that correctly?
A. Yes.
Q. It goes on to say, Mike Johnson was the agent for both, and they told the executives that if they wished to pursue key-man coverage they would need to contact Mike directly. Seven of the executives, including her husband and the insured, did so. The insured's premiums were paid from the corporation and the other executives were something from payroll deduction. What does that say? The other executives were what, taken from payroll?
A. Yeah, taken.
Q. Asked Mickey if the insured paid his own

premiums. She replied no. Did I read that correctly?
A. The insured ever paid.
Q. Okay. And she replied no. Right?
A. Correct.
Q. Now, in looking back to page 8, the second page 8, which was Mickey's conversation with Kim on 4/22/96, Mickey clearly stated to Kim, according to Kim's notes, that he had received a 1099 each year since the inception of his insured and that 1099 included premiums paid for the Minnesota Mutual disability policy. Correct?
A. Yes.
Q. It looks like you noticed that Mickey was giving you different information than she had given Kim before Mr. McGill had filed his complaint, and it says here on the top of the last paragraph of your notes, Asked her if she was aware -- hold on one second.
MS. LANG: Are you talking about the last full paragraph?
MS. BASSO: You know what, I'm looking at the wrong place. Hold on one

second.

MS. LANG: Okay.

Q. Strike that. It says here eight lines up from the bottom, which I know is kind of awkward, Asked her if she remembered phone call with Kim in 4/96 where she stated the insured did pay or at least was 1099'd for the premiums. She did not recall. So you did question her about that?

A. Yes, according to this note I did.

Q. And what did Mickey not recall, the conversation or whether or not he was 1099'd for the premiums?

A. I can't tell what I said as far as what she didn't recall.

Q. Now, at this time, Mr. McGill had already filed his complaint. Correct? She makes reference to a complaint in previous notes.

MS. LANG: You're not referring to a legal complaint.

MS. BASSO: No.

MS. LANG: I just want to make sure the record's clear on that. The Virginia complaint hadn't been filed.

Q. I'm sorry. At this point, Minnesota Mutual was already notified that Mr. McGill had an issue with the fact that he didn't believe he received the insurance policy that he paid for. Correct?
A. Correct.
Q. All right. And is it fair to say that that's what caused you to contact Mike Johnson and Mickey Doyle and the different people that you spoke with about this?
A. Yes.
Q. Okay. When you spoke with Mickey Doyle about the 1099 issue, was Mrs. Doyle aware of the fact that Mr. McGill had filed a complaint?
A. I don't know.
Q. All right.
A. Or there may be a note in here.
Q. Now, according to your notes, Mr. McGill wasn't aware of a modified policy until June 3rd, 1996. Correct?
A. Pardon me. Can you ask me again?
Q. According to your notes, page 10, Mr. McGill was not aware of a modified policy until June 3rd of 1996.

A. Correct.
Q. Therefore, Mr. McGill didn't make any complaint against Minnesota Mutual until after June 3rd, 1996. Correct?
A. Correct.
Q. So when Kim Harrison spoke with Eleanor Doyle on April 22, 1996, that was prior to there being any complaint made with this policy -- made about this policy. Correct?
MS. LANG: Objection to the form of the question. You can answer.
A. Yes.
MS. BASSO: We're still on the 11/20/96 note. It's almost one o'clock. Why don't we take a break for a little bit.
MS. LANG: Sure.
(Brief recess taken)
Q. Returning here to page 16 of the Individual Claims Memoranda, Ms. Wolf, this is your penmanship again on this 11/20/96 continued note. Correct?
A. Yes.
Q. And the first full paragraph says, Asked Mickey if she had ever received insured's DI

policy and she stated no. Did I read that correctly?
A. Yes.
Q. And then she goes on to say, All she did was make sure the premiums were paid for. Is that correct?
A. Yes.
Q. As the executives were on their own with Mike on the key-man insurance, there was no reason for her to get involved. Did I read that correctly?
A. Yes.
Q. And Mickey said that to you and then you memorialized it in this claims note. Correct?
A. Yes.
Q. This is different from what Mike Johnson told you about him having delivered all of these policies to Mickey Doyle. Is that correct?
A. Yes, it is. But I believe he said he didn't recall, he thought he had delivered them to Mickey Doyle.
Q. Did you know Mike Johnson either personally or professionally prior to dealing with him with regards to Mr. McGill's claim?

