UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOHN L. McGILL, Plaintiff, | ) | |
| -vs- | ) | CIVIL ACTION NO.: 05-CV-0481/S |
| MINNESOTA MUTUAL LIFE INSURANCE COMPANY, Defendant. | ) | |

**<u>MEMORANDUM OF LAW OF PLAINTIFF JOHN J. McGILL IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

**INTRODUCTION**

This Memorandum of Law is submitted by Plaintiff John L. McGill ("McGill") in opposition to the motion for summary judgment herein by Defendant Minnesota Mutual Life Insurance Company ("MML"). McGill's Complaint alleges causes of action against MML for misrepresentation, breach of contract, fraud, and breach of fiduciary duty relating to MML's issuance of an individual long-term disability insurance policy effective July 2, 1992.

The graveman of the Compliant is that McGill contracted for and accepted, through MML's authorized agent, E. Michael Johnson ("Johnson"), a Policy with a maximum benefit period to age 65, but the Policy as written and delivered to McGill's employer provides for a maximum benefit period of five years. The Policy was never delivered to McGill by MML or Johnson, and McGill never knew of this material change in the agreed terms of the coverage until May 1996, almost four years after the Policy became effective and over six months after he became disabled on November 30, 1995 and entitled to benefits under the MML Policy.

Notably, MML's motion for summary judgment is not supported by a single factual affidavit or declaration from an MML employee or former employee. Moreover, notwithstanding that an extensive deposition was taken of Cheryl Wolf, MML's senior claims examiner assigned to handle McGill's claim, MML has not supported its motion with even a single page from her deposition. Many of the factual issues that exist in this case could and should be addressed by employees or former employees of MML with personal knowledge of the underwriting of the MML Policy, but MML has chosen not to submit any such evidence.

MML's motion is based on four grounds, as follows: (1) the MML Policy insuring McGill is governed by ERISA, and the applicable statute of imitations bars this action, and the Release executed by McGill in favor of Interflex in November 1995, which also releases any claims under ERISA, bars this action; (2) McGill is estopped as a matter of law from pursuing this action because he failed to disclose his potential claim against MML in the bankruptcy petitions and subsequent proceedings commenced by McGill and his wife in U.S. Bankruptcy Court for the Northern District of New York in 2001, which was concluded in 2002 as an asset; (3) if ERISA does not preempt McGill's state law claims, then the law of Virginia, where the MML Policy was issued to McGill governs the state law claims and with the exception of McGill's breach of contract cause of action they are all barred by the applicable Virginia statutes of limitations; and (4) McGill's breach of contract cause of action, to the extent not preempted by ERISA, is not supported by Virginia law.

As demonstrated herein and in the factual documents submitted to the Court in opposition to the motion, MML's summary judgment motion must be denied because

1. ERISA does not govern McGill's claims in this action, and therefore the claims are neither preempted by ERISA nor barred by the ERISA statute of limitations;

2. McGill is not estopped as a matter of law from pursuing his claims in this case because his potential claim against MML was not listed as an asset when he and his wife filed for bankruptcy in New York because he potential claim for disability benefits under the MML Policy is specifically exempt from the bankruptcy estate; and

3. as conceded by MML, Plaintiff's breach of contract cause of action is not barred by the applicable Virginia statute of limitations and there are questions of fact under Virginia law that require a trial of McGill's breach of contract cause of action.

## STATEMENT OF FACTS

McGill is an attorney admitted to practice law in Rhode Island, Massachusetts, Delaware, and New York, and has practiced law and worked extensively in business. When McGill was hired in November 1991 to be Vice-President of Eastern Shore Printing Company, Inc., a Virginia Corporation whose name was later changed to The Interflex Company, Inc. ("Interflex"), he entered into an Employment Agreement (**McGill Exhibit "1")** that called for Interflex to provide him with "Paid Disability Insurance." He subsequently replaced Joseph Doyle as President, who along with his wife, Eleanor "Mickey" Doyle, owned Interflex. McGill Decl. ¶ 2.

In the spring of 1992, MML's authorized agent, E. Michael Johnson ("Johnson") contacted McGill to discuss the purchase of "individual" long-term disability coverage that was not part of a plan sponsored by Interflex and provided to all Interflex employees. This individual disability coverage was intended to supplement an existing "group" long-term disability plan that was sponsored and paid for by Interflex and available to all Interflex employees, including myself issued by Trans-

General, which provided disability coverage until age 65.[1] When Johnson contacted him McGill understood that Johnson was meeting with only Joseph Doyle and him to sell the individual disability coverage. He subsequently learned during this litigation that at approximately the same time Johnson was meeting with Joseph Doyle and him regarding the purchase of individual MML disability policies or shortly thereafter, Johnson also made proposals to a select few other executives at Interflex who also purchased individual policies from MML. McGill Decl. ¶¶ 3, 5.

On or about May 12, 1992, Johnson and I met in person and he presented me with a Term Sheet for the Policy as MML's authorized agent. MML Statement of Undisputed Facts ("SUF") **Exhibit "C"**. The Term Sheet for the Policy provided coverage in the amount of $3,400.00 per month from the date of the covered long-term disability, after the requisite waiting period, until McGill's 65th birthday plus inflation adjusted increases each succeeding year during the coverage period after the commencement of a covered disability. McGill Decl. ¶ 8. At the meeting, McGill confirmed his acceptance of the terms of the Policy by signing MML's disability policy application that was prepared by Johnson at the meeting ("Application"). Interflex remitted a check to MML and Johnson in payment of the first month's premium due under the Policy as reflected in the Application. McGill Decl. ¶ 9; **Exhibit "F".**

The Application specifically provides that the "benefit period" is age "65" and that it is an "own occupation insurance policy *** to age 65 own occupation period." **Exhibit "F"**. McGill's Application is part of the bound MML Policy. McGill Decl. at ¶ 26. The bottom of the last page of Part 1 of the Application provides in bold and capital letters: "**FOR HOME OFFICE USE ONLY**". The Application further states under this heading **"Home Office**

[1] *See* **McGill Exhibits "2"** and **"3" (**Trans-General Group Insurance Benefits Booklets provided to McGill at the beginning of his coverage under the Interflex sponsored group policy that list "Eastern Shore Printing Corp." and "Interflex Group, Inc." as "Policyholder").