A. No.
Q. Had you ever met him before?
A. No.
Q. Is it fair to say that -- well, actually, no. Let me strike that.
When Mike Johnson stated to you that he had no formal method of delivering policies to insureds or no set practice, you wouldn't have any other information regarding his habits from anyone else other than him. Correct?
A. Correct.
Q. So you just talked to him about it and that was it?
A. Yes.
Q. Okay. Mrs. Doyle goes on to say, if you look toward the bottom third of the page, She assumed that Mike would have personally delivered all of the other policies like he did theirs. Did I read that correctly?
A. Yes.
Q. She did admit that she knew Mr. McGill's contract had been modified because Mike had informed them that the premium was higher

because the insured was a smoker and overweight. Is that right?

MS. LANG: Are you moving to the next paragraph?

MS. BASSO: I'm sorry. You know what I do, I'm trying to move this along.

MS. LANG: I know.

Q. Did I read that correctly?

A. Yes.

Q. Now, I want to skip ahead actually to page 18 which is still 11/20/96. And the first full paragraph -- and again, this is still your handwriting, right, and this is still you talking to Mrs. Doyle?

A. Yes.

Q. And it says, The insured was terminated from Interflex effective 11/30/95 as they disagreed with his management style and where the company was heading. They decided to reorganize and eliminate the president's position. It's still eliminated. Did I read that correctly?

A. Yes.

Q. Now, looking back to May 7th, 1996, which is

on your claims note, page 9, Mickey Doyle was explaining to you at that point why Mr. McGill left the company, and that was when she appeared to have gone into an explanation regarding sales volumes and they were letting go a lot of executives and that business was slow and what not. Correct?
A. Correct.
Q. So at that point in May of '96 there was no mention of Mr. McGill's management style; yet then when you spoke to her in November of '96, she indicated that he was terminated because of his management style and then they downsized. Correct?
A. Yes.
Q. When you spoke to Mickey Doyle in -- actually, let me strike that. Let me back up.
Minnesota Mutual -- and tell me if you know this or not -- had received a letter from an attorney representing Mr. McGill earlier in November of 1996. Do you have a memory of that?
A. Yes.
Q. Okay. And you, in fact, were able -- saw the

letter that came to Minnesota Mutual from
Mr. McGill's attorney. Correct?
A. Yes.
Q. And do you know as we sit here whether or not
you received a copy of that attorney's letter
prior to November 20th, 1996?
A. I don't know.
Q. If I told you that the letter from the
attorney was dated November 6th, 1996, would
that refresh your recollection as to whether
or not you had received it or seen it prior to
November 20th, 1996?
MS. LANG: I just want to make sure,
the letter is not addressed to Ms. Wolf, is
it?
MS. BASSO: No, but she does
reference --
MS. LANG: No, I know.
Q. It's not addressed to you. But I'm just
asking, I know you remember having seen a
letter.
A. Yes.
Q. And I'm telling you that the letter is dated
November 6th, 1996. So my question is, do you

know if you saw it before you contacted Mickey Doyle on November 20th, '96?
A. I don't remember.
Q. Do you know if you contacted Mickey on November 20th, '96 in response to having seen that letter?
A. I don't recall.
Q. Okay.
MS. BASSO: I would like to have this marked as Exhibit I.
(Exhibit I marked for identification)
Q. I'm gonna show you what's been marked as Plaintiff's Exhibit I. And I'd like you to take a look at it and tell me if you recognize this document.
A. Yes, I do.
Q. And what is it?
A. It's a complaint from Mr. McGill's attorney regarding his modified policy.
Q. And this is a letter dated November 6th, 1996 from Attorney Thomas F. Coates?
A. Yes.
Q. And this is not the first time that you've seen this letter. Correct?

A. Correct.
Q. Now, the letter is addressed primarily to Mr. Robert L. Senkler, who's the president apparently or was the president of Minnesota Mutual Life Insurance Company. Is that correct?
A. Yes.
Q. And was this letter then at some point passed along to you?
A. Yes.
Q. Okay. Now, I'm gonna ask you to keep that with you.
MS. BASSO: But what I would like to do is mark this as Exhibit J.
(Exhibit J marked for identification)
Q. And I'm gonna ask you to take a look at this document and tell me if you've ever seen it.
A. Yes.
Q. You have seen it?
A. Yes.
Q. And what is it?
A. It's a letter from our in-house counsel to Mr. McGill's attorney.
Q. And in-house counsel is Harold Oien?