**Corrections or Additions – Acceptance of the policy shall ratify changes entered here by Minnesota Mutual Life."** (Emphasis supplied) After additional typed language, the Application has handwritten information as follows "50% premium increase, base benefit period – 5 yr., Guaranteed Increase Agreement plan omitted, Plan of Coverage – own occupation insurance policy 5 yr. Own Occupation Period."

Part 3 of the Application is the "Agreements, Certification and Authorization" portion of the Application. In relevant part, the first portion of this part of the Application provides as follows:

> **AGREEMENTS/CERTIFICATION:** I have read, or have had read to me the statements and answers recorded on Part 1 and Part 2 of my Application. They were given to obtain this insurance and are, to the best of my knowledge and belief, true and complete and correctly recorded. I understand that any false statement or misrepresentation on this Application may result in loss of coverage under this Policy subject to the Time Limit on Certain Defenses, incontestability provision, and legal proceedings. I agree that they will become part of this application and any policy issued on it. The insurance applied for will not take effect unless the policy is issued and delivered and the full first premium is paid while the health of the Proposed Insured remains as stated in Part 1 and Part 2 of the Application. **If such conditions are met the insurance will take effect as of the Policy Date specified in the Policy; the only exception to this is provided in the Receipt and Temporary Life Insurance Agreement, and the Conditional Health Receipt, issued if the premium is paid in advance**. (Emphasis in original)

A nurse employed by MML gave McGill a physical examination at Interflex's offices in June 1992. McGill Decl. ¶ 10. Effective July 2, 1992 MML issued the Policy, which provides for the payment of disability benefits to McGill in the event of a covered disability. **Exhibit "D"**. However, the coverage provided for in the Policy, as written, does not conform completely to the provisions of the Term Sheet and Application MML and Johnson provided McGill and he accepted on May 12, 1992. Instead, the Policy as written purports to provide materially and substantially less coverage than

what had been offered to McGill by MML and accepted by McGill on May 12, 1992. Thus, on page 1A of the Policy, entitled "YOUR POLICY INFORMATION," it states that "OWN OCCUPATION PERIOD – FOR 5 YEARS" and "MAXIMUM BENEFIT PERIOD FOR DISABILITY: FIVE YEARS." This is contrary to the "age 65" maximum benefit period and own occupation period specified in the Application. However, consistent with the Application, the same page of the Policy states that it is "NON-CANCELLABLE AND GUANANTEED RENEWABLE TO INSURED'S AGE 65" and that the disability benefit is $3,400 per month 'THROUGH JUL 1, 2013," which is the year and month that McGill turns 65. McGill Decl. ¶ 24. As issued, the Policy also increased the monthly premium charge for the lesser coverage it provided by approximately 50%.

Neither MML nor its agent, Johnson, delivered the Policy to McGill, nor did they inform or notify McGill in any manner of the purported materially reduced maximum benefit period contained in the Policy as issued. McGill was never asked by MML or Johnson to sign an amended application, and he would have refused to do so since it provided substantially less coverage than what he had contracted for. McGill Decl. ¶12. Instead, in July 1992 Johnson simply called McGill and advised him that he had made several attempts to deliver the MML Policy to him, but that McGill was either out of town or unavailable. Johnson also told McGill that the Policy had been issued by MML "without a hitch," and only noted in passing that MML would be charging a slightly higher premium than Johnson originally quoted when the Term Sheet and Application were completed and accepted by McGill because of his physical examination. Johnson assured McGill that the Policy as issued provided the same coverage that McGill had contracted for as set forth in the Term Sheet and his signed Application. McGill Decl. ¶ 13.

The only documentation McGill received from MML or Johnson after the Policy was issued were "Annual Policy Reviews" sent to McGill's home beginning July 2, 1993, the first anniversary of

the effective date of the Policy, and on every successive anniversary date of the Policy thereafter until July 2, 1996. **McGill Exhibit "4".** None of the Annual Policy Reviews states that the maximum benefit period and the "own occupation" period under the Policy as issued is limited to five years rather than to age 65 as set forth in the Application.

In April 1994 McGill was diagnosed with severe obstructive sleep apnea. By the Fall of 1995 his sleep apnea had progressed to the extent that it rendered him disabled and incapacitated from continuing to work at his "occupation" at Interflex. McGill Decl. ¶ 18. In October 1995 while McGill was looking through the Interflex HR Department files where Mickey Doyle worked for Minutes of a September Board of Directors meeting he inadvertently came across a folder with his name on it and thumbed through it and saw the Term Sheet he had obtained from Johnson for his MML Policy. He took the folder and kept looking for the Board Minutes without success. McGill Decl. ¶¶ 19-20.

McGill filed for disability benefits with MML through Johnson. MML accepted his disability claim and following the 90 day waiting period he began receiving the $3,400 monthly benefit payment from MML and a waiver of premium for the MML Policy pursuant to its terms. At that time McGill reasonably believed, based on the information given to him by MML and Johnson, that his disability benefit payments under the Policy would continue monthly until his 65th birthday in July 2013 so long as he continued to meet the definition of "disability" contained in the Policy. McGill was only 48 years old when he became permanently disabled in November 1995. McGill Decl. ¶¶ 21, 23.

McGill also filed for disability benefits with Trans-General, who had issued the group disability policy covering all Interflex employees and Trans-General accepted his disability claim and began making disability payments to him under the Interflex group policy. McGill Decl. ¶ 21. When McGill filed for the group disability policy benefits with Trans-General, Interflex's HR Department provided him with a copy of an Interflex Plan Booklet that defines the "Company" as "Trans-General

Life Insurance Company." **McGill Exhibit "5"**. McGill never received any "plan" booklet or documentation from Interflex regarding the MML Policy issued to him as the "policyholder."