A. Correct.
Q. Is he still at your company?
A. No.
Q. This letter here is dated November 21st, 1996. Correct?
A. Yes.
Q. And it says it's addressed to Mr. Coates who was Mr. McGill's attorney and it says in the first line, I am writing in response to your letter of November 6, 1996, addressed to Robert L. Senkler. Did I read that correctly?
A. Yes.
Q. Now, it appears then that you received a copy of the November 6, 1996 letter to Mr. Senkler and then so did in-house counsel. Correct?
A. I didn't receive a copy of this letter -- I received it through our in-house counsel. One did not come to me directly.
Q. Okay. Do you know if you received it prior to November 21st, 1996?
A. I don't know.
Q. Okay. Do you recall speaking with Attorney Oien prior to his writing this November 21, 1996 letter?

A. I don't remember.
Q. In this letter, the attorney indicates that this matter is under investigation and he says, Unfortunately, we have not yet completed our investigation and I ask your forbearance for approximately one more week at which time we should be able to respond to the statements made in your letter.
My question is, were you part of the group of people or were you the person that was investigating the allegations contained in Mr. Coates's November 6th letter?
A. Yes.
Q. Okay. So is it fair to say or does it refresh your memory that your November 20th, 1996 telephone conversation with Mickey Doyle pertained to allegations contained in that November 6th letter?
A. I don't know.
Q. Okay.
A. I don't recall.
Q. Okay. Now, senior counsel here we know responded to Mr. Coates on November 21, 1996, and shortly after that you responded to

Mr. Coates's letter. Correct?
A. Correct.
MS. BASSO: I would like this marked as Exhibit K, if I could.
(Exhibit K marked for identification)
Q. I'd ask you to take a look at that and tell me if you've seen it.
A. Yes.
Q. What is this?
A. It's a letter from me to Mr. McGill's attorney.
Q. And regarding what?
A. It was regarding his modified policy and the circumstances surrounding the delivery of his policy.
Q. It's a denial of Mr. McGill's attorney's request to extend the benefit period. Correct?
A. Correct.
Q. Now, I know Mr. Oien who is with in-house counsel at Minnesota Mutual initially responded to Attorney Coates regarding the status of the investigation; but it looks like your letter dated January 20th, 1997,

Exhibit K here, which is actually the denial that you sent to Mr. Coates, actually comes from you.

So my question is, why would staff counsel write the initial letter regarding the investigation and then you write the letter concerning the outcome of your investigation?

A. I don't remember.

Q. Was that typical?

A. I don't recall. I don't know if that's typical.

Q. Well, during the course of your employment as a disability claims examiner, did you have -- how often would you send responses to attorneys with respect to claims disputes?

A. Well, if one was filed, I would be the one to respond as a claims examiner. I was the one that would make the decisions.

Q. Okay. Now, this January 20th, 1997 letter to Mr. Coates from you, did you draft this letter yourself? Not type it, but this information here comes from you. Correct?

A. Yes.

Q. Okay. And in your third paragraph you write,

Due to the passage of time, Mr. Johnson does not recall the circumstances surrounding the delivery of Mr. McGill's policy. Did I read that correctly?

A. Yes.

Q. And you wrote that sentence based upon information that you received from Mr. Johnson?

A. Yes.

Q. And that's based upon information that you didn't receive from anybody but Mr. Johnson. Correct?

A. Correct.

Q. All right. And then you go on to say, ...but is certain that it was delivered in the normal course of business. Did I read that correctly?

A. Yes.

Q. Now, in looking back to your claims memoranda, page 13, the second paragraph where you wrote, Mike has no set procedure as to when he tells a client that their policy has been modified. Sometimes it's before delivery, sometimes at delivery. Did I read this correctly?