In May 1996 McGill called MML to inquire about the inflation protection clause referred to in the Annual Policy Reviews he had received, and spoke to Cheryl Wolf ("Wolf"), the MML claims examiner for his claim. In that conversation he learned for the very first time that the MML Policy as issued purported to provide for disability benefit payments for a maximum term of only five years, not until age 65 as set forth in the Term Sheet and Application offered by MML and Johnson and accepted by McGill in May 1992. McGill Decl. ¶ 25.

McGill never reviewed the Policy after he found it in Mickey Doyle's office at Interflex in October 1995 until after this conversation with Wolf from MML. The Policy as issued is contained in a bound folder. Included in this bound folder is a copy of his signed Application accepting the provisions of the Term Sheet. The folder in which the Policy and the Application are bound also contained a "Revised Term Sheet" which was inserted, unbound, in the back of the folder. The Revised Term Sheet reflects the material changes to the coverage in the Policy as issued – the reduction in the maximum benefit period and the "own occupation period" to five years rather than to age 65 as provided in the original Term Sheet and Application. The Revised Term Sheet was never presented to McGill at all, let alone for his acceptance or consent. McGill Decl. ¶ 26.

In McGill's conversation with Wolf in May 1996 he also learned for the first time of a letter dated July 21, 1992 (**Exhibit "E", McGill Exhibits "16" and "17"**) that an "Individual Underwriter" at MML purportedly sent informing McGill that MML had decided to issue the Policy and stating, among other things, that "it was necessary to make some changes to the policy we are offering." McGill did not receive this July 21, 1992 letter until Wolf sent a copy of it to him in May 1996 after their conversation, nearly four years after the letter had allegedly been written and sent and the Policy

issued, and more than six months after he had become permanently disabled. McGill Decl. ¶ 27. Notably, even if McGill had received the July 21, 1992 letter in July 1992 its contents would not have alerted him to the materially reduced maximum benefit period and own occupation period provided in the Policy as issued because the letter contained no information in this regard. McGill would have reasonably believed that the unspecified "changes" mentioned in the letter referred merely to the increased monthly premium that Johnson told him about in their July 1992 telephone conversation. McGill Decl. ¶ 28.

**Deposition Testimony of MML's Senior Claims Examiner Cheryl Wolf**

Wolf testified that she started working for MML in 1977 and has been with them ever since. Wolf Deposition Transcript (**McGill Exhibit "7")** at 6-7. From 1993 to 2001 she was a Disability Claims Examiner. *Id*. at 8. She was the Lead Claims Examiner on McGill's claim. *Id*. at 10. The MML Policy that was sold to McGill was an individual policy. *Id*. at 21.

Deposition Exhibit "B" (**McGill Exhibit "15"**) is a set of Wolf's handwritten notes that she made based on a review of the underwriting file, which was part of the claims file that she had. *Id*. at 21, 24-25. She created the notes after speaking with McGill and realizing there was a difference in the benefit period. *Id*. at 25-26. The entry for 6/30/92 on her notes states that "u/w approved (would not have without agency ok)." This means that Underwriting approved McGill's application and would not have approved it without the agent, Johnson, saying it was okay to approve a modified policy. *Id*. at 27-28.

Deposition Exhibit "D" (**McGill Exhibit "12"**) is a Notice of Underwriting Action and was part of the underwriting file reviewed by Wolf. *Id*. at 29. On the bottom of the document she wrote the words "the white copy of this form is mailed to the agent" based on her

conversations with Underwriting. *Id*. at 29-30. The form provides that the decision to provide McGill less benefits at a higher premium than originally intended could be reconsidered in two years, but she does not know if the decision was ever reconsidered. *Id*. at 34.

Deposition Exhibit "E" (**McGill Exhibit "16"**)is a copy of an unsigned letter dated July 21, 1992 from Jon Fasching of MML's Underwriting Department to McGill regarding his Policy. She saw this letter upon her review of the Underwriting file after speaking to McGill about the difference in benefit periods. On the bottom of the copy she wrote: "This letter is mailed two to three weeks after the policy is sent to agent for delivery. Gives agent time to discuss with insured. Letter is mailed directly to insured. A copy of this letter is mailed to the agent one to two weeks before mailed to insured." *Id*. at 43-44. Wolf obtained this information on the general procedure from Underwriting; she has no knowledge of whether the letter was actually sent to McGill or the agent, Johnson. *Id*. at 44-45. She acknowledged that there is nothing in the letter that specifies what the modifications to McGill's Policy were, including the 50% premium increase, the reduction in benefit period from age 65 to 5 years, or the omission of GIA benefits. *Id*. at 45.

Deposition Exhibit "F" (**McGill Exhibit "17"**) is another copy of the unsigned July 21, 1992 letter, but the font and set up of the letter looks different from the first copy. At the bottom of this copy of the letter is a note written by Wolf stating "mailed copy to ins in 6/96". Wolf testified that she mailed a copy of this letter to McGill in June 1996. *Id*. at 48-49. She knew Jon Fasching from Underwriting. On the July 21, 1992 letter it states under his typed name "Individual Underwriting". This means that he was an underwriter who wrote individual policies. *Id*. at 50.

Deposition Exhibit "G" (**McGill Exhibit "8"**) is a document entitled "Policy Delivery Instructions" that Wolf saw upon her review of the underwriting file. *Id*. at 51. The handwriting on the bottom stating "this form is stapled to agent's copy of policy papers + mailed with actual policy" is by Wolf, who obtained this information from Underwriting. *Id*. at 51-52. At the top of the form a box is checked for the category **"IMPORTANT AGENT MUST VERIFY THE FOLLOWING WITH THE CLIENT"**. Wolf does not know if the agent in this case followed any of these instructions. *Id*. at 52.