A. Yes.
Q. And there's nothing in your claims memoranda here on page 13 when you were speaking to Mike Johnson about the delivery of his policy that concerns what his normal course of business was. Is that fair to say?
A. Yes.
Q. Okay. So Mike Johnson couldn't say whether or not he gave -- delivered the policy to the Doyles or to Jack McGill and that's based upon your claims note. Correct?
A. Yes.
Q. Mickey Doyle said, We never received Mr. McGill's policy. Correct?
A. Yes.
Q. And she didn't know whether or not Mr. McGill had ever received that policy because she had nothing to do with that, all she did was get notified of the premium changes. Correct?
A. Yes.
Q. You concluded in the last paragraph of your January 20th, 1997 letter, Therefore, it is Minnesota Mutual's position that Mr. McGill had knowledge of the policy modifications and

that the policy was delivered. Did I read that correctly?

A. Yes.

Q. So let's talk about Minnesota Mutual's conclusion that the policy was delivered. Mike Johnson couldn't say whether or not it was delivered and he was the agent. Correct?

MS. LANG: Objection to the form of the question.

Q. Let me rephrase that. Mike Johnson could not say whether or not he delivered the policy to Jack McGill. Correct?

MS. LANG: Objection to the form of the question. I think that mischaracterizes what the witness records Mr. Johnson as having said, that he could not recall whether or not -- or the circumstances of delivery, not that he couldn't recall that he delivered it.

Q. Okay. Mike Johnson said to you that he could not recall whether or not he delivered the policy.

MS. LANG: Objection to the form of the question. You may answer it based on your notes.

A. I believe my notes reflect he couldn't recall who he delivered it to.
Q. Okay. But he did go on to say that he thought he delivered the policy to Mickey Doyle because -- that's why Mike probably delivered the policy to Mickey Doyle because he explained that he believed he had dropped off a bunch of policies at Interflex. Correct?
MS. LANG: Objection to the form of the question. You can answer.
Q. Page 13. The last sentence of the third paragraph. The insured individual coverage is part of an employment agreement between insured and Interflex, so that's why Mike probably delivered the policy to Mickey Doyle. Did I read that correctly?
A. Yes.
Q. And you got that information from your telephone conference with Mike Johnson?
A. Yes.
Q. So Mike Johnson indicated to you that he has no set procedure as to when he tells a client that their policy has been modified. Correct?
A. Correct.

Q. And he couldn't remember who he delivered Mr. McGill's policy to, but it was probably Mickey Doyle. Correct?
A. Correct.
Q. And then Mickey Doyle said, Absolutely we did not ever receive Jack McGill's policy. Correct?
A. Yes.
Q. And based on that, Minnesota Mutual drew its conclusion that the policy was delivered to Mr. McGill?
A. Yes, because we received the premium payment for the increased amount.
Q. Even though the person who paid the premium said to you, We didn't receive the policy, all we do is pay the premium?
MS. LANG: Object to the form of the question. You can answer.
A. Could you repeat that, please?
Q. You said that Minnesota Mutual made its conclusion that the policy was delivered because it had received the premium payment. Correct?
A. Yes, according to this letter.

Q. Yet, as of January 20th, 1997, you had already had your lengthy telephone conversation with Mickey Doyle where she said, All we did was pay the premium, we know nothing about the policy itself.

MS. LANG: Objection to the form of the question.

A. I'm sorry. I don't understand what you asked me.

Q. All right. Let me move on.

What's constructive delivery of a policy?

A. I'm not sure.

Q. Well, in your letter in the third paragraph it says, As Minnesota Mutual received the increased premium as acceptance of its counteroffer, we consider the modified policy to have been constructively delivered. Did you write that?

A. My recollection of this letter is that I did have assistance from our law department, from legal advice.

Q. Did an attorney write this letter for your signature?

A. I don't remember how it all occurred.
Q. Do you know whether or not you wrote this letter?
A. Due to the passage of time, I can't remember.
Q. Now, Minnesota Mutual, according to this January 20th, 1997 letter, also took the position that Mr. McGill had knowledge of the policy modification. Did I read that correctly?
A. Is that the last paragraph?
Q. Yup.
A. Yes.
Q. And as of June 3rd, 1996, based upon your telephone conference with Mr. McGill, he had no knowledge of the policy modifications. Correct?
A. Correct.
Q. And Mike Johnson couldn't remember whether or not he had discussed the actual policy modifications with Mr. McGill. Correct?
MS. LANG: I'm gonna object to the question because I believe that mischaracterizes what Ms. Wolf recorded in her notes as to what Mr. Johnson said to her.