Deposition Exhibit "H" (**McGill Exhibit "18"**) consists of 28 pages and is the Individual Claim Memoranda generated by Wolf and the MML Claims Department regarding McGill's claim. Most entries in the Memoranda are Wolf's because McGill's claim was assigned to her, but other examiners would work on the claim and make entries if she were out of the office. It was her practice to keep notes as she was speaking to someone and she would either just remember the conversation and then write her notes in the Claim Memoranda or she would take notes on a scratch pad and then transfer them and write them up on the Memoranda. The claim notes reflecting conversations with people were made at the time of the conversation or shortly thereafter. It was her responsibility to keep accurate claim memoranda notes of her conversations and activities. *Id*. at 57-58. It was MML's policy for claims examiners to keep notes as they were speaking to people or write them down shortly thereafter. *Id*. at 63-64.

At the top of page 10 there is an entry dated June 3, 1996 reflecting a conversation between Wolf and McGill. In the conversation she learned that McGill was unaware until this conversation that he had a five year maximum benefit period because he thought he had to age 65. She wrote "Informed him he was issued a modified contract w/ a rating. He was unaware of this." McGill Exhibit "18" at 10. Wolf also told him about the July 21, 1992 letter allegedly

sent to him by Underwriting in their conversation, and Wolf agreed to send him a copy. She testified that starting with this conversation on June 3, 1996 she knew there was a question whether McGill had known that his benefit period had been reduced. *Id*. at 70-71. Wolf testified that according to the Claim Memoranda notes, McGill was not aware of the modified policy until June 3, 1996. *Id*. at 86-87.

On page 11 there is an entry dated November 14, 1996. *Id*. at 72-73. On that date Wolf spoke to Geoff Graeb again at Trans-General, who had issued a group disability policy to Interflex covering McGill, and learned that their policy was not issued as modified and there was no underwriting done because it was an open enrollment policy. The agent on their policy for the Interflex employees was also Johnson. She contacted Graeb because she wanted to know what had been done regarding the benefit period for McGill under the Trans-General policy. *Id*. at 74-75.

On page 12 there is an entry for November 18, 1996 regarding a telephone conversation between Wolf and Johnson regarding a complaint letter from McGill's attorney. Johnson told Wolf he had advised McGill's attorney that he looked in his files, but could not find an amendment to the policy signed by McGill changing the maximum benefit term. Wolf did not know whether MML required that when an amended policy is issued there is a requirement that the insured sign an acknowledgment of that amendment, but there was no signed amendment for McGill's policy in MML's files. *Id*. at 76-78.

Wolf's notes of her conversation with Johnson on November 18, 1996 state as follows:

> Mike does admit that he knew the contract was modified. He also says both the employer and the insured knew it also. Mickey is the Office Manager of Interflex in addition to being the owner's wife. **It's been so long, but he doesn't recall exactly who he delivered the policy to. He believes he delivered several policies to Mickey Doyle, as he also sold contracts to the other executives,**

> **who was then going to pass them out to the various insureds. He thought maybe the insured was out of town at policy delivery and since the corp. was paying premiums, left it with Mickey.** He knows that he discussed the modified policy with Mickey. At some point probably at delivery, because he would have had to collect additional premiums. ***
>
> Mike has no set procedure as to when he tells a client that their policy has been modified. Sometimes it's before delivery, sometimes at delivery. *** Mike sold them both the group and individual policies. **The [insured's] individual coverage was part of an employment agreement between ins and Interflex, so that's why Mike probably delivered the policy to Mickey Doyle. He suggests we speak to Mickey *** as he believes she delivered the policy to Jack when he returned from out of town plus discussed the fact that it was modified**.

*Id*. at 79-81 (emphasis supplied); **McGill Exhibit "18"** at 13. Based on this entry in her notes, Wolf testified that Johnson told her that he delivered McGill's policy to Mickey Doyle. *Id*. at 81.

From the top of page 15 to page 19 of the Claim Memoranda there is an entry for a November 20, 1996 telephone conversation between Wolf and Mickey Doyle in Wolf's handwriting. *Id*. at 81-82. As relevant here the notes state:

> Insured was hired by their company as the highest ranking executive below her husband, Joe, the owner (she also owns part of the company). He was hired as the executive V.P. and was eventually promoted to President. **To their executives they offered "company LTD" through Trans-General, which Interflex would pay for. They also offered "key-man" LTD which each executive was responsible for paying except for the Ins.** Because he was the highest ranking, Interflex offered to also pay for his key-man LTD through MML. They offered the "key-man" as the "company LTD" maxed out at $2500 per month. Mike Johnson was the agent for both, and **they told the executives that if they wished to pursue "key-man" coverage they would need to contact Mike Johnson directly.** Seven of the executives, including her husband and the Insured did so. The Insured's premiums were paid from the corp. and the other executives were taken from payroll deductions.

***

> **Asked Mickey if she had ever received Ins DI policy. She stated no, all she did was make sure the premiums were paid for as the executives were on their own with Mike for the key man insurance, there was no reason for her to get involved.** Asked he if she had ever seen a letter from MML addressed to Ins, she stated no.
>
> ***
>
> Asked Mickey if she knew the contract had been modified she replied yes. Mike informed them that the premium was higher because the Ins was a smoker and over weight. *** She was not shocked to learn that the Ins policy was not as applied for as stated in complaint, as she knew and had been paying the increased premiums for 3 years.

**McGill Exhibit "18"** at pp 15, 16, 16-17; Wolf Deposition (**McGill Exhibit "7"**) at 82-90.

Wolf Deposition Exhibit "I" is a letter dated November 6, 1996 from McGill's attorney, Thomas Coats received by MML (**McGill Exhibit "20"**) demanding that the original maximum benefit period to age 65 be restored. MML's in-house counsel, Harold Oien, responded to Attorney Coates by letter dated November 21, 1996 (**McGill Exhibit "21"**) requesting additional time for MML to complete its investigation of the claims made in his November 6th letter. *Id*. at 94-95. Wolf was the person performing the "investigation" of the allegations referred to in Attorney Oien's letter of November 21, 1996. *Id*. at 96. By letter dated January 20, 1997 Wolf responded to Attorney Coates' November 6, 1996 letter denying his request. *Id*. at 97. She did not recall why in-house counsel sent a letter requesting additional time to complete the investigation, but the denial of the request came from her. *Id*. at 98. In the third paragraph the letter states "due to the passage of time, Mr. Johnson does not recall the circumstances surrounding the delivery of Mr. McGill's policy ***." This sentence was based on information Wolf obtained from Johnson and not from anyone else. *Id*. at 99. The letter also states that Johnson "is certain that it was delivered in the normal course of business." She acknowledged,

however, that on page 13 of her Claim Memoranda there is nothing from her conversation with Johnson that states what his normal course of business for delivering policies was. *Id*. at 100.