Q. What did Mr. Johnson say to you about discussing policy modifications with Jack McGill?

MS. LANG: Do you want to refer to your claim memoranda?

A. I'd have to look at the file.

MS. LANG: Take your time.

A. The file reflects that he did -- Mike did discuss it with Mr. McGill.

Q. What page?

A. Page 13.

Q. What line?

A. 3.

Q. Recalls discussing with insured but doesn't remember when exactly. However, he's almost certain he did when insured applied for life insurance. Did I read that correctly?

A. Yes.

Q. Again, Mr. Johnson couldn't exactly say when he would have discussed these policy modifications with Mr. McGill?

A. Correct.

Q. This January 20th, 1997 letter that you signed off on to Mr. Coates, during this seven to

eight years that you were a disability claims examiner, did you write any other such letters to attorneys or insureds?

MS. LANG: I'm gonna object to the form of the question. When you say "such letters" --

MS. BASSO: A claims denial letter.

MS. LANG: Okay.

A. Yes.

Q. When you would send out your denial letters, was it typical for you to consult with attorneys in doing so?

A. Yes.

MS. BASSO: I'm gonna have this marked as the next exhibit which is Exhibit L.

(Exhibit L marked for identification)

Q. Have you seen this letter before?

A. Yes.

Q. And what is it?

A. It's a letter from the agent, Michael Johnson. It looks like he mailed me some additional information.

Q. It's addressed to you. Correct?

A. Yes.

Q. And what's the date of this letter?
A. December 27th, 1995.
Q. And clearly at that point you had already received Mr. McGill's claims file. Correct?
A. Yes, we had received notice of his claim.
Q. All right. Now, there's a handwritten note -- actually, strike that.
Let's just get to the typewritten information. It says, Dear Cheryl, Attached is the additional information that you had requested regarding John L. McGill. Did I read that correctly?
A. Yes.
Q. So had you written to Mike Johnson or called him to request additional information?
A. I believe this is the information that I requested on that previous exhibit we looked at, the claim forms.
Q. And he says, I've also enclosed some other information that I thought might be helpful. You will notice that Mr. McGill was actually having difficulty sleeping over a year ago. Obviously, this condition affected his job performance and his ability to perform his

duties. Did I read this correctly?
A. Yes.
Q. All right. And then Mr. Johnson went on to say that he had known Mr. McGill since January of 1992 and that he was very familiar with his case and would help you in any way. Is that correct?
A. Yes.
Q. Now, there's a handwritten note on the bottom here that says, Cheryl, in reviewing this file, I noticed that the withholding statement reflects that the employer paid the premium, which is true. All premiums are included in Mr. McGill's W-2 earnings. Thanks, MJ.
My question is, was this handwritten note on the initial letter that you had received?
A. I don't remember.
Q. Okay.
MS. BASSO: I'm gonna have our next exhibit marked as Exhibit M, which is a two-page exhibit.
(Exhibit M marked for identification)
Q. And I'm gonna ask you to take a look at this

and tell me if you recognize it.
(Witness reviews document)
A. Yes, I recognize it.
Q. And what is that?
A. It's Mike Johnson, the agent, sending me a 1099 for Mr. McGill.
Q. Now, it says on the front page it's a fax communication. Correct?
A. Yes, it looks like a fax.
Q. It says on the front of the fax page, date 22nd of March, and then down at the bottom from the fax machine it says March 22, 1996. Do you have any reason to dispute that that's the date that this was transmitted?
A. No.
Q. Okay. And this is addressed to both Geoff Graeb of Trans-General and to you. Correct?
A. Yes.
Q. And it goes on to say that, This is to serve as verification that Mr. McGill paid taxes on his DI income. Please call with any questions you may have. Thanks, Mike Johnson. Did I read that correctly?
A. Yes.