Wolf also admitted that MML's Claim Memoranda notes reflect that Johnson told her that he probably delivered the policy to Mickey Doyle and that Mickey Doyle stated that she did not receive McGill's policy, but despite these facts MML drew a conclusion, set forth in her January 20, 1997 letter, that the policy was delivered to McGill. Her explanation was "Yes, because we received the premium payment for the increased amount." *Id*. at 102-103.

The letter states that "[a]s [MML] received the increased premium as acceptance of its counteroffer, we consider the modified policy to have been constructively delivered." Wolf did not know the meaning of the phrase "constructive delivery" even though it is contained in her letter. She admitted that "my recollection of this letter is that I did have assistance from our Law Department, from Legal Advice". *Id*. at 104. When asked whether an attorney wrote this letter for her signature she stated "I don't remember how it all occurred." When asked if she wrote the letter she stated "due to the passage of time, I can't remember." *Id*. at 104-105. The letter also states that McGill had knowledge of the policy modification, but Wolf admitted that her June 3, 1996 Claim Memoranda notes state that based on her telephone conversation with McGill he had no knowledge of the policy modification. *Id*. at 105.

In a letter dated February 8, 1996 (McGill Exhibit "23") Graeb at Trans-General requested certain information from Wolf regarding McGill's benefits from MML. The second question asked by Graeb was whether the coverage in force from MML was individual or group and Wolf circled "individual." *Id*. at 111-112.

Deposition Exhibit "O" (**McGill Exhibit "14"**) is a MML document entitled "Notice of Complaint" which the MML Law Department sends out when a complaint is received, such as

Attorney Coates' letter dated November 6, 1996. *Id*. at 113. On the first page "Individual Health" rather than "Group Health" is circled as the type of policy, and on the second page there is a check mark next to the title "Individual Insurance Claims." There were other boxes to indicate that the policy was a "Group Claims Disability" policy that was not checked.

On December 15, 1997 Wolf faxed a letter to Mickey Doyle (**McGill Exhibit "24")** **c**oncerning whether Interflex actually issued a Form 1099 to McGill for his MML disability premiums. *Id.* at 114-115. Wolf testified that the Claim Memoranda (McGill Exhibit "18" at p. 23) confirms that on January 13, 1998 Mickey Doyle called her in response to this letter and confirmed that the Interflex Comptroller created the 1099 for McGill and that Interflex did issue the 1099 and Mickey Doyle was not previously aware of it. *Id*. at 116-117.

**Deposition Testimony of MML's Authorized Agent, Michael Johnson**

Johnson was an authorized agent of MML when he sold the MML Policy issued to McGill. Johnson Deposition Transcript (**McGill Exhibit "6"**) at 15. Johnson met with Joseph Doyle, President of Eastern Shores Printing, which later became Interflex, and discussed his insurance needs before he ever met McGill. Disability insurance was a "big deal" so they discussed both group coverage and individual policies for him and some of the key people at Interflex. *Id*. at 19-22. McGill obtained coverage under the Interflex group disability plan and an individual disability policy from MML. *Id.* at 23. Johnson referred to the MML policy providing long-term disability coverage to McGill and other Interflex executives as "individual policies" throughout his deposition. *Id*. at 24, 31, 32, 34, 39, 74-75, 97, 113, 116. He specifically testified that the MML policies were not part of "group insurance," but were "individual contracts." *Id*. at 24, 97.

Trans-General was the insurer that provided the group disability plan that was purchased by Interflex for all employees and Johnson was the authorized agent for the Trans-General plan also. *Id*. at 68-69. Johnson did not recall how many participants were in the Interflex group plan provided by Trans-General, but typically with group insurance there had to be a certain percentage of employees, which at that time was approximately 50%. Interflex employees who were participants in the Trans-General group disability plan were not required to submit to physical examinations, but physical exams were required for each of the executives who were interested in purchasing the individual policies from MML. *Id*. at 72-75. He was familiar with an employee booklet that Trans-General prepared for the participants in the "group benefit plan at Interflex" provided by Trans-General. *Id.* at 102, 112.

Johnson filled out the Application for McGill as he did for most potential insureds. *Id*. at 78-79. The MML Policy that Johnson discussed with McGill was a non-cancelable disability policy that provided benefits to age 65. *Id*. at 25. The policy issued by MML for McGill was issued with a five year maximum benefit period rather than to age 65 based on an underwriting decision by MML. *Id*. at 29-30. Johnson admitted that a change in maximum benefit period from age 65 to five years is "certainly a big change" in the policy and that the 50% premium increase in McGill's Policy from what he presented to McGill to what was issued was a "material change." *Id*. at 90-92.

Johnson does not recall whether he was told that McGill's Policy was issued with a five year benefit limitation rather than to age 65. He does not recall whether he called the Underwriter to find out why the Policy was issued on terms different than what he presented to McGill. *Id*. at 33-34. He testified that currently – in 2006 – when an issued policy is modified from the one presented by him to the insured both the insured (McGill) and the agent (Johnson)

would have to sign off saying that they agreed to the policy modification. Johnson does not recall whether that was required at the time McGill's Policy was issued. *Id*. at 35-36.

The policy had an effective date of July 2, 1992 and the insurance company required him to deliver it to the insured. *Id*. at 41-42, 89. Any conversation that he had with McGill concerning the benefit limitation period would have occurred at the time of delivery of the Policy. *Id*. at 40. He was received the Policy Delivery Instructions (McGill Exhibit "8") from MML, which typically came with the policy in the mail. *Id*. at 35-36, 90.