Q. Now, looking at the second page of the fax, it's a 1995 1099. Correct?
A. Yes.
Q. And there's handwriting on the top of this that says Trans-General Insurance equals $283.44 and MML, $2,276.88. Do you know who wrote that on there?
A. No.
Q. That's not your handwriting?
A. No.
MS. BASSO: N, please.
(Exhibit N marked for identification)
Q. Do you know what this is?
A. Yes.
Q. And what is it?
A. It's a request for information from Trans-General.
Q. Addressed to who?
A. To me.
Q. And it's from Geoffrey Graeb?
A. Yes.
Q. Now, it looks like Mr. Graeb asked you some questions which are typewritten and then there are some handwritten answers. Is the

handwriting yours?
A. Yes, it is.
Q. This letter is dated February 8th, 1996. Correct?
A. Yes.
Q. And in the first question it says, Is the above referenced -- who's claimant John L. McGill -- eligible for long term disability coverage with Minnesota Mutual Life, and your answer is yes. Correct?
A. Yes.
Q. And then regarding what type of coverage is in force, you had a choice to circle individual or group and you circled individual. Correct?
A. Yes.
Q. It said, What were the eligibility requirements for obtaining this policy, and you wrote appropriate income and medical information. Did I read that correctly?
A. Yes.
Q. All right. And at this point the benefits had not begun to be paid yet, he was still within the waiting period. Correct?
A. Yes.

Q. What was the waiting period? Do you remember?
A. According to this letter, it was a 90-day waiting period.
Q. Okay. Do you know whether or not Minnesota Mutual ever conducted any surveillance of Mr. McGill at any time?
A. Not to my knowledge.
(Exhibit O marked for identification)
Q. I'm gonna show you the next exhibit which is marked as Exhibit O. Take a look at this, if you would. And have you ever seen this before?
A. Yes.
Q. What is it?
A. It's a notice of complaint. When we receive a complaint letter, our law department sends this out.
Q. Do you know if this would be in response to Attorney Coates's letter of 11/6/96?
A. I would assume it is because it says Date of Letter, 11/6/96.
Q. Did you prepare this?
A. No.
Q. Looking at the second page, there's a

checkmark that says Individual Insurance Claims, Jon Meier. Do you know what that checkmark means?
A. No.
Q. Do you know if it means that this matter was referred to Jon Meier, LC?
A. I don't know.
Q. Do you know if LC stands for legal counsel?
A. No.
Q. It doesn't? What does it stand for?
A. Lafayette Center. It's one of our buildings.
(Exhibit P marked for identification)
Q. Exhibit P is a three-page document, and I'm gonna ask you to look at all three pages.
(Witness reviews document)
Q. Do you recognize this document?
A. Yes.
Q. What is it?
A. It's a letter that I had written to Mickey Doyle.
Q. And what's the date of the letter?
A. December 15th, 1997.
Q. Did you draft this letter?
A. Yes, I would assume I did.

Q. Did anyone else assist you with writing this letter?
A. I don't recall.
Q. Is it possible that someone else did assist you with writing this letter?
A. It could be possible.
Q. Okay. But you don't know?
A. I don't know.
Q. All right. And again, this concerns the question as to whether or not Interflex actually issued Mr. McGill's 1995 Form 1099. Correct?
A. Yes.
Q. Okay. And it appears that you discussed this issue with Mrs. Doyle on the telephone; and then based upon that discussion, you reached the conclusion that Interflex did not issue the Form 1099 and therefore you believe that Mr. McGill's disability benefits should be taxable. Is that correct?
A. Yes.
Q. Did you ever send any further notification to Mrs. Doyle regarding the taxability of Mr. McGill's benefits?

A. If it wasn't in the claim file, then I didn't.
Q. Do you have any memory of taking any further action in that regard?
A. Only what the claim file would reflect.
Q. Now, attached to this was a Form W-2 1996 with the employer being Interflex Group and the employee being John McGill. Is that correct?
A. Yes.
Q. And you asked Mrs. Doyle in your December 15th letter to explain to you what this money represents. Did she ever do that?
A. I would have to look at my claim notes.
Q. Page 23. And it looks like you've got an entry dated 12/8/97 which is before you wrote this letter to Mrs. Doyle. Correct?
A. Correct.
Q. And then the next entry is 1/13/98. Is that correct?
A. Yes.
Q. And this is your penmanship. Correct?
A. Yes.
Q. It says, Called Mickey Doyle to follow up to my 12/15 letter. She had received it and thought she had responded before Christmas but