Although Johnson initially testified that he delivered the Policy to McGill, he admitted that he had no specific recollection of the circumstances under which he delivered the policy. *Id.* at 36-37. After being shown entries in the MML Individual Claim Memoranda (**McGill Exhibit "18"**), including the entry on page 12 reflecting his November 18, 1996 telephone conversation with Wolf, Johnson he did not recall who he physically delivered or gave McGill's Policy to. *Id*. at 87.

He is "sure" that he had a conversation with McGill concerning the modification of the policy and that he talked to Mickey Doyle about it, but he simply told Mickey Doyle that the policy had been issued differently than what was applied for. *Id*. at 36-37. When Johnson spoke with Mickey Doyle he does not remember and is not sure if McGill was present. When asked what modifications he discussed with Mickey Doyle, Johnson testified that "I don't know. I assume that I would discuss the changes in the contract which would have been the benefit period and the premium increase." *Id*. at 89. When asked what he told McGill about the modification to the policy, Johnson stated that "the same thing I would tell anyone; that the contract had been modified." *Id*. at 38. When asked whether he discussed with McGill the limitation of the benefit period to 5 years, Johnson testified that "I really can't recall the

conversation. I'm sure that we had a typical conversation that anyone would have. He would want to know why it was changed, if it's permanent, if there is anything we can do about it, and those kinds of things. I can't remember the specifics of the conversation." *Id*. at 39-40.

Johnson does not recall ever seeing the letter dated July 21, 1992 from MML to McGill regarding the modified Policy that was issued. *Id*. at 46. Like Wolf, Johnson admitted that the letter does not specify or discuss any of the modifications, including the change in maximum benefit period from age 65 to 5 years. *Id*. at 93-94. Johnson has no idea if McGill ever received this letter. *Id*. at 94. Johnson never gave any **written** notice to McGill regarding the modifications to his policy either prior to or after the Policy was issued. *Id*. at 95.
Johnson did not recall receiving or viewing the MML "Notice of Underwriting Action" dated June 30, 1992 (**McGill Exhibit "12"**), but assumes he would have received it. *Id*. at 105. The Notice specifically provides that MML's decision to change the terms of McGill's Policy can be reconsidered in 2 years.

## POINT I

### ERISA DOES NOT GOVERN MCGILL'S CLAIMS IN THIS ACTION, AND THEREFORE THE CLAIMS ARE NEITHER PREEMPTED NOR BARRED BY THE ERISA STATUTE OF LIMITATIONS

McGill concedes that **IF** his claims in this action are governed by ERISA, MML's motion for summary judgment should be granted because the claims presented here would be barred by the ERISA statute of limitations and would be preempted by ERISA. Thus, the critical issue is whether McGill's claims related to the MML Policy are "governed" by ERISA. We respectfully submit that the claims are not governed by

ERISA or, at the very least, there is a question of fact whether the claims are governed by ERISA.

Moreover, McGill does not take issue with the general statements of law contained in MML's Memorandum of Law as to the required constituent parts of an ERISA governed benefit plan, which include: (1) a plan, fund or program (2) established or maintained (3) by an employer or an employee organization, or both (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death [benefits] *** (5) to participants or their beneficiaries. *See Wickman v. Northwestern Nat. Ins. Co.*, 908 F.2d 1077, 1082 (1st Cir. 1990); *see also, Demars v. Cigna Corp.*, 173 F.3d 443, 446 (1st Cir. 1999).

Notably, in *Demars*, the First Circuit held that the insured's individual long-term disability insurance policy was not an employee welfare benefit plan and was therefore not subject to ERISA's preemption provision. In that case, the employee had an ERISA governed plan with her employer, but converted it to an individual policy after termination of employment. *Id*. at 444. Notably, while employed as a National Life employee, she enrolled in a "group" long-term disability policy, but upon termination of her employment she converted her group coverage to an "individual" policy. *See Id*. The Court rejected the defendant's argument that the conversion policy was sufficiently connected or related to the underlying ERISA plan because she obtained the conversion policy by virtue of rights granted by the previously existing group disability benefits plan. The Court rejected this "but for" argument by defendants. *Id.* at 445.

The First Circuit noted that ERISA's definition of an "employee welfare benefit plan" is a "nearly tautological definition [that] offers little guidance." *Id*. The Court held

that the key phrase for purposes of the action was whether the insured's conversion policy was "established" or "maintained" by the employer rather than by her individually. *Id*. at 445-446. In resolving this question, the court quoted and relied on the U.S. Supreme Court's decision in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987) as follows:

> "Congress intended pre-emption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations. This concern only arises *** with respect to benefits whose provision by nature required an ongoing administrative program to meet the employer's obligation." *Fort Halifax,* 482 U.S. at 11.
>
> Thus, "an employee benefit may be considered a plan for purposes of ERISA only if it involves the undertaking of continuing administrative and financial obligations by the employer." *Belanger [v. Wyman-Gordon Co.,]* 71 F.3d [451,] 454 [(1st Cir. 1995)]. Under this analysis, conversation policies are not ERISA plans, because employers do not bear an administrative or financial responsibility for them.

173 F.3d at 446.

The First Circuit's analysis in *Demars* is directly on point in this case and demonstrates that McGill's individual MML long-term disability policy is not governed by ERISA. In contrast with MML's individual policy, the group disability plan provided by Interflex to all of its employees, including McGill, through Trans-General, would appear to meet all of the ERISA requirements. McGill received a plan booklet from Interflex for the Trans-General group plan and he received policy booklets from Trans-General for both Eastern Shore Printing and Interflex. He never received any "plan booklet" or documentation from Interflex for the individual MML disability Policy at issue in this litigation. Moreover, there is no proof submitted by MML to demonstrate that it "established" or "maintained" a plan that included the individual MML Policy issued to McGill or the few other select executives.