I never received. Did I read that correctly?
A. Yes.
Q. She informed me that the handwriting on the 1099 was her payroll manager. The payroll manager remembers being asked by the comptroller to create the 1099. Therefore, Interflex did issue the 1099; however, Mickey was unaware of it and had never received a copy of it even though she's supposed to receive a copy of the 1099s. Is that correct?
A. Yes.
Q. And that came from Mickey Doyle.
A. Correct.
Q. She said that to you. She went on to say, The 1996 W-2 consists of the remaining salary and severance pay through -- is it 8/96 due to the insured?
A. Yes.
Q. Now, in looking at page 4 of your claims notes -- sorry, page 24. I'm sorry. You've got an entry dated 2/6/98 that records or memorializes a conversation that you had with Mr. McGill. Correct?
A. Yes.

Q. And then it looks like in March of '98 you placed a call to Doctor Ganley's office -- or, I'm sorry, K.B. did. Someone in your office did. Correct?
A. Correct.
Q. Then on March 13th, 1998 you received Doctor Ganley's medical records. Correct?
A. Yes.
Q. And then 4/30/98 you received Mr. McGill's tax returns from 1997. Correct?
A. Correct.
Q. Now, looking at page 25, which I know is really dark, 2/1/99 is someone else's notes about receiving Doctor Ganley's records. Correct? And it says, Continue to monitor?
A. Yes.
Q. Okay. I know it's hard to see. And then 5/5/99, there are your notes regarding you reviewed Mr. McGill's 1998 tax returns. Correct?
A. Yes.
Q. And, in fact, there's no further mention on page 25 here of any conversations with Eleanor Doyle or Mike Johnson regarding Mr. McGill's

complaint or the issue of the 1099s. Correct?
A. Correct.
Q. So would it be fair to say that after that January 13th, 1998 conversation where you called Mickey Doyle yourself to see if she got the letter you had sent a month earlier, you had no further contact with Eleanor Doyle about this claim?
A. Correct.
Q. And have you talked to or written to Eleanor Doyle since January 13th, 1998?
A. No.
Q. Now, I just want to ask you to look ahead, if you would, to page No. -- I think it's 27 of your notes. You've got an entry dated 12/21/00 and it looks like you've initialed it?
A. Yes.
Q. And the last sentence says, According to the def -- I guess meaning definition -- of disability contained in the insurance policy, insured continued to qualify for waiver of premium benefits. Correct?
A. Correct.

Q. Now, we've looked through every page of these notes with the exception of the very, very last page which appears to list doctors and it's very difficult to read but it's a Contestable Claim Log. Correct?
A. Yes.
Q. And other than that, we've been through every page here. Nowhere in your claim memoranda is there any indication that Mr. McGill was not disabled and therefore entitled to his disability benefits. Is that fair to say?
MS. LANG: Objection to the form of the question. You can answer.
A. Yes.
Q. Okay. So while you were handling the claim, you never questioned the nature or extent of his disability. Correct?
A. I would have reviewed all the information. But no, I did pay the claim.
Q. Okay. And during the course of your handling of this claim, you requested a lot of information from Mr. McGill from claims forms to medical records to tax returns and what not. Correct?

A. Correct.
Q. And it's fair to say that he always complied with your requests?
A. Yes.
MS. BASSO: Give me one more second. I think I'm almost done.
MS. LANG: Is this a good time to take a quick bathroom break?
MS. BASSO: Oh, sure. Perfect. I think I'm just about done.
(Brief recess taken)
MS. BASSO: I don't have any other questions. So I don't know if Melissa does.
MS. LANG: No.
(Whereupon the deposition was concluded at 2:05 p.m.)

# CERTIFICATE

STATE OF RHODE ISLAND
COUNTY OF NEWPORT

I, Mary E. Rinne, Registered Professional Reporter and Notary Public in and for the State of Rhode Island, do hereby certify that the foregoing transcript of the deposition of Cheryl Wolf, having been duly sworn on Thursday, June 1, 2006, is true and accurate to the best of my knowledge, skill and ability.

IN WITNESS HEREOF, I have hereunto set my hand and notarial seal this 21st day of June 2006.

Mary E. Rinne
RPR and Notary Public

My Commission Expires: February 27, 2007