Moreover, the following factors weigh heavily in favor of demonstrating that the MML Policy issued for McGill is not governed by ERISA:

1. MML's own documentation demonstrates that the policy issued for McGill was an "individual" rather than a "group" policy;

2. Both Johnson, MML's authorized agent, and Wolf consistently referred to McGill's Policy as an "individual" rather than a "group" policy; and

3. MML's Individual Claim Memoranda reflect a conversation between Wolf and Mickey Doyle, the HR Director at Interflex, recording Mickey Doyle's statements that if the executives at Interflex "wish to pursue key-man coverage they would need to contact Mike Johnson directly" and that "all she did was make sure the premiums were paid for as the executives were on their own with [Johnson] for the key-man insurance, there was no reason for her to get involved." (**McGill Exhibit "18"** at pp. 15, 16).

Moreover, it is clear that whether an ERISA plan exists is a question of fact to be answered in light of all surrounding facts and circumstances from the point of view of a reasonable person. *Wickman*, *supra*, 908 F.2d at 1082. In *Wickman*, the First Circuit noted that the "mere purchase of insurance does not constitute a plan" governed by ERISA. *Id*. at 1082. Moreover, unlike *Wickman*, the MML policies purchased by a select few Interflex executives here does not evidence a long-term commitment to "purchase benefits for a substantial percentage of a class of employees." *Id*. at 1083. That obligation and plan was established by the Interflex group plan that provided benefits to all employees and was issued by Trans-General, not MML. Moreover, the First Circuit noted in *Wickman* that a handbook distributed by an employer listing ERISA rights and a summary plan description "is strong evidence that the employer has adopted an ERISA regulated plan." In this case, the only plan booklet listing

ERISA rights provided by Interflex to McGill and other employees related to the Trans-General group plan, not the individual MML disability policies issued to McGill and a few other executives.

Finally, MML asserts that the Severance Agreement and Release McGill signed with Interflex releases it from the claims asserted in this case. It is clear from the language of the release relied on, and MML's Memorandum of Law that it simply asserts that it would be covered by the language of the Release only to the extent that McGill's claims are governed by ERISA, and that if they are not – as we claim – then MML is not a party released by the Severance Agreement and Release. Thus, MML states that "[t]his language is unambiguous insofar as it releases parties acting with and/or for Interflex, **such as defendant in its capacity as the administrator of the Interflex Keyman Disability Insurance Program**." MML Memorandum of Law, at 17.[2]

**POINT II**

**MCGILL IS NOT ESTOPPED FROM PURSUING HIS CLAIMS IN THIS CASE BECAUSE HIS POTENTIAL CLAIM AGAINST MML WAS SPECIFICALLY EXEMPT FROM THE BANKRUPTCY ESTATE**

It is undisputed that McGill and his wife filed a Chapter 13 Bankruptcy Petition in the Bankruptcy Court for the Northern District of New York, where they were and had been residents for several years, on May 25, 2001. Their initial Chapter 13 Petition was dismissed without prejudice on October 4, 2001, and they re-filed a second Chapter 13 Petition on October 13, 2001. The Petition was converted to a Chapter 7 proceeding in 2001, and concluded on October 30, 2002. **Exhibits "J"**

---

2 It is important to note that in several places in its moving papers, MML uses phrases like "Interflex Keyman Disability Insurance Program" in reference to the policies it issued to McGill and six other Interflex executives. There is not a single document or factual witness who used any such phrase or language to describe these policies; this is purely a creation of MML's counsel in an attempt to create the idea in the Court's mind that this Policy is governed by ERISA when that is simply not true.

**and "K".** It is also undisputed that McGill did not list or schedule his potential claims against MML as an asset in his Petitions or filings.

McGill asserts in his Declaration that he advised both their attorney, Robert Fix, Esq., and the Bankruptcy Trustee, Mark Swimelar, of the potential claim he had against MML for additional long-term disability benefits under the Policy, but he was advised that he did not need to list this potential claim as an asset. McGill Decl. ¶ 32. Three years after the conclusion of the bankruptcy he filed this action because he found an attorney who would handle it on a contingency basis; the bankruptcy had nothing to do with the timing of when this action was commenced. McGill Decl. ¶ 33.

MML asserts that McGill is estopped to assert his claims in this case because he did not list or schedule these potential claims in his bankruptcy case, citing authority finding such estoppel where a party's position in a second lawsuit is inconsistent with his earlier position, that party succeeded in persuading a court to accept his earlier position, and where that party would derive an unfair disadvantage if not estopped. The cases cited by MML are not on point and none of these factors are present here.

The Bankruptcy Code specifically exempts certain property from the bankruptcy estate. As relevant here, 11 U.S.C. § 522(d)(10)(C) reads as follows:

> (d) The following property may be exempted under subsection (b)(1) of this section:
>
> (10) The debtor's right to receive --
>
> ***
>
> (C) a disability, illness, or unemployment benefit ***.

Thus, the issue here is whether this exemption set forth in § 522(d)(10)(C) in a debtor's "right to receive a disability *** benefit" applies to McGill's claims in this action when he filed his bankruptcy in New York in 2001. Moreover, the McGills were

residents of New York when their bankruptcy was filed and New York Debtor and Creditor Law § 282(iii)(2)(c) provides, consistent with the Bankruptcy Code, as follows:

> 282. Permissible exemptions in bankruptcy.
>
> Under section five hundred twenty-two of title eleven of the United States Code, entitled "Bankruptcy", an individual debtor domiciled in this state may exempt from the property of the estate, to the extent permitted by subsection (b) thereof, only *** (iii) the following property:
>
> 2. Bankruptcy exemption for right to receive benefits. The debtor's right to receive or the debtor's interest in: *** (c) a disability, illness, or unemployment benefit ***.

It is clear that McGill's claims in this action against MML involve his "right to receive a disability benefit" and were therefore exempt from his bankruptcy estate. *See In re Michael*, 262 B.R. 296, 297 (Bank. Ct., M.D. Pa. 2001) (right to receive disability benefits is exempt, not a lump sum settlement received by debtor and set aside before bankruptcy); *In re Panza*, 219 B.R. 95 (Bank. Ct., W.D. Pa. 1998) (exemption for the right to receive benefits does not apply to funds debtor set aside prior to commencement of case directly traceable to such benefits); *In re Ruffo*, 261 B.R. 580 (Bank. Ct., E.D.N.Y) (policeman debtor's right to receive benefits under deferred compensation plan was exempt from the estate). Moreover, under both Federal and New York law exemption statutes are liberally interpreted in favor of debtors. *See In re Miller*, 167 B.R. 782 (Bank. Ct., S.D.N.Y. 1994) .

Not surprisingly, when McGill told his attorney and the Trustee about the potential claim against MML they told him he did not need to list it as an asset of the estate. McGill Decl. ¶ 32.

## POINT III

### THERE ARE QUESTIONS OF FACT UNDER VIRGINIA LAW THAT REQUIRE A TRIAL OF MCGILL'S BREACH OF CONTRACT CAUSE OF ACTION

McGill concedes that with the exception of his claim for breach of contract, the remaining claims are barred by the applicable statute of limitations under Virginia law. As MML concedes, however, McGill's breach of contract cause of action is not barred by the applicable Virginia statute of limitations. The issue, therefore, is whether there are material issues of fact requiring a trial with regard to McGill's breach of contract claim.

In asserting that Virginia law does not support McGill's breach of contract claim under the facts of this case, MML relies almost exclusively on the Proposal or Term Sheet presented by Johnson to McGill in May 1992 to the exclusion of the Application that was completed by Johnson and McGill on the same day. Moreover, MML relies on *People's Life Ins. Co. v. Parker*, 20 S.E.2d 485 (Va. 1942) notwithstanding the fact that the language contained on the policy application in that case is significantly different from the language in the MML Application. The language in the application in *Parker* is on page 19 of MML's Memorandum of Law and the language in MML's Application is quoted on page 20 of the Memorandum of Law. Moreover, none of the cases cited by MML in support of its motion, which appears to be limited to *Parker* and *Hayes v. Durham Life Ins. Co.*, 96 S.E.2d 109 (Va. 1957), contains the critical language found in MML's Application here. Thus, the Application specifically provides that the "benefit period" is age "65". **Exhibit "F"**. At the bottom of the last page of Part 1 of the Application, which is part of the bound MML Policy, it provides in bold and capital letters: "**FOR HOME OFFICE USE ONLY**". The Application further states under this heading **"Home Office Corrections or Additions – Acceptance of the policy shall ratify changes**

**entered here by Minnesota Mutual Life."** (Emphasis supplied) After additional typed language, the Application has handwritten information as follows "50% premium increase, base benefit period – 5 yr., Guaranteed Increase Agreement plan omitted, Plan of Coverage – own occupation insurance policy 5 yr. Own Occupation Period."

Thus, this language in the Application confirms McGill's claim in this action that the Term Sheet and Application constituted a contract between himself and MML because the Application itself spoke to "Corrections or Additions" to the terms of the Policy as set forth in the Application and required that the insured accept these corrections or additions. This is made clear by the language in the Application as follow: "Corrections or Additions – Acceptance of the Policy shall ratify changes entered here by Minnesota Mutual Life." Thus, under the terms and language of MML's Application, unless McGill accepted the policy as changed he could not ratify the changes made by MML on the Application.

If there is anything that is clear from the voluminous papers submitted to this Court it is that there is a question of fact as to whether McGill "accepted" policy corrections or additions made by MML on and to the Application as set forth in the Policy that was issued effective July 2, 1992. McGill clearly states that the Policy was never delivered to him and therefore he could not have accepted and ratified the changes made by MML. Johnson, MML's authorized agent, testified as one point in his deposition that he delivered the Policy to McGill, but after reviewing MML's Individual Claim Memoranda he retreated completely from this statement and testified that he did not recall who he physically delivered or gave McGill's policy to. **McGill Exhibit "6"** at pp. 36-37, 87. MML's Senior Claims Examiner handling McGill's claim, Wolf, testified that Johnson told her that he delivered McGill's Policy to Mickey Doyle. **McGill Exhibit "7"** at p. 81.

Quite frankly, there is little to no proof that the MML Policy was ever “delivered” by MML or Johnson to McGill. McGill states unequivocally that he never received the Policy until he inadvertently found it in Mickey Doyle’s office in October 1995. At the very least, there is a question of fact whether this constitutes “delivery” of the Policy such that McGill could be found to have “ratified” the material changes made to the terms of the Policy by MML, especially given the fact that he had already been diagnosed with severe sleep apnea in April 1994 and was about to file his disability claim with MML in November 1995, shortly after he inadvertently found the policy.

Moreover, neither Johnson nor Wolf knew whether MML required an insured like McGill to approve, agree to or consent to an amended policy after it was modified from Johnson’s presentation to McGill and his acceptance of it and the changes made by MML’s Underwriting Department. **McGill Exhibit “6”** at 35-36 (Johnson); **McGill Exhibit “7”** at 76-78 (Wolf). Finally, MML’s Notice of Underwriting Action (**McGill Exhibit “12”**) provided that the decision to provide McGill less benefits at a higher premium than set forth ion the Term Sheet and Application could be reconsidered in two years, but Wolf did not know if the decision was ever reconsidered and there is no proof by MML that it performed this reconsideration. *Id*. at 34.

## CONCLUSION

For all the foregoing reasons, and based upon all of the factual documents submitted to the Court, we respectfully request that this Court issue an Order denying MML's motion for summary judgment, together with such other and further relief as to the Court seems just and equitable.

Dated: November 30, 2006

Respectfully Submitted:

*Counsel for Plaintiff*

By: **/s/ Alan J. Pierce**
Alan J. Pierce, Esq.

HANCOCK & ESTABROOK LLP
1500 Tower I, P.O. Box 4976
Syracuse, New York 13221-4976
Tel: (315) 471-3151

COIA & LEPORE
Jessica L. Basso, Esq.
226 South Main Street
Providence, RI 02903
Tel: (401) 751-5522